IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00922-RPM-CBS

REBECCA A. CAPPS,

      Plaintiff,

v.

LEVEL 3 COMMUNICATIONS, LLC,

      Defendant.

---

## MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

      Defendant, Level 3 Communications, LLC, ("Level 3") through its undersigned attorneys, submits the following Memorandum Brief in Support of its Motion for Summary Judgment.

### INTRODUCTION

      In this case, Plaintiff maintains that her position elimination was a result of discrimination on the basis of her gender and alleged disability.  As demonstrated herein, there is no genuine issue of any material fact precluding judgment from entering against Plaintiff as a matter of law.

      Plaintiff was hired at Level 3 in 1999 as a Field Operations Manager.  Her position and title later changed to Outside Plant Manager for the "long haul" operations.  Long haul operations are comprised of network maintenance and installation in regions outside of designated "metro" areas, which are the inner-city regions of Level 3's operation, such as Denver.  In the long haul operations, the network cables span long distances, and Level 3 employs in-house technicians for maintenance and installation.  The metro operations are much

more condensed than long-haul, and tend to be serviced by contractors instead of in-house technicians.  At all times relevant hereto, the metro manager needed to have knowledge of the location of the network loops, rings, and points of presence, and was required to hire and oversee independent contractors.  In addition, because of the use of contractors, the metro manager position consisted of extensive paperwork and required managerial diligence to oversee the contractors, award contracts, and handle large sums of money.

Effective January 1, 2006, Level acquired another large communications company by the name of WilTel Communications Group, LLC ("WilTel"), which was followed in rapid succession by the acquisition of several additional communications companies.  Beginning with the integration of WilTel and Level 3, the combined companies began to undertake a significant restructuring of all of their operations.  This required them to reduce redundant positions and increase efficiencies in all positions.

In or around March 2006, several executives within the Field Services group at Level 3, where Plaintiff was employed, met in order to determine appropriate head counts in their segments of the operations, which included the region encompassing Denver.  At these meetings, the decision was made to decrease the number of managers in the field operations division in which Plaintiff worked from three to one.  Prior to the acquisition of WilTel, in the relevant region, Plaintiff was the long haul Outside Plant Manager, Diron Benschop was the metro Outside Plant Manager, and Everett McCain was the long haul Outside Plant Manager for WilTel.  It was determined that the above three positions could be restructured so that they could be combined, for the most part, into one position.  The new position, Field Manager, consisted of management duties for both the long haul and the metro operations.

Prior to April 2006, Plaintiff's manager was Peter Smith.  In April 2006, Mr. Smith left Level 3 to pursue other opportunities and Kaily Bissani took over as Plaintiff's supervisor. Shortly after taking over as Plaintiff's supervisor, Mr. Bissani was directed by his boss, Tim Elbert, to combine the positions pursuant to the above-described decision.  Accordingly, the three former positions were eliminated and the new position was posted.  Mr. Bissani encouraged everyone to apply for the Field Manager position, including the Plaintiff.  She, however, failed to apply.

Mr. Bissani also obtained input from Peter Smith regarding his reports, prior to Mr. Smith's departure.  Mr. Smith generally reported that Plaintiff was not qualified to take on the new position.  Mr. Smith reported that Plaintiff was already challenged in her current position and that she would not be able to handle both the long haul and metro responsibilities.  In addition, Mr. Smith reported that Diron Benschop was not qualified for the Field Manager position, as Mr. Benschop lacked the necessary technical skill.  After considering the applications that were received for the position, Mr. Bissani offered the job to a former Level 3 employee, Steve Forry.  Mr. Forry applied for the Field Manager position on the Level 3 website, and had previously worked for Level 3 as an Outside Plant Manager in California.

As a result of Plaintiff's position elimination and failure to apply for any new positions, she was laid off in a Reduction in Force ("RIF").  Everett McCain was also laid off.  Mr. Benschop was kept on by Steve Forry in order to assist Mr. Forry in operating the metro plant. In order to stay on with the company, Mr. Benschop accepted a demotion and less pay.

Plaintiff now claims that she was wrongfully included in the RIF because of her gender and purported disability (bulging disk).  Her claims are without merit, however, and she cannot show a genuine issue of material fact precluding judgment from entering against her as a matter

3

of law.  Specifically, Plaintiff cannot establish violation of the American's with Disabilities Act ("ADA") or Colorado Ant-Discrimination Act ("CADA") because she was not disabled under the Acts' definitions, nor can Plaintiff establish all the elements of a *prima facie* case of gender discrimination under Title VII or CADA and the reasons Defendant proffered are a pretext for discrimination.

## STATEMENT OF UNDISPUTED FACTS

For purposes of this motion only, Defendant asserts that the following facts are undisputed:

### Level 3/WilTel Acquisition

1.      From the end of 2005 though 2006, Level 3 acquired five separate companies. See Defendant's Response to Discovery Request No. 4, attached hereto as **Exhibit A**.  As part of the process of integrating the new companies, Level 3 needed to identify and reduce redundant positions and increase its efficiencies in all positions.  Exhibit A at 5.

