# EXHIBIT B

00001

1      IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLORADO

2

3  Civil Action No. 07-cv-00922-RPM-CBS

4  REBECCA A. CAPPS,

5     Plaintiff,

6  vs.

7  LEVEL 3 COMMUNICATIONS LLC,

8     Defendant.

9  _____

10     DEPOSITION OF REBECCA ANN CAPPS

11       August 29, 2007

12  _____

13

14

15

16

17

18

19

20

21

22

23

24

25

**Rebecca Capps.txt**            **Page 1**

00026

1  can't recall his name.

2      Q.   Was it one day or --

3      A.   I think Rob Zulfer was -- he was in HR.

4      Q.   Did you meet with these individuals separately

5  or in a group?

6      A.   I think -- I believe it was a group.

7      Q.   And when was the first time you met

8  Mr. Zulfer?

9      A.   I believe he sent the offer letter to me.  I

10  don't know exactly when I first met him.  Pretty --

11  initially, right away.  Every -- you know, the office was

12  compressed at Church Ranch.

13      Q.   You didn't know Mr. Zulfer before you worked

14  at Level 3?

15      A.   Oh, no.

16      Q.   What was your understanding of what he did?

17      A.   He was human resources.

18      Q.   For?

19      A.   Field operations.

20      Q.   Was that your department?

21      A.   Yes.

22      Q.   Is that what you were told or came to believe

23  during the first few weeks of your employment?

24      A.   Yes.

25      Q.   Did you ever have any other HR personnel

**Rebecca Capps.txt**                                      **Page 26**

00038

1      A.  Yes.

2      Q.  -- first?

3          Okay.  And how many people did you have

4  reporting to you while you worked at Level 3?

5      A.  Probably at one time seven and then six.  The

6  majority of the time I had six.

7      Q.  Do you recall the names of those individuals

8  who reported to you?

9      A.  Yeah.  Yes, I do.

10     Q.  Can you list them for me, please?

11     A.  Before I left, my direct reports?

12     Q.  Yes.

13     A.  Bob Cooper, Ian Yuland, Steve Mauzy, Cody

14  McFall.  I had a new employee in the Nebraska area.  I'm

15  trying to think of his name.  I'll have to come back to

16  that.

17     Q.  Okay.  Do you recall what he was doing?

18     A.  He was a field technician.

19     Q.  Okay.  That leaves us one more.

20     A.  It's hard to explain because it was at a

21  transition time, but -- oh, Kathy Bennett actually.

22     Q.  So those are the six people who, as of

23  May 2006, were working directly for you?

24     A.  Yes.

25     Q.  Do you recall the names of any of your other

00048

1      MS. MARTINEZ:  All right.  Let's take a break.

2      (A recess was taken from 10:35 a.m. to

3      10:50 a.m.)

4    Q.  (By Ms. Martinez)  Mrs. Capps, have you ever

5  heard of WilTel?

6    A.  Yes.

7    Q.  What is WilTel?

8    A.  Another communications company.

9    Q.  And how does it relate to Level 3?

10    A.  They're probably -- they're a customer of

11  Level 3.

12      MR. OLSEN:  I'm going to step out for just a

13  moment.  You may proceed.  Can I get anybody anything?

14      MR. LICATA:  No, thank you, Jack.

15    Q.  (By Ms. Martinez)  Was there ever any merging

16  or acquisition of WilTel and Level 3?

17    A.  Yes.

18    Q.  Was there any kind of corporate structural

19  change that you're aware of?

20    A.  Yes.

21    Q.  What was that change?

22    A.  Level 3 bought WilTel Communications.

23    Q.  When?

24    A.  In '05.

25    Q.  What information were you provided on that

**Rebecca Capps.txt**        **Page 48**

00050

1    A.  No.

2    Q.  Anything like that?

3    A.  No, not that I recall.

4    Q.  Do you have any understanding as to why there

5  was a merger between these two companies?

6    A.  Joining of networks.  You know, retaining the

7  other company's customers, providing more network to our

8  existing customers.

9    Q.  Do you have an opinion on what the general

10  state of the telecommunications industry was in the first

11  half of 2006?

12    MR. OLSEN:  Objection.  Calls for a legal

13  conclusion.  You may answer.

14    A.  I think it was starting to become steadier.

15  Communications had been doing really well and then it

16  slumped.