2.      Prior to 2006, the telecommunications industry had experienced significant downsizing, layoffs, and mergers because of a slump within the industry.  Deposition of Rebecca A. Capps at 50:9-51:9, pertinent portions attached hereto as **Exhibit B**.  Level 3 was impacted, and also experienced layoffs and downsizing.  Exhibit B at 51:4-9.

3.      In early 2006, Level 3 bought WilTel.  Exhibit B at 48:15-24.  As part of Level 3's integration with WilTel, and approximately five weeks prior to Plaintiff's separation from Level 3, Frank Mambuca, Paul Sidore, Tim Elbert, and Kelly Bell met in Tampa, Florida. Exhibit A at 5.  These executives were to determine the number of employees needed for each region after the WilTel acquisition.  Exhibit A at 5.  The meeting was held over the course of several days and final head count numbers were decided for minimal coverage in each region.

4

Exhibit A at 5.  During that meeting, the decision was made to limit the number of managers in each region.  Exhibit A at 5.

4.      As a result of that meeting, more than 85 employees within Plaintiff's Division (Field Services) were let go, and 131 employees company-wide were impacted by the May 2006 RIF.  Exhibit A at 5.

5.      Plaintiff was aware that Level 3 had laid off groups of employees in RIFs and understood that there were several thousand people impacted at various times by RIFs over a period of five to six years at Level 3.  Exhibit B at 52:20-22; 53:15-18.

6.      As is most pertinent to this case, the decision was made to combine the metro Outside Plant Manager position (formerly Diron Benschop's position) and long-haul Outside Plant Manager positions (formerly Plaintiff's position at Level 3, and Everett McCain's position at WilTel) into one position.  Exhibit A at 5.  Plaintiff admitted that she knew Level 3 was looking to combine the Metro and Long Haul positions to create one position.  Exhibit B at 93:10-24.

### Plaintiff's Position and Peers

7.      Plaintiff was first employed by Level 3 in August 1999.  See Complaint at ¶ 11. Plaintiff was an Outside Plant Manager.  See Complaint at ¶ 12.

8.      Plaintiff was employed in the field operations division of Level 3.  Exhibit B at 26:18-21.

9.      Diron Benschop was also an Outside Plant Manager at Level 3.  Exhibit B at 56:13-24.

10.     Everett McCain was a long haul manager for WilTel and did the same job as for WilTel as Plaintiff did for Level 3.  Deposition of Kaily Bissani at 40:24-42:2, pertinent portions attached hereto as **Exhibit C**.

11.     When Plaintiff was let go in May 2006, Diron Benschop was doing substantially similar things to what Plaintiff was doing.  Exhibit B at 56:1-16.  Plaintiff and Diron were considered peers at Level 3.  Exhibit B at 56:17-57:7.  Everett McCain was also a peer.  Exhibit B at 224:10-225:2.  The three former positions were combined.  Deposition of Steven Forry at 14:25-15:6, pertinent portions attached hereto as **Exhibit D**.

<u>**The New Position**</u>

12.     A new position, Field Manager (Denver), was created to assume the duties of these positions and to take on additional duties.  Exhibit C at 13:12-14:2.  The combined long haul and metro outside plant role was a consolidation of jobs.  Deposition of Peter Smith at 43:16-22, pertinent portions attached hereto as **Exhibit E**.

13.     The Field Manager position was posted on the Level 3 website.  Exhibit D at 9:25-10:3.  Plaintiff did not apply. Exhibit B at 96:8-9; 133:22-134:3.

14.     Steven Forry submitted his application and was ultimately hired into the combined position.  Exhibit E at 78:13-17; Exhibit D at 34:16-35:6.

15.     While the position assumed duties formerly performed by others, Mr. Forry did not take any individual's job when he was hired by Kaily Bissani.  Exhibit C at 13:9-14:2.

16.     Indeed, Mr. Forry's position was a new position, a new function.  Exhibit C at 13:9-14:2.  Plaintiff also admitted that the Field Manager position was a *new* position.  Exhibit B at 114:7-115:9.  The metro Outside Plant Manager and long-haul Outside Plant Manager

positions were eliminated.  Deposition of Diron Benschop at 9:1-23; 10:25-11:6, pertinent portions attached hereto as **Exhibit F**.

17.      In addition to absorbing the metro Outside Plant and long haul Outside Plant manager duties, the new Field Manager position also consisted of additional sites and more route miles not previously covered by Mr. Benschop, Mr. McCain, or Plaintiff.  Exhibit A at 5.

18.      Furthermore, the former positions were distinctively different jobs.  Exhibit E at 70:7-23.

## The RIF

19.      After the meeting in Florida (referenced above), the division Vice Presidents picked their division leaders.  Exhibit A at 6.  Once the division leaders were chosen, each was given a head count to work with.  Exhibit A at 6.  Mr. Elbert picked Peter Smith as the Denver division leader.  Exhibit A at 6.

20.      After Mr. Elbert notified Mr. Smith of his selection however, Mr. Smith resigned from Level 3.  Exhibit E at 8:19-9:4.  Prior to his departure, Mr. Smith was told by Tim Elbert that the metro Outside Plant Manager and long-haul Outside Plant Manager were going to be combined under one manager.  Exhibit E at 48:8-16.

21.      Kaily Bissani subsequently replaced Mr. Smith as Director of Operations when Mr. Smith left in April 2006.  Exhibit E at 8:15-9:1.