17    (Whereupon, Ms. Martinez's phone rang.)

18    MS. MARTINEZ:  Excuse me.

19    (A discussion was had off the record.)

20    Q.  (By Ms. Martinez)  And when you say there had

21  been problems, what are you referring to?

22    A.  Oh, downsizing, layoffs, merger of companies,

23  things like that.

24    Q.  Did that impact Level 3 in any way?

25    A.  Yes.

00051

1          (Whereupon, the phone rang.)

2          MS. MARTINEZ:  Let me turn that off.  I

3 apologize.

4     Q.  (By Ms. Martinez)  Okay.  Did those impact

5 Level 3 in way?

6     A.  Yes.

7     Q.  How so?

8     A.  Level 3 experienced layoffs and downsizing,

9 selling of assets.

10        Q.  During the entire time you were there or

11 during a specific period of time?

12        A.  More of a specific period of time.

13        Q.  When?

14        A.  I'd say from sometime in '02 to '04.

15        Q.  And why do you say that it stopped in '04?

16        A.  Well, I think things started to level out

17 more.

18        Q.  What do you base that on?

19        A.  Just an assumption.

20          (A discussion was had off the record.)

21        Q.  (By Ms. Martinez)  Were you ever present when

22 any Level 3 employees were laid off?

23        A.  Yes.

24        Q.  How many times?

25        A.  Two.

**Rebecca Capps.txt**                                        **Page 51**

00052
1     Q.   Do you recall the employees' names?

2     A.   Kathy Bennett most recently.  Ray Roseberry.

3     Q.   When were these two individuals laid off?

4     A.   Kathy was laid off about a week before myself,

5   and Ray Roseberry in '03, '04.  I don't have --

6     Q.   Did Ray work directly for you?

7     A.   Yes.

8     Q.   Did you make the decision to lay off

9   Ms. Bennett?

10     A.   No.

11     Q.   Do you know who did?

12     A.   Yes.

13     Q.   Who?

14     A.   Pete Smith.

15     Q.   Did you make the decision to lay off

16   Mr. Roseberry?

17     A.   No.

18     Q.   Do you know who did?

19     A.   Pete Smith.

20     Q.   Were you aware that Level 3 had been laying

21   off groups of employees in Reductions In Force?

22     A.   Yes.

23     Q.   Do you know how many Reductions In Force

24   Level 3 had undergone before May of 2006?

25     A.   No.  I had -- no, I don't know.

**Rebecca Capps.txt**                              **Page 52**

00053

1     Q.   Without picking a number, do you have any idea

2   of how extensive the Reductions In Force were?

3     A.   I -- honestly, I would say I do, but they had

4   layoffs at corporate that I wasn't -- I knew there was

5   some activity, but no idea what departments or how many

6   people.  I did at one point hear a number of 6,000

7   employees to 3,000 employees, but then that number went

8   back up.

9     Q.   Meaning individuals who were at the company

10  changed --

11    A.   Yeah.

12    Q.   -- or the number of individuals who were RIF'd

13  was in that range?

14    A.   The number of employees at the company.

15    Q.   So was it your understanding that there were

16  several thousand people impacted at various times by

17  Reductions In Force?

18    A.   In five to six years, yes.

19    Q.   Do you know how frequently Reductions In Force

20  were occurring?

21    A.   No.

22    Q.   Do you have any idea?

23    A.   No.

24    Q.   Do you know how the company would go about

25  identifying individuals for a Reduction In Force?

00054

1    A.   Not the company, no.

2    Q.   And when you say "Not the company, no," do you

3 mean you have information on something else?

4    A.   Well, I could tell you how we identified them

5 in the Denver division.  As field operations, I have a

6 vague idea.  As a company, no.

7    Q.   Tell me how you identified individuals to be

8 impacted by a RIF in field operations.

9    A.   I didn't identify individuals, but I know it

10 was -- geographics was a factor, workloads were a factor.

11    Q.   Anything else?

12    A.   I'm sure, but I don't know.

13    Q.   And how do you know that geographics was a

14 factor?

15    A.   Everything in field operations, geographics is

16 a factor.