22.      Prior to Mr. Bissani's assumption of Mr. Smith's position, he was the Vice President of Operations, running the West Coast region.  Exhibit C at 54:8-12.

23.      Upon assumption of the Director of Operations role, Mr. Bissani was required to make employment decisions necessary to meet the reduced head count in his division.  Exhibit A

at 6.  Like Mr. Smith, Mr. Bissani was told by Tim Elbert that the metro and long haul manager positions had to be combined.  Exhibit C at 11:11-22.

24.     Before choosing the new Field Manager, Mr. Bissani obtained input from Peter Smith and Tim Elbert regarding Rebecca Capps, Diron Benschop, and Everett McCain.  Exhibit A at 6.

25.     Mr. Smith met Mr. Bissani at LePeep in Denver in order to transition the Director of Operations position to Mr. Bissani.  Exhibit E at 39:22-40:25.

26.     During the meeting at LePeep, Messers. Smith and Bissani specifically discussed the Plaintiff and Diron Benschop.  Exhibit E at 39:22-40:16; 41:25-42:5.  Mr. Smith told Mr. Bissani that he did not think Plaintiff could perform the combined long-haul/metro operations outside plant role.  Exhibit E at 41:23-43:11.

27.     Also, Mr. Smith relayed to Mr. Bissani generally that Plaintiff was a strong outside plant person but had limited managerial diligence.  Exhibit E at 58:7-12.  Specifically, Mr. Smith felt that Plaintiff could not perform the metro portions of the combined role because her attention to detail and paperwork were a shortfall for her.  Exhibit E at 62:22-63:3.

28.     Plaintiff admitted to her former direct report, Justin Aimone, that she had received poor performance reviews from Mr. Smith.  Deposition of Justin Aimone at 34:25-35:2, pertinent portions attached hereto as **Exhibit G**.

29.     Further, Mr. Smith told Mr. Bissani he didn't think Plaintiff could handle both workloads.  Exhibit E at 63:4-10; 64:4-10.  Plaintiff admitted that workload was a factor in determining appropriate individuals to include in a RIF.  Exhibit B at 53:24-54:10.

8

30.     Regarding Diron Benschop, Mr. Smith commented to Mr. Bissani that Mr. Benschop was generally a "strong paper trail person," but had "some shortcomings on the outside plant technical skill-set."  Exhibit E at 58:15-20.

31.     Ultimately, Mr. Smith felt that neither Plaintiff nor Mr. Benschop was going to be able to do both jobs and each was challenged in his or her current role.  Exhibit E at 61:18-22; 65:15-66:2.  Mr. Smith told Mr. Bissani that he didn't think that either Plaintiff or Mr. Benschop was capable of doing both jobs simultaneously.  Exhibit E at 56:4-15.

32.     Mr. Bissani also did not believe that Plaintiff could perform the duties of the Field Manager position from her home in Wheatland, Wyoming.  Exhibit C at 57:14-23.  Mr. Bissani was concerned that Plaintiff was unwilling to work out of Denver, as he had instructed her to increase her presence in the metro area on several occasions.  Exhibit C at 57:14-58:8.

33.     Indeed, Mr. Bissani talked to Plaintiff about moving to Denver at least 10 times because she would never show up in Denver.  Exhibit C at 57:14-58:8.

34.     The new Field Manager job was in Denver and required presence in Denver.  Exhibit C at 57:19-23.  Plaintiff admitted that geography was a factor in determining which individuals to include in a RIF.  Exhibit B at 53:24-54:10.

35.     Mr. Bissani was never specifically required to address whether Plaintiff should be selected for the Field Manager position, however, because Plaintiff never applied for that position.  Exhibit B at 96:8-9; 133:22-134:3.

36.     The Field Manager job was posted.  Exhibit D at 9:25-10:3.

37.     Despite Mr. Bissani encouraging Plaintiff to apply for the position, Exhibit C at 59:10-17, Plaintiff failed to apply.  Exhibit B at 96:8-9; 133:22-134:3.

38.     Plaintiff admitted that she knew the Field Manager position was posted and went to the Level3.com to look up the position.  Exhibit B at 95:21-96:24; 133:14-24.

39.     Indeed, Diron Benschop and Steven Forry applied for the position, among others. Exhibit F at 11:7-20; 34:6-13; Exhibit D at 9:25-10:3; see also Requisition Profile, attached hereto as **Exhibit H**.

40.     Mr. Forry interviewed for the position with Mr. Bissani first, and then Tim Elbert. Exhibit D at 13:6-10; 14:14-19.

41.     Mr. Forry was offered the Field Manager position and started on or around May 10, 2006.  Exhibit D at 12:17-22.  The new job was managing the entire outside plant network for the Denver division and the metro network for Denver.  Exhibit C at 7:6-15.

42.     Plaintiff admitted that she was aware that those not chosen for the Field Manager position would be demoted, laid off, or reassigned.  Exhibit B at 93:10-94:17.

43.     Mr. Bissani made the decision to lay off Plaintiff.  Exhibit C at 22:11-13.

44.     Mr. McCain, the long-haul Manager for WilTel, was also laid off because he was not qualified for position.  Exhibit C at 40:24-41:17; 41:22-42:2.