17    Q.   Can you explain what that means?

18    A.   You may -- you may man a region or an area by

19 geographics, if they're on one side of a mountain pass

20 that is impacted by severe weather.  Population in

21 geographics are going to impact employment, workloads,

22 things like that.  Everything is broken down by -- there's

23 no set, here's a state, they get so many people.  It's

24 about the customers in that area, the -- even right down

25 to the weather patterns in a certain area.

00056

1    Q.   You were let go in May of 2006, correct?

2    A.   Yes.

3    Q.   At that time, Ms. Capps, was there anyone who

4 was doing exactly what you were doing?

5    A.   With Level 3?

6    Q.   Yes.

7    A.   No.

8    Q.   Was there anyone who was doing substantially

9 similar things to what you were doing --

10    A.   Yes.

11    Q.   -- for Level 3?  Who?

12    A.   Diron Binshop.

13        MR. OLSEN:  Would you say that again?

14        THE DEPONENT:  Diron Binshop.

15    Q.   (By Ms. Martinez) Anyone else?

16    A.   No.

17    Q.   And why do you say that Mr. Binshop was doing

18 substantially similar things to what you were doing?

19    A.   He was considered a peer of mine, but he

20 worked in the Metro area.

21    Q.   Why do you say he was considered a peer of

22 yours?

23    A.   The outside plant inner city managers and the

24 Metro managers were just considered peers.

25    Q.   By whom?

**Rebecca Capps.txt**                                **Page 56**

00057

1    A.   The company.

2    Q.   Anyone in particular at the company?

3    A.   Field operations.

4    Q.   I'm trying to figure out if there's someone in

5    particular, like a name.

6    A.   No.  I mean, it's just a general, across the

7    country, across the world.

8    Q.   Did you work with Diron on a day-to-day basis?

9    A.   No.  He maintained the Metro area.  We had

10   defined lines drawn in the dirt where he started and I

11   left off.

12   Q.   Did you do any of his work in the Metro area?

13   A.   I did when he was absent.

14   Q.   Did he do any of your work outside the Metro

15   area?

16   A.   No.

17   Q.   What would happen when you were absent?

18   A.   I would have a direct report fill in for me.

19   Q.   How often did you fill in for Diron?

20   A.   Officially, I'd say two times.  I did -- you

21   know, I did go down and help him out in his area on

22   several occasions, but as far as him being completely

23   absent from work and myself taking over his workload,

24   about twice.

25   Q.   When?

**Rebecca Capps.txt**                                    **Page 57**

00061

1  not you had been considered for this decision?

2      A.  No.

3      Q.  Do you know whether or not your health or any

4  health condition was raised in these RIF decisions as a

5  reason to terminate your employment?

6      A.  I wasn't in on any of those discussions.

7      Q.  Okay.  Other than -- so, I guess what you're

8  saying is you're on firsthand knowledge, right?

9      A.  Right.

10     Q.  Do you have secondhand knowledge about --

11     A.  No.

12     Q.  Let me finish my question.  Do you have any

13  secondhand knowledge as to whether anyone raised your

14  health or health condition as a reason to include you

15  within the RIF?

16     A.  No.

17     Q.  Have you seen any documents that indicate your

18  gender, health, or health condition were considered by

19  Mr. Bissani as a factor in including you within the RIF?

20     A.  No.

21     Q.  Do you know of any other Level 3 employees who

22  took FMLA leave besides you?

23     A.  I don't have knowledge of that.

24     Q.  Other than your pregnancy and the birth of

25  your child, did you have any other condition while you

**Rebecca Capps.txt**                                    **Page 61**

00062

1 were working for Level 3 that you thought qualified you to

2 take Family Medical Leave Act leave?

3    A.  No.

4    Q.  Did you have a back condition in 2006?

5    A.  Yes.

6    Q.  When did that back condition start?

7    A.  It's hard to explain.  I've basically had

8 issues with my back my -- since I was young.

9    Q.  So what you had in 2006 wasn't an accident or

10 anything that was trauma induced or anything like that?

11 Was it progressive or continuing?  How would you describe

12 it?

13    A.  Yes, continuing.

14    Q.  Okay.  Had you had this continuing back issue

15 at the time you were hired at Level 3?

16    A.  No.  It's hard to explain, but I'd say it

17 reoccurred.  I mean, I had prior back surgery, and then I

18 went about nine years with some minor back pain, things

19 like that, and then it basically reoccurred in a slightly

20 different area.