45.     In addition, Mr. Benschop was informed that he did not get the position because he didn't have enough experience.  Exhibit F at 35:22-36:2.

46.     Mr. Bissani wanted to let Mr. Benschop go.  Exhibit D at 19:5-8.

47.     Mr. Forry, however, specifically wanted to keep Mr. Benschop because of his metro plant knowledge.  Exhibit D at 18:19-19:11.

48.     Accordingly, Mr. Benschop was given the option to take a demotion and lesser salary, as a technician in the metro area.  Exhibit D at 31:12-19; Exhibit F at 14:21-15:1; 18:9-14.  Mr. Benschop was offered the demotion from his boss, Mr. Forry.  Exhibit C at 27:5-28:1.

The position Mr. Benschop took was a new position, based on new head count.  Exhibit D at 20:12-21:9.

49.    Plaintiff admitted that Diron Benschop was demoted after she left, and that Mr. Benschop did not maintain the same role that he had while Plaintiff was employed at Level 3, but received a lesser role.  Exhibit B at 99:16-22.

50.    After his former job was eliminated, Mr. Benschop's position changed from a management role to a non-management role.  Exhibit D at 59:24-60:6.  He no longer managed projects, schedules, budgets, and no longer coordinated with vendors and upstream organizations.  Exhibit D at 59:24-60:6; 62:5-7; Exhibit C at 45:5-20.  Mr. Benschop reported directly to Mr. Forry as a technician.  Exhibit C at 27:17-28:1.

**Plaintiff's Medical Condition**

51.    Plaintiff claims that she was let go in part because of an alleged "disability."  See Complaint at ¶¶ 16-20.

52.    When asked at her deposition about this alleged disability, Plaintiff explained that her medical condition is a bulging disk.  Exhibit B at 62:14-63:7.

53.    Plaintiff testified that she treated her bulging disks with Ibuprofen, chiropractors, anti-inflammatories, and Cortisone injections.  Exhibit B at 63:13-18.

54.    Plaintiff reported that the Cortisone shot she received was performed in a clinic environment, the procedure takes only a few hours, and then "you go on about your day." Exhibit B at 64:7-65:2.  No sedation is involved.  Exhibit B at 65:7-8.

55.    Plaintiff testified that she had back surgery *after* she was laid off from Level 3. Exhibit B at 65:14-23.

56.     As a result of the surgery, Plaintiff had restrictions on lifting and twisting. Exhibit B at 66:25-67:8.  Plaintiff, however, admitted that the restrictions were <u>not</u> permanent and only lasted six to eight weeks.  Exhibit B at 67:16-20.

### Plaintiff's Claims for Relief

57.     Plaintiff filed this lawsuit on May 3, 2007, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, <u>et</u> <u>seq.</u>, the Americans with Disabilities Act of 1990, 42 USC §§ 12101-12213, and the Colorado Anti-Discrimination Act, C.R.S. §§ 24-34-401 <u>et</u> <u>seq.</u>

58.     Plaintiff alleges that Level 3 is culpable for an ongoing pattern of discrimination against women, which has a disparate impact upon them and Plaintiff.  <u>See</u> Complaint at ¶15.

59.     Plaintiff also claims that she was intentionally discriminated against because of her gender and her purported disability.  <u>See</u> Complaint at ¶¶ 20-23.

### ARGUMENT

## I.     STANDARD OF REVIEW

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The issue is not whether there is "literally *no* evidence favoring the non-movant, but whether there is any upon which a jury could properly proceed to find a verdict in that party's favor."  <u>De Arteaga v. Pall Ultrafine Filtration Corp.</u>, 862 F.2d 940, 941 (1st Cir. 1988) (emphasis in original).

A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).  Where a party "fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," there can be no genuine issue as to any material fact.  Celotex, supra, at 322-23. The use of "self-serving assertions, without factual support in the record, will not defeat a motion for summary judgment." Jones v. Merchants Nat'l Bank & Trust Co., 42 F.3d 1054, 1058 (7th Cir. 1994) (citation omitted).

## II.     PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF DISPARATE IMPACT BASED ON GENDER

Under Title VII, a plaintiff may allege discrimination under various theories, including disparate impact or disparate treatment.  A disparate impact claim "involves employment practices that are fair in form, but discriminatory in operation." Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1312 (10th Cir. 1999) (internal citation omitted), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 n. 11 (2002).  A "plaintiff may establish a *prima facie* case of disparate impact discrimination by showing that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group." Id.  Under this theory "a plaintiff must not merely show circumstances raising an inference of discriminatory impact but must demonstrate the discriminatory impact at issue." Id.

> [T]he plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force.  The plaintiff must begin by identifying the specific employment practice that is challenged.  Although this has been relatively easy to do in challenges to standardized tests, it may sometimes be more difficult when subjective selection criteria are at issue.  Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.
>
> Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.  Our formulations, which have never been framed in terms of any rigid

mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation.

Watson v. Fort Worth Bank and Trust, 487 U.S. 977, 994-95 (1988).