21    Q.  What's the diagnosis?

22    A.  A bulging disk.  I have trouble in my L4, L5,

23 L3.  I don't really know what the proper terms are for it;

24 pinched nerves, things like that.

25    Q.  So did you have different disks that were

**Rebecca Capps.txt**                              **Page 62**

00063

1  bulging at different times or just --

2      A.  Yeah.

3      Q.  Okay.

4      A.  Yeah.

5      Q.  So you had some bulging disks before you

6  worked at Level 3, and then in 2006 you had some --

7      A.  Yeah.

8      Q.  -- other bulging disks; is that right?

9      A.  Right.

10      Q.  Okay.  And before 2006 had any of these same

11  areas in your back been problematic?

12      A.  Off and on.

13      Q.  Had you treated them?

14      A.  Yeah.

15      Q.  How?

16      A.  Ibuprofen, chiropractors, things like that.

17  Anti-inflammatories mostly.  Cortisone injections -- later

18  cortisone injections, but that's it.

19      Q.  Did any of those problems that you had before

20  May of 2006 require anything more invasive than shots?

21      A.  Well, I had the prior back surgery.

22      Q.  Okay.  But I'm talking about while you worked

23  at Level 3?

24      A.  Oh, no.

25      Q.  Okay.  And how often were you getting

**Rebecca Capps.txt**                    **Page 63**

00064

1  cortisone shots?

2      A.   Oh, just at the end I received -- I know I got

3  one.  I may have gotten two.

4      Q.   What does the cortisone do for the back

5  problems?

6      A.   I believe it's an intense anti-inflammatory.

7      Q.   What's involved in getting the cortisone

8  shots?

9      A.   It's an injection directly into your spine.

10  Just -- they put you under an X-ray, and you're X-rayed

11  the entire time they insert the needle so they can watch

12  the needle to make sure they don't hit anything.

13      Q.   Is it an all-day procedure?  Is it an

14  inpatient procedure?

15      A.   It's inpatient.  It's a few hours.

16      Q.   So you go into a doctor's office?

17      A.   No.  You know, you have to go into -- I don't

18  know what they'd be called, but you have to go into a

19  place where they can X-ray you, like radiology, in a

20  clinic-type environment.

21      Q.   And they give you a shot in your back?

22      A.   Um-hum.

23      Q.   Yes?

24      A.   Yes.

25      Q.   And then what happens?

**Rebecca Capps.txt**                              **Page 64**

00065

1     A.  Then you go on.  Then you go on about your

2  day, nothing.

3     Q.  Do they keep you for observation for any

4  period of time?

5     A.  Maybe 15 minutes.  Maybe, I don't know.  I

6  don't recall.

7     Q.  Do you take any sedation?

8     A.  No.

9     Q.  Do you have to have somebody drive you to and

10  from?

11    A.  I don't remember.  I don't think so.

12    Q.  Do you have to be admitted to a hospital?

13    A.  No.

14    Q.  Did you actually have surgery in May of 2006?

15    A.  Yes.

16    Q.  When was that surgery scheduled?

17    A.  Well, I don't think I had surgery in May.  I

18  don't know exactly the day.

19    Q.  But you did have surgery?

20    A.  Yes.

21    Q.  And was this surgery while you were actually

22  working at Level 3?

23    A.  No, it was after.

24    Q.  So it was sometime later in 2006?

25    A.  Um-hum.

**Rebecca Capps.txt**                    **Page 65**

00066

1     Q.  Yes?

2     A.  Yes.

3     Q.  Do you have any idea of how much time passed

4  between your last day and when you had the surgery?

5     A.  Oh, at the most, two months, but I'd say

6  within the next month.

7     Q.  When did you schedule that surgery?

8     A.  I can't remember.  It's kind of a series.

9  They want to see -- they make a couple of attempts of some

10  other things and they want to see how you'll react, so

11  they don't know.  So there's initial talk of the surgery

12  and then let's try these things, and then if they don't

13  work, then we'll do the surgery.

14     Q.  Okay.  Do you know for sure that the surgery

15  was scheduled while you were still at Level 3?

16     A.  I don't know that.  I know talk of the surgery

17  was for sure while I was at Level 3, and the official

18  scheduling of it may have occurred later.