In the Complaint, Plaintiff alleges that Level 3 "is culpable for an ongoing pattern of discrimination against women, which has had a disparate impact upon them and plaintiff." See Complaint at ¶15.  Plaintiff has provided no evidence of this alleged "pattern of discrimination against women," and had failed to identify any decision-making process or employment practice which has the alleged result.  Similarly, in the Scheduling Order, Plaintiff's only allegations of disparate impact are unsupported conclusory statements that Plaintiff's termination "came against the background of an ongoing pattern of discrimination against women, which has had a disparate impact upon them and upon plaintiff." See Scheduling Order at 2.

Plaintiff has failed to point to any specific employment practice or policy she claims has a disparate impact.  Accordingly, this Court should grant Defendant's Motion for Summary Judgment with respect to Plaintiff's disparate impact claim.

Moreover, Plaintiff has also failed to provide any statistical evidence regarding the alleged "disparate impact" on women.  Instead, Plaintiff simply claims that two other women were included in the same RIF as her.  Exhibit B at 199:16-200:8.  Plaintiff, however, admitted that she had no idea how many men were included in the same RIF.  Exhibit B at 225:7-12.  Moreover, Plaintiff understood that there were several thousand people impacted at various times by RIFs over a period of five to six years at Level 3.  Exhibit B at 53:15-18.

It is undisputed that those impacted in April/May 2006 by the RIF under Kaily Bissani totaled four.  Exhibit C at 11:25-12:10.  The sample size Plaintiff offers is simply too small to be given any weight.  See Holopirek v. Kennedy and Coe, LLC., 303 F.Supp.2d 1223, 1239 (D. Kan. 2004) ("plaintiff's small sample size significantly lessens the value of plaintiff's statistical

data.").  In <u>Holopirek</u>, the plaintiff asserted that several female employees in plaintiff's region were terminated during a time frame when only one male employee from the region was terminated.  <u>Id.</u> at n.11.  There, the Court noted, "the Tenth Circuit has cautioned, 'the smaller the sample size, the greater the likelihood that the under representation reflects chance rather than discriminatory practices.'"  <u>Id.</u> at 1239 (citations omitted).

It is also undisputed that the two women Plaintiff attempts to use as comparators, Patricia Weber and Kathy Bennett, were not managers, similarly situated to Plaintiff, but were technicians.  Deposition of Bob Cooper at 6:12-23; 20:4-10, pertinent portions attached hereto as **Exhibit I**.  In fact, Kathy Bennett was a direct report of Plaintiff after the WilTel acquisition.  Exhibit B at 38:3-24.  Evidence in the record indicates that Plaintiff made the decision to let Kathy Bennett go.  Exhibit C at 12:11-17.  Mr. Bissani testified in his deposition that Plaintiff was the first to suggest that Ms. Bennett be laid off.  Exhibit C at 67:6-9.  Plaintiff told Mr. Bissani that Ms. Bennett was "a liability to Level 3."  Exhibit C at 67:6-9.  Accordingly, Plaintiff's attempt to create a statistical disparity by grouping herself with Kathy Bennett is improper.

The relevant pool, if any, for Plaintiff's disparate impact claim, is Mr. Benschop, Mr. McCain, and Plaintiff – the three managers under Kaily Bissani.  It is undisputed that Mr. McCain was let go in the same RIF as Plaintiff.  Exhibit C at 41:18-42:2.  It is also undisputed that Mr. Benschop lost his job as a manager and was adversely affected by the RIF as well; he was demoted and received a lower salary.  Exhibit D at 31:12-19; Exhibit F at 14:21-15:1; 18:9-14.  Furthermore, it is also undisputed that Mr. Forry, a different decision maker, made the decision to keep Mr. Benschop employed at Level 3, and not Mr. Bissani.

Accordingly, Plaintiff's disparate impact claim should be dismissed, as she has failed to point to any specific employment practice, and has further failed to show any adverse impact on women at Level 3 sufficient to give rise to an inference of discrimination.

**III.   PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF DISPARATE TREATMENT BASED ON GENDER**

It is undisputed that the Field Manager position was a <u>new</u> position and was posted online.  Exhibit C at 13:9-14:2; Exhibit B at 114:7-115:9; Exhibit D at 9:25-10:3.  It is also undisputed that Kaily Bissani told Plaintiff about the job and encouraged her to apply for the position.  Exhibit C at 59:10-17.  Despite encouragement, Plaintiff failed to apply for the position.  Exhibit B at 95:21-96:24; 96:8-9; 133:22-134:3; Exhibit C at 59:10-17.  No one prevented Plaintiff from applying for the position.  Exhibit B at 133:25-134:3.  Thus, based on the undisputed facts as admitted by Plaintiff, Plaintiff's claim is for failure to hire.

**A.   PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF FAILURE TO HIRE**

"In <u>McDonnell Douglas</u>, the Supreme Court enumerated the elements required in order for a plaintiff to establish a prima facie case in the failure to hire context.  These are: (i) plaintiff belongs to a protected class; (ii) <u>plaintiff applied</u> and was qualified for a job for which the employer was seeking applicants; (iii) despite being qualified, the plaintiff was rejected; and (iv) after plaintiff's rejection, the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications."  <u>Kendrick v. Penske Transp. Services, Inc.</u>, 220 F.3d 1220, 1227 (10th Cir. 2000) (emphasis supplied) (citing <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S.Ct. 1817)); <u>see also</u>, <u>Bennett v. Quark</u>, 258 F.3d 1220, 1228-29 (10th Cir.