19     Q.  How long were you in the hospital?

20     A.  I believe they kept me overnight.

21     Q.  Was it general anesthesia?

22     A.  What is that?

23     Q.  Were you put under?  Were you put asleep?

24     A.  Yes.

25     Q.  And how long were you recuperating from that

**Rebecca Capps.txt**                                   **Page 66**

00067

1  surgery?

2       A.  Oh, I think you're on some mild pain

3  medication for the first week or two.  Depends on how you

4  feel.  I don't remember exactly.  And then just some

5  restrictions after that as far as lifting and, you know,

6  some of your movements and things like that, prolonged

7  twisting -- you know, twisting and things like that they

8  don't want you doing.

9       Q.  Were these the same restrictions that you had

10  had the first time you had the surgery?

11      A.  Yeah.  Very similar, yes.

12      Q.  Were you expecting that this was going to be

13  kind of the same recuperation period as what you had

14  before?

15      A.  Yes.

16      Q.  So are these restrictions on lifting and

17  moving and twisting permanent?

18      A.  No.

19      Q.  How long did they last?

20      A.  Six to eight weeks.

21      Q.  Can you drive during the six to eight weeks?

22      A.  Yes.

23      Q.  Is there any restriction on how you drive or

24  how far you drive or anything like that?

25      A.  No, there's not restrictions on that.

00071

1 let him know that I had back surgery coming up, that I had

2 a bulging disk, and that I'd be, you know, taking some

3 time off after the surgery.

4     Q.  Did you tell him that you did not know when

5 you'd be back?

6     A.  No, I didn't tell him that.

7     Q.  Did you tell him that this was a permanent

8 issue or a problem?

9     A.  No.

10     Q.  Did you convey to him, essentially, what you

11 had told me about there's going to be some recuperation

12 and you'd be back at work?

13     A.  Yes.

14     Q.  Okay.  How did he respond?

15     A.  He was -- he basically said -- he said, he

16 didn't care.  He just said he didn't care that I was

17 getting back surgery, and he was pretty negative about it.

18     Q.  Other than saying he didn't care or words to

19 that effect, do you remember anything specifically that he

20 said in the conversation?

21     A.  He said that he didn't care.  I talked to him

22 about how I would arrange for coverage of my area, and I

23 talked to him about my return time.

24     Q.  What did he say, if anything, in response?

25     A.  I don't remember the -- I mean, the

00072

1  conversation was pretty short.

2      Q.  Do you remember anything that he said?

3      A.  He just -- he had no interest in the

4  conversation and he was pretty much done speaking to me.

5      Q.  What did you say about your return time?

6      A.  Just that the initial week of the surgery --

7  I'd try to schedule the surgery for as close to the

8  weekend, and then I may be on some pain pills, depending

9  on how I felt, for a few days, and then I would progress

10  to the point of being able to be available on e-mail and

11  phone calls for my people, for my direct reports, for any

12  questions, and then within a couple weeks I would be back.

13      Q.  Did you tell him that you were going to be

14  limited in your ability to perform your job after your

15  recuperation of a few weeks?

16      A.  I didn't feel like I'd be limited in doing my

17  job.  I know there's more to the job.  There's some

18  lifting and things, but I didn't feel like I would be --

19  that it would be anything that I couldn't handle or

20  delegate.

21      Q.  Did he say to you that you wouldn't be able to

22  handle your job in his opinion?

23      A.  No, he didn't say anything to me.

24      Q.  Have you ever known any employees of Level 3

25  who left or were let go and then came back to Level 3?

00093

1    Q.  Or did he call it field manager?

2    A.  He may have called it field manager,

3 operations manager.

4    Q.  Had you interviewed for the position at that

5 point, the position of field manager?

6    A.  No, not that I'm aware of.

7    Q.  Did you ever interview for the position of

8 field manager?

9    A.  No.

10    Q.  Did you ever apply for the position of field

11 manager?

12    A.  I was under the impression that the -- there

13 was talk, but never -- I was never told fully, but there

14 was talk of combining the Metro and Long Haul, and that --

15 I'm trying to make sure I get it in sequence.

16        This conversation was before the Steven Forry

17 conversation.  They were looking to combine the two

18 positions and create one.

19    Q.  Who told you that?

20    A.  I believe it was Pete Smith initially who told

21 me that and then Kaily told me that.  So in the discussion

22 of the combined areas, Pete informed me that there would

23 be -- they're looking to do one position, and it would be

24 myself, Diron Binshop, and a WilTel employee.