2001) (holding no *prima facie* case established where plaintiff failed to show that she applied for the position).[1]

Here, as noted above, Plaintiff admitted that she knew of the position posting and failed to apply.  Exhibit B at 95:21-96:24; 96:8-9; 133:22-134:3.  She also admitted that no one prevented her from applying, and the evidence indicates she was encouraged to apply.  Exhibit B at 133:25-134:3.

Accordingly, Plaintiff's disparate treatment claim fails as a matter of law.  Defendant respectfully requests that this Court grant its Motion for Summary Judgment on Plaintiff's claim for disparate treatment.

## B.     PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF DISCRIMINATORY TERMINATION

Even if this Court rejects that Plaintiff's claim should be analyzed under a failure to hire framework, Plaintiff's claim for discriminatory termination similarly fails.  It is undisputed that Plaintiff was let go in a RIF.  Exhibit B at 224:10-225:2.

In a reduction or downsizing context, a plaintiff may establish a *prima facie* case of gender discrimination by showing that she was: (1) female; (2) doing satisfactory work or qualified for the position; and (3) discharged; (4) under circumstances "from which a fact finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue."  Branson v. Price River Coal Co., 853 F.2d 768, 770-71 (10th Cir. 1988).  Plaintiff may establish the fourth element if she can present evidence that she "was treated less favorably than

---

[1] In addition to Plaintiff's Title VII claim, she brings a claim under the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-34-401 *et seq*.  See Complaint at ¶ 28.  As the basis for Plaintiff's CADA claim is unclear, to the extent this Court deems the Plaintiff's allegations sufficing to state a CADA claim for discrimination based on sex, Defendant hereby incorporates the analysis set forth herein to Plaintiff's CADA claim.  See Colorado Civil Rights Com'n v. Big O Tires, Inc., 940 P.2d 397, 400 (Colo. 1997) (adopting the McDonnell Douglas framework for analyzing CADA employment discrimination claims).

[male] employees during the reduction-in-force." Id. at 771.  For the purposes of this Motion only, Defendant does not contest Plaintiff's ability to show elements one and three.  Plaintiff cannot establish a genuine dispute of material fact, however, regarding the last element of a *prima facie* case.

### 1.     Plaintiff cannot establish that she was treated less favorably than male employees during the RIF.

Notably, Plaintiff performed the same job as another employee, Everett McCain.  Exhibit B at 224:10-225:2; Exhibit C at 40:24-41:17.  Both Plaintiff and Mr. McCain were long haul Outside Plant Managers.  Exhibit B at 224:10-225:2; Exhibit C at 40:24-41:17.

As stated above, after the WilTel acquisition, Level 3 needed to identify and reduce redundant positions.  Exhibit A at 5.  As a result, Level 3 determined that the field operations division in the region of which Plaintiff was a part would be reduced from three managers to one. Exhibit A at 5.  The three manager positions, formerly held by Plaintiff, Everett McCain, and Diron Benschop were eliminated.  Exhibit F at 9:1-23; 10:25-11:6.  A new position was created, Field Manager, which took on the duties of all three former management positions plus increased route miles not previously covered.  Exhibit C at 13:9-14:2; Exhibit A at 5.  Plaintiff thus, had one similarly situated peer – Everett McCain and both were let go in the same RIF.  Exhibit B at 224:10-225:2.  Accordingly, Plaintiff simply cannot establish that she was treated differently than her male peer under the downsizing criteria.

Indeed, both Plaintiff and her male counterpart, Everett McCain were let go by Level 3 at the same time and for the same reason, position elimination.  Exhibit B at 224:10-225:2. Plaintiff therefore cannot satisfy the fourth element of a prima facie case of discriminatory termination.  The undisputed evidence shows that Plaintiff was not treated less favorably than

her similarly situated male peers during the RIF.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for disparate treatment.

### 2.        Plaintiff Cannot Prove Pretext.

Even assuming Plaintiff could establish a *prima facie* case for discrimination; Defendant may rebut Plaintiff's *prima facie* case by offering a legitimate, nondiscriminatory reason for the decision.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973); O'Neal v. Ferguson Construction Co., 237 F.3d 1248, 1252 (10th Cir. 2001).  Here, Plaintiff was terminated due to a legitimate downsizing of Level 3's plant operations and elimination of her position.  Exhibit C at 11:9-24.

Plaintiff must respond by demonstrating that Defendant's asserted reason for the adverse action is a pretext for discrimination.  See Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999).  The Tenth Circuit "requires a showing that the tendered reason for the employment decision was not the genuine motivating reason, but rather was a disingenuous or sham reason." McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1988).  In a RIF case, a plaintiff can demonstrate pretext in three principal ways, by demonstrating: (1) her termination does not accord with RIF criteria; (2) the RIF criteria were deliberately falsified or manipulated in order to terminate her; or (3) that the RIF generally was pretextual.  Pippin v. Burlington Resources Oil & Gas Co., 440 F.3d 1186, 1193 (10th Cir. 2006).  "Where an employee is selected for RIF termination 'solely on the basis of position elimination,' qualifications become irrelevant and one way that employee can show pretext is to present evidence that h[er] job was not in fact eliminated but instead remained a 'single, distinct position.'"  Id. at 1194 (internal citations omitted).  The undisputed evidence provides that Plaintiff's position was eliminated.  It was combined with the metro Outside Plant Manager position, as stated by Kaily Bissani and

Peter Smith in their depositions, and as directed by Tim Elbert.  Exhibit C at 11:9-24; Exhibit E 48:8-10.