25    Q.  Everett McCane?

**Rebecca Capps.txt**                              **Page 93**

00094

1     A.   Yep, who -- and the three of us were basically

2  in line for this position.

3     Q.   What do you mean by "in line"?

4     A.   Well, they had to make a decision between the

5  three of us, and either demote the rest of us or have

6  layoffs or find other positions for us, you know, however

7  it works.

8          So I made arrangements to have housing in

9  Denver and had a lengthy conversation with my family

10  because, basically, they told me this position is in

11  Denver.  It would be based out of Denver, and I would have

12  to live in Denver to have this position.  So I made all

13  those arrangements, and -- at this time this is when Pete

14  Smith said that I was -- that he would be telling Kaily

15  that I was the most qualified individual for this position

16  and his recommendation would be, as long as I worked out

17  of Denver, that I assume this role, and that's about it.

18     Q.   Do you know whether or not Pete Smith actually

19  told Kaily Bissani that you were the most qualified and he

20  was recommending you?

21     A.   Pete Smith told me that he would tell him.

22     Q.   Okay.  I understand, but my question is a

23  little different.  Pete Smith told you he would tell him

24  that.  My question is --

25     A.   Yes.

**Rebecca Capps.txt**                                    **Page 94**

00095

1    Q.  -- do you know whether or not he actually told

2  him that?

3    A.  I do know that because Kaily did say that to

4  me.  He did say to me that "Pete has recommended you for

5  this position; that you're the most qualified for this

6  position."

7    Q.  When did he tell you that?

8    A.  Kaily?

9    Q.  Um-hum.

10    A.  We were in a vehicle together.  I was giving

11  him a ride to somewhere.

12    Q.  So tell me what interview or consideration

13  process you went through at Level 3 for this field manager

14  position.

15    A.  I don't think -- there wasn't an official --

16  that I'm aware of.  There wasn't an official interviewing

17  process where -- you know, we weren't told, okay, you're

18  coming into this room.  These people are going to speak to

19  you about your qualifications and your role in the

20  company.  Those things didn't happen.

21    Q.  Do you know whether or not the position was

22  posted?

23    A.  I do know it was posted after I left the

24  company, after I was let go.

25    Q.  Was it posted externally, internally, or both?

00096

1      A.   I know it was posted internally.  I don't know

2  if it was posted externally.

3      Q.   How do you know it was posted internally?

4      A.   I was told by an individual.

5      Q.   Who?

6      A.   One of my -- an individual who used to report

7  to me directly, Justin Aimone.

8      Q.   Did you apply for that position?

9      A.   I didn't, no.

10     Q.   Why not?

11     A.   I had just been let go from that position.  I

12  also knew from my conversation with Forry that they had

13  already hired Steven Forry for the position.

14     Q.   You said there was no official interviewing

15  process to your knowledge.  Do you know, even through

16  secondhand knowledge, what the different steps were that

17  Level 3 took to combine or to create a new position --

18     A.   No.

19     Q.   -- out of the old ones?

20     A.   No.

21     Q.   Were you allowed to give any input on whether

22  or not the positions would be combined or whether there

23  would be a new position or how they would structure it?

24     A.   No.

25     Q.   Do you have any knowledge other than this

00099

1      A.   I know that he was laid off.

2      Q.   Do you know when?

3      A.   I'm assuming the same time I was laid off.

4   But, actually, now that I think about it, he was laid off

5   after I was.  I don't know when, but after.

6      Q.   Do you know if he was laid off in 2006 or this

7   year?

8      A.   No.

9      Q.   No, you don't know?

10      A.   I don't know.

11      Q.   Okay.  Do you know why he was laid off?

12      A.   No.

13      Q.   Do you think that Level 3's decision to lay

14   Mr. McCane off was improper or unfair in any way?

15      A.   I -- I have never given it really any thought.

16      Q.   Okay.  Do you know what happened to Diron

17   Binshop?

18      A.   I believe he was demoted.  He didn't maintain

19   the same role that he had while I was employed there.

20   He -- as far as I know, he received, like, a lesser

21   role -- what I would consider a lesser role, but I don't

22   know for sure.

23      Q.   Do you think that he was treated unfairly or

24   improperly by Level 3?