Indeed, the test for position elimination is "not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position." Myers v. Colgate-Palmolive Co., 26 Fed. Appx. 855, 861 (10th Cir. 2002); see also, Garcia v. Pueblo Country Club, 299 F.3d 1233, 1239 (10th Cir. 2002) (citing Brown v. McLean, 159 F.3d 898, 903 (4th Cir. 1998) (noting that the 'new' position "encompassed duties that had not been part of the [previous] position that [plaintiff] had held")).  It is undisputed that the Field Manager position had additional duties beyond those of Plaintiff's position.  Exhibit C at 7:9-15.  Steve Forry took on Plaintiff's duties, and the duties of two additional individuals, as well as more route miles.  Thus, after the WilTel acquisition, Plaintiff's former responsibilities did not constitute a single, distinct position, but rather, only a portion of a new position.  Notably, Plaintiff has offered no evidence that her position was not eliminated, and in fact, admits that the new position was a "combined" position of her and others former duties and responsibilities. Exhibit B at 93:10-24.

Moreover, Plaintiff cannot attack the downsizing as pretextual by "challenging its necessity." Doan v. Seagate Technology, Inc., 82 F.3d 974, 977 (10th Cir. 1996).  "[T]he wisdom of a RIF is not for a court or jury to decide." Id.  It is a "business decision and [Title VII] is not a vehicle for reviewing the propriety of business decisions." Id.; Branson, 853 F.2d at 772.  Further, "the manner in which a company chooses to conduct a RIF is within the company's sound business discretion." Doan, 82 F.3d at 978.

Here, Plaintiff has presented no evidence that the downsizing and elimination of her position was a pretext for discriminatory motive.  Plaintiff's mere subjective belief that her

gender was considered in the elimination of her position cannot defeat summary judgment.

Branson, 853 F.2d. at 772.

## IV.   PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF DISABILITY DISCRIMINATION UNDER THE ADA

To establish a *prima facie* case of discriminatory discharge under the ADA, a plaintiff must establish: (1) that she is a disabled person within the meaning of the ADA; (2) that she is qualified, meaning able to perform the essential functions of the job, with or without reasonable accommodation; and (3) that her employer fired her because of her disability.  See Aldrich v. Boeing Co., 146 F.3d 1265, 1269 (10th Cir. 1998); 42 U.S.C. § 12112(a) (proscription of discrimination "against a qualified individual with a disability because of the disability"); 29 C.F.R. § 1630.4.  Level 3 is entitled to judgment in its favor because Plaintiff cannot make such a *prima facie* case.  Plaintiff cannot establish even the first element of her claim -- that she was disabled.  See Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (to obtain relief under the ADA, Plaintiff must as a threshold matter prove that she was "disabled.").[2]

To satisfy the ADA's definition of disability, a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities."  Holt v. Grand Lake Mental Health Ctr., Inc., 443 F.3d 762, 765 (10th Cir. 2006) (citations omitted).  "Whether the plaintiff has an impairment within the meaning of the ADA and whether the conduct affected is a major life activity for purposes of the ADA are questions of law for the court to decide.  Ascertaining

---

[2] To the extent Plaintiff has pled a claim under CADA based on disability, as the basis of Plaintiff's claim is unclear in the Complaint, see Complaint at ¶ 28, such claim is addressed by Defendant in conjunction with Plaintiff's ADA claim.  See Tesmer v. Colorado High School Activities Ass'n, 140 P.3d 249, 253 (Colo. App. 2006) ("Whenever possible, the CADA should be interpreted consistently with the Americans with Disabilities Act (ADA).").

whether the impairment substantially limits the major life activity is a question of fact for the jury, although a court is not precluded from deciding the issue on a motion for summary judgment."  Berry v. T-Mobile USA, Inc., 490 F.3d 1211, 1216 (10th Cir. 2007).

The United States Supreme Court defines a "substantial" impairment as one "that prevents or severely restricts [an] individual from doing activities that are of central importance to most people's daily lives" and that is "permanent or long term."  Toyota Motor Mfg., Ky. Inc. v. Williams, 534 U.S. 184, 198 (2002) (citation omitted).  In Berry, the Tenth Circuit held, "[w]e must strictly interpret the term "substantial" to "create a demanding standard for qualifying as disabled."  Berry, 490 F.3d at 1216.

"Substantially limits" does not include temporary impairments.  "Temporary, non-chronic impairments of short duration with little or no long-term or permanent impact are usually not disabilities."  See Gutridge v. Clure, 153 F.3d 898, 901-02 (8th Cir. 1998).  Furthermore, general lifting restrictions are not enough.  "The number of Americans restricted by back problems to light work is a legion.  They are not disabled."  Mays v. Principi, 301 F.3d 866, 869-70 (7th Cir. 2002).