25      A.   I don't know.  I didn't -- no.  I mean, I

**Rebecca Capps.txt**                                    **Page 99**

00114

1    A.   Not very long.  Thirty seconds, a minute, I

2  don't know.  I mean, you don't time it.

3    Q.   And who was Mr. Bissani's supervisor at that

4  point?

5    A.   I don't remember his last name, but his first

6  name was Ed I think.  He was a WilTel individual.

7    Q.   Did you make any efforts to talk to Ed?

8    A.   I did meet with Ed.

9    Q.   When?

10    A.   He came into the Denver division to meet with

11  people.  He came specifically into my office and sat down.

12  We had talked about -- I guess if there's any type of an

13  interview, this would have been as close to it as

14  possible.  But I talked about my team, how we performed

15  things, some ideas that I had for integrating the two

16  groups, some things that I knew WilTel needed to address

17  and how we, at Level 3, address those issues in our

18  company and we could help them, you know, come into the

19  fold.

20       And then he asked -- he, basically, at that

21  point in time talked to me about this new position and was

22  I interested in this job, and I said, "Absolutely."  You

23  know, "I want this job."  And then he said, "Well, you

24  realize it's in Denver?"  And I said, "Yes."  And I

25  explained to him the living arrangements that I had made,

00115

1   the discussion I had with my family about commuting to

2   work and being home on weekends and things.

3          And he asked me at that point in time, "Have

4   you conveyed this information to Kaily?"  And I said,

5   "Yes.  I've told him everything."  And he said, "Well, you

6   need to reiterate it, you know.  Tell him again.  Let him

7   know."  And we had a really excellent conversation, and I

8   felt like it went really well and he liked a lot of my

9   ideas, and, you know, it was positive and upbeat.

10      Q.   So did you recommunicate that information to

11  Kaily?

12      A.   I tried.

13      Q.   How?

14      A.   I went into his office and I talked to him

15  about, you know, "I've made arrangements to live in Denver

16  to be here for this job, and I want this job."

17      Q.   And what did he say?

18      A.   He didn't speak to me.

19      Q.   Did he acknowledge that you were in his

20  office?

21      A.   Somewhat, but, no.

22      Q.   What do you mean by "somewhat"?

23      A.   Well, you know someone's there.  We're closer

24  than you and I are right now.

25      Q.   What did you tell him about the arrangements

**Rebecca Capps.txt**                          **Page 115**

00133

1  24th like I stated earlier.

2      Q.   Are these individuals people who reported to

3  you or are they just people who you know?

4      A.   Both.  Some did report to me and some are

5  people that I know.

6      Q.   What is the top portion of this document,

7  Exhibit 5?

8      A.   This is a reply from an individual.

9      Q.   Where is the top part of that e-mail?

10     A.   It didn't print out.  It's just the way my AOL

11  account is.  It didn't print out.

12     Q.   Who sent you that response?

13     A.   Justin Aimone.

14     Q.   Did you go to Level3.com after you received

15  this e-mail?

16     A.   Yes.

17     Q.   What did you do at Level3.com?

18     A.   I looked for -- I looked for the job listing

19  to see if it was the same position that I held.

20     Q.   Did you find it?

21     A.   Yes.

22     Q.   Did you find it under the title of field

23  manager?

24     A.   Yes.

25     Q.   Did you apply for it?

**Rebecca Capps.txt**                          **Page 133**

00134

1      A.  No.

2      Q.  Did anyone prevent you from applying for it?

3      A.  No.

4      Q.  Did you respond to this e-mail from Justin?

5      A.  I probably responded with a thank you or

6  something along those lines.

7      Q.  Did you keep that?

8      A.  No.  I may have just called him directly.

9      Q.  Did you have any conversations with Justin

10  about this opening and posting?

11      A.  No.  I mean, other than he saw it and I said

12  it looks like my job.  Not really.  I mean, nothing that I

13  can recall that was important.

14          (Deposition Exhibit 6 was marked for

15          identification.)

16      Q.  (By Ms. Martinez)  Ms. Capps, I've handed you

17  a two-page document marked Exhibit 6 for identification.

18  Do you recognize this document?

19      A.  Yes.

20      Q.  What is it?

21      A.  Human resources required everyone in the field

22  to fill out a profile.