Moreover, as stated above, the ADA's definition of disability requires Plaintiff to identify one or more major life activities.  Holt, 443 F.3d at 765; see also, Gallegos v. Swift & Co., 237 F.R.D. 633, 644 (D. Colo. 2006) ("A plaintiff stating a claim under the ADA must articulate with precision the impairment alleged and the major life activity affected by that impairment.").  Here, Plaintiff fails to identify any specific major life activity.  Plaintiff simply alleges that her "medical condition limited, or would reasonably be expected to limit, one or more of her major life's activities . . . ."  See Complaint at ¶17.  Plaintiff has failed to demonstrate that she was disabled.

Based on Plaintiff's own testimony in her deposition, she is not disabled. Plaintiff's claimed "disability" is a bulging disk. Exhibit B at 62:14-63:7. Plaintiff testified that she had back surgery *after* she was laid off from Level 3. Exhibit B at 65:14-23. She also claims that Level 3 was aware of her impending surgery, and thus, regarded or perceived Plaintiff as disabled. <u>See</u> Complaint at ¶¶17-18.

During the time when Plaintiff worked at Level 3, Plaintiff treated her back with Ibuprofen, and in April 2006 had a Cortisone injection in her spine. Exhibit B at 63:13-18. Plaintiff admitted, however, that the Cortisone shot was delivered in a clinic environment, not a hospital, the procedure took only a few hours and then she went on about her day. Exhibit B at 64:7-65:2. No sedation was involved. Exhibit B at 65:7-8. Furthermore, Plaintiff admitted that her only limitations as a result of her allegedly "planned" back surgery were restrictions on lifting and twisting. Exhibit B at 66:25-67:8. Plaintiff admitted that the restrictions were <u>not</u> permanent and only lasted six to eight weeks. The following deposition testimony was given by Plaintiff:

> Q.      So are these restrictions on lifting and moving and twisting permanent?
>
> A.      No.
>
> Q.      How long did they last?
>
> A.      Six to eight weeks.
>
> Q.      Can you drive during the six to eight weeks?
>
> A.      Yes.
>
> Q.      Is there any restriction on how you drive or how far you drive or anything like that?
>
> A.      No, there's not restriction on that.

Exhibit B at 67:16-25.

In addition, "for an employee to prevail on a 'regarded as' claim with respect to the major life activity of working, there must be sufficient evidence that the employer subjectively believed the employee to be significantly restricted as to a class of jobs or broad range of jobs in various classes." E.E.O.C. v. Heartway Corp., 466 F.3d 1156, 1163 (10th Cir. 2006).  Here, Plaintiff testified in her deposition that she did not plan to take FMLA leave, and did not feel that her back problems and/or alleged upcoming surgery warranted notification to her boss that she would be limited in her duties.  Exhibit B at 72:13-23.  Plaintiff also acknowledged that when she told Mr. Bissani about her upcoming back surgery, he appeared not to care.  Exhibit B at 71:10-23.  In addition, Plaintiff's former supervisor, Peter Smith, testified that he was unaware of any medical condition or back problems with respect to Plaintiff.  Exhibit E at 80:9-15.

Moreover, Plaintiff admitted that she had neither first-hand nor second-hand knowledge that her health or health condition was raised with respect to her inclusion in the RIF, Exhibit B at 61:3-16, and that she does not have any documents indicating that her health and/or health condition were considered as factors in including her in the RIF.  Exhibit B at 61:17-20.

The following line of questioning from Plaintiff's deposition also undercuts Plaintiff's argument that she was disabled or perceived as disabled under the ADA:

> Q.     Did you tell him that you were going to be limited in your ability to perform your job after your recuperation of a few weeks?
>
> A.     I didn't feel like I'd be limited in doing my job.  I know there's more to the job.  There's some lifting and things, but I didn't feel like I would be – that it would be anything that I couldn't handle or delegate.
>
> Q.     Did he say to you that you wouldn't be able to handle your job in his opinion?
>
> A.     No, he didn't say anything to me.

Exhibit B at 72:13-23.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim under the ADA, as the undisputed evidence reveals that Plaintiff is not disabled under the Act.  Such a threshold showing is essential to Plaintiff's claims under the ADA and CADA.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant enter summary judgment in its favor and against Plaintiff on all claims set forth in Plaintiff's Complaint.

Dated this 23rd day of January, 2008.


BROWNSTEIN HYATT FARBER SCHRECK, LLP


s/Meghan W. Martinez
Meghan W. Martinez
Leah P. VanLandschoot
410 17th St., 22nd Floor
Denver, CO 80202
(303) 223-1100

ATTORNEYS FOR DEFENDANT
LEVEL 3 COMMUNICATIONS, LLC

## <u>CERTIFICATE OF MAILING</u>

   The undersigned hereby certifies that on this 23rd day of January, 2008, a true and correct copy of the foregoing **MEMORANDUM BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

     olsenbrown@comcast.net


       BROWNSTEIN HYATT FARBER SCHRECK, LLP


       s/ Meghan W. Martinez
       Meghan W. Martinez
       Leah P. VanLandschoot
       410 17th Street, Suite 2200
       Denver, Colorado 80202
       (303) 223-1100

       ATTORNEYS FOR DEFENDANT
       LEVEL 3 COMMUNICATIONS, LLC