23      Q.  Who asked you to do this?

24      A.  I think it was a -- I think it was like a

25  general e-mail that went out to the entire field

00199

1  doing.

2      Q.   Okay.  But what about in the decision to

3  replace you, anything unprofessional about the way that

4  happened?

5      A.   Well, getting a phone call from an individual

6  letting me know that I'm going to lose my job.

7      Q.   Well, what is it that Mr. Bissani did that was

8  unprofessional?

9      A.   Speaking outside of the company, talking to

10  other individuals about existing employees.

11      Q.   Before you got the word?

12      A.   Yes.

13      Q.   Okay.

14      A.   And my direct reports having second and

15  third-hand knowledge of Kaily's decision.

16      Q.   When he became your boss, how many women were

17  in your unit?

18      A.   Three, including myself.

19      Q.   Okay.  What happened to those three women?

20      A.   We were all let go within days of each other.

21      Q.   By who?

22      A.   It was Kaily's decision.

23      Q.   How do you know that?

24      A.   I was informed of the layoffs, of who would be

25  let go.

**Rebecca Capps.txt**                    **Page 199**

00200

1     Q.  Were any men laid off in his unit?

2     A.  There was a WilTel individual that was let go.

3     Q.  A WilTel individual?

4     A.  Yes.

5     Q.  The three women who were laid off, other than

6  you, who were they?

7     A.  Kathy Bennett and Patty -- Patricia.  I can't

8  remember her last name.

9     Q.  At the time that Mr. Forry called you to tell

10  you that he was taking -- he had been told by Mr. Bissani

11  that he was taking your job, had Mr. Bissani had any

12  opportunity to observe your work?

13        MS. MARTINEZ:  Objection to form.  Calls for

14  speculation.

15     A.  I would say no.

16     Q.  (By Mr. Olsen)  Had he interviewed you or

17  asked you about what you did or how you liked things?  Any

18  kind of interview to learn about you at all?

19     A.  No.

20        MS. MARTINEZ:  Objection to form.

21     Q.  (By Mr. Olsen)  Did he have any basis, to your

22  knowledge, to even evaluate how you were doing?

23     A.  No.

24     Q.  Earlier you testified -- you can put

25  Exhibit 10 back over here.

00224

1 decision maker was?

2    A.  No, I guess I don't.

3    Q.  Do you know -- and I want to know if you know.

4 I don't want you to speculate.  Do you know who the

5 decision maker was with respect to this Patricia, whether

6 to let her go?

7    A.  No.

8    Q.  Now, Patricia was a WilTel employee you said?

9    A.  Yes.

10    Q.  And there were male WilTel employees who were

11 let go in 2006 too, correct?

12    A.  Yes.

13    Q.  For instance, Everett McCane?

14    A.  Yes.

15    Q.  He was a peer of yours, correct?

16    A.  Yes.

17    Q.  And there were other males who were let go in

18 the same RIF that impacted you, correct?

19    A.  In the company or in our division?

20    Q.  Yes.  Well, let's start within the company.

21    A.  I don't -- I'm assuming, yes, but I don't

22 know.

23    Q.  And within your division there were other

24 males that were impacted by the same RIF that impacted

25 you?

**Rebecca Capps.txt**                          **Page 224**

00225
1     A.  I don't know.  Everett McCane, that's all I

2  know.

3     Q.  Diron Binshop?

4     A.  Diron wasn't RIF'd.

5     Q.  You're not aware of him being part of the RIF?

6     A.  No.

7     Q.  Do you or would you have knowledge of who the

8  males were who were impacted by that RIF?

9     A.  No.

10     Q.  So you don't know one way or another how many

11  males were let go in that RIF; is that correct?

12     A.  That's correct.

13     Q.  Now, in Exhibit 10 on Page 1 --

14     A.  Okay.

15     Q.  -- Kaily Bissani asks you if you have an issue

16  that needs to be discussed, to please contact him

17  directly, do you see that?

18        MR. OLSEN:  Do you want to direct her to it?

19     A.  Yes, I see it.

20     Q.  (By Ms. Martinez)  And you didn't contact him

21  directly, did you?

22     A.  I replied to the e-mail.

23     Q.  Other than the e-mail?

24     A.  No, but I would have considered this a direct

25  contact.

**Rebecca Capps.txt**                         **Page 225**