IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00922-RPM-CBS

REBECCA CAPPS,

                Plaintiff,

v.

LEVEL 3 COMMUNICATIONS, LLC,

                Defendant.

_____

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
_____

        PLAINTIFF REBECCA CAPPS, by her attorney, the law firm of Olsen & Brown, LLC, respectfully opposes (and partially confesses[1]) Defendant's Motion for Summary Judgment, and as grounds therefor states as follows:

## INTRODUCTION

        This is a case in which an habitually sexist vice president was demoted to a lower title in a male-dominated company and male-dominated industry, took over a lesser role in Denver and quickly set about to terminate all of the females.  <u>He did exactly that</u>. Then, when it became apparent that he was going to be challenged for his illegal actions against the women, he scrambled to create bogus explanations out of whole cloth.  This particular actor -- Kaily Bissani -- should be found incredible as a matter of law, based

_____

[1] Plaintiff partially confesses the defendant's motion for summary judgment and voluntarily drops her claim of disability discrimination.

upon the following evidence of gross pretext, contradictory and obviously false deposition testimony, and other extrinsic evidence of evidence fabrication.

As shall be demonstrated *infra*, pretext is thus shown by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for the action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *See*, *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323-24 (10th Cir. 1997).

### A.  PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS.[2]

<u>Plaintiff performed her job well at Level 3 for six and one-half years.</u>

1 .  Plaintiff is a female who never hesitated to try anything a man would do, and this included competitive horsemanship, where she competed in cutting horse events for prizes in many Western states.  *See*, Plaintiff's Declaration, Exhibit 1, ¶ 1.  Thus, even though the fiber optics communication industry was male-dominated from the outset, she pushed to obtain, and then proved herself in, a job as a subcontractor working for Sprint in Wyoming and Utah.  She worked in both inside and outside plant fiber operations, helping install fiber optics networks across Wyoming, Utah and Nevada.  *See*, Plaintiff's Resume, Exhibit 2.  This was 1996 to 1997.

---

[2] For clarity and brevity, Plaintiff's proffered facts are listed first, so that Plaintiff's response to Defendant's proffered facts can follow and more conveniently and logically refer back to Plaintiff's facts.  The defense has forced the use of an unnecessary briefing format.

2 . In August 1997, plaintiff was hired away from Sprint to become an Operations Manager for QWEST Communications [*see*, Exhibit 2, p. 1], and a year later she applied for and obtained a job as Operations Manager for the defendant corporation. *Id.*, at p. 2. She became an Operations Manager and managed seven-to-eight technicians and was responsible for 1,000 miles of optical cable routes in Colorado and Wyoming. *Id.*

3 . Thus, by the time of the events described in this litigation, plaintiff had been an Operations Manager at the defendant corporation since August 1999, for more than six and one-half years overseeing the field operations for one of the largest optical communications systems in the United States. *See*, Exhibit 2, p. 2.

4 . During her six and one-half years, plaintiff's performance evaluations had always rated her "At/Above" her performance targets. *See*, Exhibit 3.

5 . Plaintiff's long-time supervisor, Peter Smith, resigned from the company in April 2006. *See*, Exhibit 5, Smith's Deposition Transcript, p. 4, ll. 23-24; p. 5, ll. 2-10. In his deposition testimony, Smith made clear that before he resigned as plaintiff's supervisor, for many years was satisfied with her performance:  "I always felt Becky did an adequate job." *See*, Exhibit 5, Smith's Deposition Transcript, p. 38, ll. 5-15; p. 39, ll. 19-21.

6 . Plaintiff:  "Pete [Smith] thought it was unusual that a woman would enjoy working in my position.  It was very technical, very tough job involving a thousand miles of fiber, and he couldn't understand why a woman would want to do the job, as

grueling as it could be.  But he always rated my performance as "At or Above".  And I always got the best raises in my salary."  *See*, Exhibit 1, ¶ 4.

7 . The defendant corporation had undergone numerous RIFs (reductions in force), but plaintiff survived them all.  Smith:  "[W]hy Becky wasn't laid off was because she was a manager of people. . . . And removing a manager at that time was not a decision we made to support Level 3 business."  *See*, Exhibit 5, p. 33, ll. 1-11.

8 . Plaintiff had been retained, despite all of the RIFs, because of her value to the company, her former boss testified.  *See*, Exhibit 5,  p. 33, l. 22 through p. 34, l. 2.

9 . Plaintiff was also rated high by her own subordinates.  *See*, Exhibit 7. Plaintiff's subordinates were required by the defendant corporation to anonymously rate plaintiff's performance, and she was rated "Always excellent," according to one.  *See*, Exhibit 8, p. 5, l. 9 through p. 6, l. 24.  Another said he rated her "good" in all of her performance evaluations.  *See*, Exhibit 9, p. 12, l. 23 through p. 14, l. 25.

10. Note: Plaintiff's own boss, Smith, then resigned from the defendant corporation and received a monetary separation package.  Smith then returned to Level 3 a few months later, in February 2007, without having to refund any of the severance money he had received.  *See*, Exhibit 5, p. 11, 13 through p. 12, l. 18.  Smith had received the severance money even though at the time of his resignation he had no claim against the company.  It was, in short, a gift.  *Id.*, at p. 12, ll. 9-11.

11.  Plaintiff:  "Pete [Smith] was part of the network of good old boys who ran the company and watched each other's backs.  No woman could ever break into that

network.  We were always outsiders.  The men all took care of each other, and sort of tolerated the women in their midst.  When Pete left the company, his friends took care of him.  That's why he got a separation package, when ordinarily no one gets a separation package at Level 3 for simply resigning.  If Pete had been a woman, that would never have happened.  Women at Level 3 never got the benefit of the doubt or any favors.  What is amazing is that Level 3 brought Pete back and never required him to pay back a penny of his separation package."  *See*, Exhibit 1, ¶ 5.

12.  Before Smith resigned from the company, he had had only one manager reporting to him, and that was plaintiff.  Plaintiff herself had six or seven subordinates reporting to her.  Thus, she managed more technicians than Smith did, even though Smith had a higher title and earned far more salary.  *See*, Exhibit 5, p. 20, l. 13 through p. 21, l. 1; p. 32, l. 25 through p. 33, l. 3.


**Level 3 was a male-dominated company to begin with;  but then Smith was replaced by a demoted vice president named Kaily Bissani, a Moroccan immigrant who did not like women in the field**.

**So Bissani promptly got rid of them all**.

13.  During the entire time that <u>Smith</u> was director of operations in global field services, there were only three females working there.  One resigned and moved to Philadelphia.  The other two women were plaintiff and Kathy Bennett.  *See*, Exhibit 5, p. 24, l. 4 through p. 26, l. 25.  [**Q.**  Do you recall any other women who ever worked in the unit while you were the director of operations?  **A.** [Smith] No.].

5

14.  All of Smith's own managers in the company had been men.  *See*, Exhibit 5, p. 35, ll. 20-21 ["My managers have all been men."].

15.  Plaintiff:  "This was a male operation.  There was this background feeling that women were not tough enough to do this kind of work, or could not master the technical part of it.  Putting in and maintaining optical networks is very technical, and Level 3 was an almost exclusively male club in that regard.  It happened repeatedly that I would meet someone and you could see the look on their face, like, 'Wow, a woman was responsible for this work -- and it was a hundred or two hundred miles of installation we were putting in and maintaining -- and I was responsible for it'."  *See*, Exhibit 1, ¶ 6.

**Upon arrival, Bissani almost immediately concocted a so-called "reorganization" and terminated all of the females.**

16.  Smith was replaced by Bissani, and Smith and Bissani initially met at a Le Peep restaurant in Denver.  *See*, Exhibit 5, p. 39, l. 22 through p. 41, l. 22.  At this initial meeting, Bissani disclosed to Smith that Bissani was going to start his stint by implementing a so-called "reorganization," and the so-called "reorganization" was going to result in plaintiff's job being combined with another employee's job into a single job -- "long haul" manager (plaintiff's job) being combined with "metro" manager (Diron Benschop's job).  *Id.*, at p. 43, l. 16 through p. 45, l. 7.

17.  The so-called "reorganization" would ostensibly result in one of the two (plaintiff or Benschop) being laid off, or RIFed.  This was according to Bissani himself.  *See*, Exhibit 12, p. 11, ll. 2-4 [Bissani:  "Well, I had to make a decision to combine the

6

two jobs."].

18.  Benschop was a male.  *See*, Exhibit 1, ¶ 7.  Plaintiff was a female, as discussed *supra*.


**Plaintiff was far more qualified than Benschop to be retained;
Bissani simply wanted to purge all of the women -- and did**.

19.  When plaintiff was fired, Benschop had been outside plant manager only three years (having been a technician before that), while plaintiff had been an outside plant manager for six and one-half years.  *See*, Exhibit 10, p. 5, l. 19 through p. 7, l. 11.

20.  Benschop had previously done a poor job in a manager position while working for Smith (according to Smith).  *See*, Exhibit 5, p. 64, ll. 18-20.  Benschop "did not do a good job for me."

21.  At the time of Bissani's so-called reorganization, Benschop had no "direct reports," i.e. he supervised no one.  *See*, Exhibit 5, p. 70, l. 24 through p. 71, l. 7.  At the same time, plaintiff had six "direct reports."  *See*, Exhibit 5, p. 71, ll. 5-7.

22.  Plaintiff had overseen not only a thousand miles of the network but also multiple large projects, including a governmental project in the Colorado Springs area, and Echostar in Cheyenne, Wyoming.  *See*, Exhibit 5, p. 72, ll. 12-17.

23. Ultimately, Bissani would <u>claim</u> that plaintiff was fired (and Benschop retained) because plaintiff had no "metro" experience, i.e. managing operations in or near a large city, and had not had to handle outside contractors, requiring paperwork.  But Bissani never cared to look at plaintiff's credentials.  His decision to fire plaintiff was

entirely subjective, and Bissani's reasons were shown to be false and rife with mendacity as shown within this litigation, to be discussed *infra*.

24.  Contrary to Bissani's rationale for firing plaintiff, she and her crew had been responsible for "metro" work, and she had abundant experience working with outside contractors and paperwork.  *See*, Exhibit 8, p. 8, l. 23 through p. 9, l. 13.  Plaintiff's crew had done "inside work" under plaintiff's supervision, including in Salt Lake City.  *Id.*, at p. 10, l. 12 through p. 11, l. 9.  Plaintiff had handled the paperwork and dealt with the "outside contractors."  *Id.*, at p. 11, l. 14 through p. 13, l. 5.  <u>This was part of her responsibility</u>.  *Id.*

25.  Plaintiff's crew, under her supervision, had also worked on the "metro ring" around Denver and Salt Lake City, which work constitutes "metro" work.  *See*, Exhibit 8, p. 24, l. 3-23.

26.  Members of plaintiff's crew had even been required to train others in Denver. *See*, Exhibit 8, p. 27, l. 12 through p. 29, l. 7.

27.  Other members of plaintiff's crew, under her supervision, maintained cable routes in "metro" areas, including "several hundred" miles of "metro" cable routes and extensive work in Colorado Springs.  *See*, Exhibit 9, p. 17, l. 19 through p. 19, l. 6.

28.  Plaintiff had hired and managed contractors numerous times, "for contractors to cover the locates," according to those who observed her work.  *See*, Exhibit 9, p. 26, l. 3 through p. 27, l. 23.  "Locates" is a term of art in the optic cable industry.

29.  Another subordinate testified that plaintiff had previously managed

contractors and thus was fully capable of performing the duties of Benschop's job.  And this was from his own observation of her work for six and one-half years.  *See*, Exhibit 9, p. 32, l. 12 through p. 33, l. 24.

30.  Even the Denver "metro" manager, Benschop himself, agreed that plaintiff's duties had encompassed "metro" activities.  **Q.**  Did she [plaintiff] have any duties that somehow touched upon metro activities. . . . **A.** Quite a bit -- well, quite a bit of the long-haul plant and the metro plant run concurrent.  So they're basically in the same duct structure."  *See*, Exhibit 10, p. 28, l. 3-9.  Thus, plaintiff's duties with regard to installation and maintenance of the Level 3 network were the same as Benschop's.  *Id.*, at p. 28, l. 24 through p. 29, l. 8.  And plaintiff dealt with contractors as well.  *Id.*, at p. 30, ll. 2-23.

31.  The Denver "metro" manager, Benschop, testified that plaintiff filled in for him [*see*, Exhibit 10, p. 39, ll. 13-20], which was confirmed by plaintiff.  *See*, Exhibit 4, p. 57, ll. 12-13.  Plaintiff was even required to make sure that Benschop's projects were on track.  *See*, Exhibit 19, e-mail dated April 17, 2006 9:53 a.m. ["Diron's projects are on track and he called Friday and expects to be back to work Wednesday.  I will keep you updated."].

32. Plaintiff and the Denver "metro" manager "basically held the same job description. . . ."  This was according to the Denver "metro" manager himself, Benschop.  *See*, Exhibit 10, p. 39, ll. 19-20.

33. Benschop said of plaintiff, **"[W]e did the same job. . . ."**  *See*, Exhibit 10, p.

39, ll. 19-20 [emphasis added].

34. Plaintiff:  "I was far better qualified than Diron [Benschop] by any measure, from managerial experience, to daily experience, to miles of cable maintained.  What happened is that when Kaily came in, he had an agenda to get all of the women out of his unit -- fast.  And he did it."  *See*, Exhibit 1, ¶ 7.

35. On the same day that Bissani fired plaintiff, he fired another woman as well, Pattie Weber.  *See*, Exhibit 9, p. 6, ll. 8-23.  Present that day was another employee, Bob Cooper.  He gave Weber a ride home.  *Id.*, at p. 19, l. 24 through p. 21, l. 15.

36.  Bissani (possibly with Peter Smith's involvement) also fired the other remaining female, Kathy Bennett;  however, in his deposition, Bissani tried to pin Bennett's firing on plaintiff.  *See*, Exhibit 12, p. 12, ll. 13-17.  This was absolutely and utterly false.  "Kaily decided to fire Kathy after Pete Smith discussed it, and Kaily decided to go through with it.  He told me that she had to go.  Kaily wanted me to be there as a witness when she was fired."  *See*, Exhibit 1, ¶ 8.   Bennett was terminated about one week before plaintiff was terminated.  *See*, Exhibit 4, p. 52, ll. 2-5.  Again, as plaintiff testified, she did not make the decision to terminate Bennett.  *See*, Exhibit 4, p. 52, ll. 8-10.

37.  Weber was pregnant when she was fired, and Bissani knew it, because he spoke with her about her health insurance options.  *See*, Exhibit 9, p. 22, l. 25 through p. 23, l. 17.  Bissani also spoke to plaintiff about Weber's pregnancy upon his arrival in Denver.  He said, with considerable concern, "You know she's pregnant, don't you?"

This was an expression of concern that she would be unavailable for work soon, rather than a concern about the momentous event of having a baby.

38.  Combined with the firing of Bennett, Bissani's firing of plaintiff and Weber -- on the same day -- left no women remaining in the unit.  *See*, Exhibit 9. p. 19, l. 24 through p. 20, l. 3.

39.  Bissani had arrived for his demotional job on March 31, 2006.  *See*, Exhibit 24 [Level 3's EEOC response, excepted], p. 2, ¶ 2 ["Kaily Bissani became Charging Party's supervisor on March 31, 2006."].  Plaintiff was informed of her firing on April 25, 2006.  *See*, Exhibit 23.  Thus, in a mere 25 days, all of the women were fired by Bissani.

40.  Plaintiff testified in her deposition:  "We were all let go within days of each other."  *See*, Exhibit 4, p. 199, ll. 20-22.

41.  Plaintiff: "It may have had something to do with Kaily's Moroccan background, I don't know.  I know this -- women were second class citizens to him.  He was rude and abrupt with females.  He was dismissive of them in a way that you might see in the movies.  I could tell the very first time I spoke with him that he rankled that a female would tell him anything about anything."  *See*, Exhibit 1, ¶ 10.

42.  Bissani was born in Casablanca, Morocco.  *See*, Exhibit 12, p. 52, ll. 2-3.  He did not come to the U.S. until 1991 or so.  *Id.*, at p. 52, ll. 7-19.

43.  The bottom line is that Bissani, regardless of nationality, was "sexist" in the way he dealt with women.  *See*, Exhibit 4, p. 222, ll. 6-7.

**In order to try to make plaintiff's termination stick, Bissani had to create false criticisms of plaintiff**.

44.  Within a few days of Bissani's arrival as plaintiff's manager, he prepared a quarterly performance evaluation of her.  It is Exhibit 26.  He declined to fill out the boxes for specific category ratings, instead writing "None selected" six times.  *Id.*

45.  But Bissani added some sharp -- and false -- narrative criticisms of plaintiff, about whom he knew almost nothing at that point.  Bissani wrote that plaintiff "lacks leadership and management skills," among other alleged shortcomings, all of which were false.  Plaintiff:  "I never saw this [Bissani's narrative criticisms] before my deposition.  If I had, I would have gone to HR about it right away because it was totally false.  Kaily had been there less than a week.  He was already creating a paper trail to get rid of me.  He did not tolerate women in leadership roles.  He never even asked me questions.  I had been in a leadership and management position for pushing seven years at Level 3, and he was willing to trash that in a couple of days.  He never showed me these written comments, because he knew that they were false and I would challenge them."  *See*, Exhibit 1, ¶ 11;  Exhibit 4, p. 102, l. 23 through p. 103, l. 5.

46.  Plaintiff testified in her deposition that she had never seen Bissani's written commentary in the performance evaluation.  *See*, Exhibit 4, p. 204, l. 14 through p. 205, l. 17.  This was even though company procedure required Bissani to have shown it to her and discussed it with her.  *Id.*

47.  In his (secret) performance evaluation, Bissani falsely claimed that plaintiff had been unavailable to help with operations in Colorado.  Plaintiff: "He claimed that I was rarely available for anyone not in Wyoming.  This was the wildest kind of lie, as I spent more time with my Colorado responsibilities than my Wyoming responsibilities.  In looking at this performance evaluation, the one he never showed me, you will notice that Kaily declined to rate me in individual categories.  This was his way of confessing that he did not know enough about me.  But he decided to rip me anyway in the narrative, and it could not have been anything but a set-up for my eventual firing.  He is a very, very crafty person."  *See*, Exhibit 1, ¶ 12; Exhibit 4, p. 88, ll. 5-16;  p. 89, ll. 14-20 [Bissani's claim in the secret performance evaluation that she never managed a Metro OSP was false as a matter of fact;  Bissani's claim that she was rarely available for anyone that did not live in Wyoming was false as a matter of fact].

48.  Plaintiff testified in deposition that Bissani was so new to her unit that he had had no time to observe her work, interview her, nor develop any basis to evaluate how she was doing.  *See*, Exhibit 4, p. 200, ll. 9-23.

49.  When Bissani came into his demotional job, he would have very short conversations with plaintiff even though they were regarding "extremely important topics relative to the Denver division. . . ."  *See*, Exhibit 4, p. 90, ll. 16-20.  When plaintiff tried to speak with Bissani, he would "go into his office and shut the door, and then I didn't have an opportunity to discuss anything with him."  *Id.*, at p. 91, ll. 17-21.  This was in contrast to the long conversations that Bissani had <u>with men</u>.  *Id.*, at p. 90, ll.

16-20.

**The actual reasons given by the company for terminating plaintiff were patently pretextual;  Bissani simply wanted to bring in an old male friend from outside the company.  To make room, he had to get rid of plaintiff.  He gave plaintiff false reasons for her firing, and then concocted the "reorganization" story.  This is shown by the hard evidence in the case.**

50.  Bissani claimed <u>later</u> that he got rid of plaintiff because her job had been combined (with Benschop's) into a new position, called "field manager."  According to Bissani, neither plaintiff nor Benschop qualified for the newly created job -- and thus they would both be out of a job in the Bissani-orchestrated RIF.  Needless to say, that's not how it worked out -- the male (Benschop) was retained through considerable machinations by Bissani;  Bissani then lied in his deposition (or was preposterously forgetful) about his machinations to save Benschop, as shall be discussed *infra*.

51.  Plaintiff had every reason to believe that if there was a newly created job, she was the best qualified to take it.  Indeed, her outgoing boss, Smith (even as he was being replaced by Bissani), told plaintiff that she was the best qualified for the new job.  *See*, Exhibit 4, p. 60, ll. 11-13.

52.  Bissani himself confirmed that Smith had told Bissani that plaintiff was the best qualified for the job -- but Bissani was referring to the job that plaintiff already held. *See*, Exhibit 4, p. 95, ll. 3-6;  p. 196, ll. 9-17; p. 196, ll. 2-12.

53.  As it turned out, Bissani had already lined up an old friend, Steven Forry, for the job and was deceiving plaintiff about his intentions, as discussed *infra*.  Thus, at one

14

point, <u>Smith</u> was deriding Forry's lack of qualifications for the new job and jokingly said to plaintiff that he wondered if there were "some naked pictures involved."  In other words, Forry, the joke went, had some damaging information that Bissani wanted to keep quiet (and so Bissani gave Forry a job).  *See*, Exhibit 1, ¶ 13.  "Pete [Smith] was joking, but that would suggest how illogical it was that Kaily would simply put Steve Forry in that job at the same time firing me."  *Id.*

54.  Astoundingly, in his deposition, Smith claimed that he could not recall a single thing that he said to plaintiff on the topic of recommending her for the new job. *See*, Exhibit 5, p. 77, ll. 8-15.

55.  In sum, Bissani had a personal agenda for the new job.  Instead of placing plaintiff in it, he fired her and then selected an outsider -- and old male friend (Forry) -- to come in and assume the new job.  Thus, Bissani informed others that plaintiff was being terminated (but upon her termination, she was not replaced for from two weeks to a month after that).  *See*, Exhibit 9, p. 8, l. 11 through p. 9, l. 19.

56.  When Bissani <u>announced</u> that plaintiff was terminated, one of plaintiff's subordinates told him that plaintiff had always done a good job.  Bissani just stared at him.  *See*, Exhibit 9, p. 16, ll. 6-13.

57.  Bissani never gave any reason for firing plaintiff to plaintiff's subordinates. *Id.*, at p. 16, ll. 14-18.  If it had been a true RIF, he surely would have told them so.

58.  As for Bissani's rationale given directly to the victim, plaintiff, Bissani merely told plaintiff that <u>she was not qualified for the job that she had held for six and</u>

<u>one-half years</u> and therefore was being terminated.  Plaintiff:  "He told me I was not qualified in his eyes.  He said, 'We no longer have a need for you at this company.'  I was well qualified and had been doing the job with good ratings by the company for six and one-half years.  Yet, Kaily just decided in his own devious way to *declare* that I was not qualified.  He just couldn't handle a female in a key role like that.  He did not want to supervise any women, and so he simply fired them all.  It was bing, bing, bing.  All of us [women] gone."  *See*, Exhibit 1, ¶ 15.

59.  Thus, the defendant corporation would later foist the "reorganization" story on the EEOC -- but Bissani never gave <u>that</u> reason to plaintiff face-to-face:  "He told me that I was being let go because I was not qualified for the job.  It was very matter-of-fact to him."  *See*, Exhibit 1, ¶ 15.

60.  Then Bissani brought in his old male friend for what he labeled a "new" job, but the male friend (Steven Forry) simply assumed plaintiff's job duties, as shall be discussed *infra*.  Plaintiff:  "Steve Forry was hired because of the good old boy network.  I felt that Steve and Kaily had some prior relationship.  Otherwise, there was no logic in firing me just to find Steve Forry a job within Level 3."  *See*, Exhibit 1, ¶ 17.

61.  Plaintiff turned out to be correct about the good old boy network.  Forry's father was an old friend of Bissani's and reported to Bissani at one point while working at Level 3 years before.  *See*, Exhibit 11, p. 8, ll. 9-21.

62.  Moreover, Forry was asked in his deposition if he socialized with Bissani:  **Q.** Did you socialize together outside of work?  **A.**  Yes."  *See*, Exhibit 11, p. 7, ll. 20-21.

16

As it turned out, they had socialized together when Forry previously worked for Level 3.

63.  Forry had previously worked at Level 3 and been laid off.  *See*, Exhibit 11, p. 9, ll. 14-24.  But he was only out of work two months when, after hearing of Bissani's so-called "new" job through Forry's own father, he was hired by Bissani, formally returning to Level 3 on May 10, 2006.  *Id.*, at p. 11, l. 22 through p. 13, l. 2.

64.  Bissani did not announce that Forry was going to be coming in until about two weeks after plaintiff was fired.  *See*, Exhibit 9, p. 9, ll. 12-19.  There was a gap of two to three weeks after plaintiff was fired that there was no supervisor at all.  *See*, Exhibit 9, p. 42, l. 18 through p. 43, l. 14.

65.  Recall that the reason given to the EEOC for firing plaintiff was that plaintiff's "long haul" position was being combined with Benschop's "metro" position, as discussed *supra*.  But said explanation was patently bogus.  **The merger of those two jobs did not occur until December <u>2007</u>.**  At the time of the deposition of one of the subordinates on the team that was taken over by Forry, Bob Cooper testified (on December 20, 2007) that combining of those two jobs had not occurred until, "Just last week."  *See*, Exhibit 9, p. 28, l. 17.  Cooper made clear that there was no combining of the two jobs after plaintiff was fired, until the week before he gave his deposition.  *Id.*

66.  Thus, the rationale for firing plaintiff that was given to the EEOC was bogus. The alleged merger of jobs did not occur <u>until one year and eight months after plaintiff was fired</u>.

67.  To boot, after Forry was hired, it was obvious that he was not performing the

duties of the allegedly <u>combined</u> job, as claimed by the company, and did not perform very many "metro" duties at all:  One of his subordinates, who still works for Level 3, testified as to his own observation of Forry:  "I didn't think he performed much metro duties, I'm sorry."  *See*, Exhibit 9, p. 37, ll. 3-6.  This was because, the team member testified, "metro" (which was Benschop's old job) **was still being covered by Benschop himself**.  *Id.*, at 44, ll. 8-20.

68.  In sum, Benschop was still doing his old job for nearly two years after plaintiff was fired.  Benschop's job and plaintiff's job were <u>not</u> formally merged -- until December 2007.  In sum, Benschop somehow survived the RIF that Bissani had *claimed* was in store for both Benschop and plaintiff.  The circumstances thereof are so rife with mendacity as to be pretextual as a matter of law.

> **Not only did Bissani bring in an old friend, Forry, at plaintiff's expense, but he saved <u>Benschop</u> from being RIFed -- also at plaintiff's expense. Plaintiff patently was treated disparately multiple times because of the good old boy network.**

69.  First, Bissani tipped off Benschop that there allegedly was going to be a combination of Benschop's "metro" job and plaintiff's "long haul" job and that if Benschop was interested, he should apply for the new position.  *See*, Exhibit 10, p. 11, ll. 1-18.

70.  The upcoming job opening was never posted while plaintiff was still at work. *See*, Exhibit 4, p. 95, l. 21 through p. 96, l. 13.  The reason is that it was not really a

"new" job.  It was actually <u>plaintiff's job</u>, as discussed *supra*.  Indeed, Bissani himself confirmed that the job that Benschop was given was not posted until after plaintiff was fired and gone.  *See*, Exhibit 12, p. 46, ll. 6-21.  ["I think she was gone by then."]. Moreover, the job into which Benschop as placed was never posted <u>at all</u>, as will be discussed *infra*.

71.  Benschop was being protected from the outset.  Indeed, Benschop was never informed by anyone that there was any possibility that he would not have a job after his job was *allegedly* combined with plaintiff's job.  *See*, Exhibit 10, p. 12, l. 5 through p. 16, l. 5.

72.  To the contrary, Bissani actually <u>created a new job for Benschop</u>, rather than fire him, like plaintiff.  Bissani told Benschop that he would be placed into the new job, called "field engineer."  *See*, Exhibit 10, p. 12, l. 5 through p. 16, l. 5.

73.  To be perfectly clear, it was Bissani who informed Benschop of the new job for Benschop.  *See*, Exhibit 10, p. 14, l. 23 through p. 15, l. 4:  "[I]t was at that time that Kaily offered me the senior field -- well, at the time it was titled different, but he offered me senior field tech position, basically a demotion. . . . He [Bissani] told me that, you know, he has this position available if I want it."

74.  In his deposition, Bissani, denied making the decision to protect and keep Benschop.  *See*, Exhibit 12, p. 20, ll. 9-21.  This was just one of the myriad contradictions in Bissani's testimony, as shall be discussed *infra*.

75.  It was confirmed by other managerial sources that Benschop's job was a new

job, i.e. was a "new headcount, yes."  *See*, Exhibit 11, p. 19, l. 25 through p. 20, l. 4.

76.  Thus, the paradox -- and pretext -- is shown, that during a so-called RIF to reduce headcount, Bissani's group actually increased head count.

77.  The job into which Bissani placed Benschop was previously unfilled in the Denver Gateway.  *See*, Exhibit 10, p. 16, ll. 1-25;  Exhibit 11, p. 19, l. 25 through p. 21; l. 9; p. 21, ll. 18-23.  Thus, a new job was created for Benschop.  Bissani himself testified:  "No, nobody was in it [no incumbent was in the job].  It was <u>created</u> based upon the workload and responsibility that it was created."  *See*, Exhibit 12, p. 42, l. 25 through p. 43, l. 2 [emphasis added].

78.  **The job into which Benschop was placed was never posted**.  *See*, Exhibit 10, p. 17, ll. 7-23;  Exhibit 11, p. 72, ll. 20-22.

79.  Recall that plaintiff was sent home after being told she was being fired on April 25, 2006, as discussed *supra*.  Benschop was offered his new job <u>the very next day</u>. *See*, Exhibit 25.

80.  Astoundingly, even though the new job was never posted and Benschop was placed directly into it, Bissani testified that Benschop "applied for the job like everybody else."  *See*, Exhibit 12, p. 27, ll. 2-16.

81.  Eventually Bissani conceded in his deposition in so many words that Benschop was kept employed even after plaintiff was terminated.  Thus, Benschop was still employed in his old job when plaintiff was fired, and thus Benschop "applied" for the newly created job, at least according to Bissani's incredible deposition testimony.

Once again Bissani tried to claim that Benschop *applied*, when, to the contrary, he was simply handed the job, as discussed *supra*. *See*, Exhibit 12, p. 31, ll. 6-8; p. 32, ll. 1-3. Bissani repeatedly claimed that the new job that Benschop got was posted "on the Job Monster or on the Web internally or externally. . . ." and that plaintiff could have applied for it. *Id.*, at p. 34, l. 22 through p. 35. l. 1.

82.  This was false.  Plaintiff:  "The job they handed Diron [Benschop] was never posted and I was never told of it.  They just kept Diron in his old job and gave it a new title.  They did this because they had to manufacture a reason to justify keeping Diron and firing me.  Diron's new job title was never posted.  No one knew about it until Diron was handed the job.  Kaily never advertised the job.  Kaily is making that all up, because he thinks it is a way to disprove discrimination."  *See*, Exhibit 1, ¶ 18.

83.  This was once again a deception by Bissani.  Plaintiff:  "They created a job for Diron Benschop and fired me.  The job they gave to Diron was never posted.  If it had been, I would have applied for it rather than lose my job and my career.  And I would have been far more qualified than Diron for that job.  That's why it was not posted."

84.  Benschop's own boss confirmed that he never saw a job description for Benschop's newly created position.  *See*, Exhibit 11, p. 22, ll. 2-4.

85.  **Indeed, when Benschop assumed the new job, his duties did not change at all from what they had been previously, <u>according to Benschop himself</u>.** *See*, Exhibit 10, p. 18, ll. 2-8.  **Bissani told Benschop to just keep doing the same duties as**

**before**.  *Id.*

86.  Benschop's new boss confirmed that Benschop's duties did not change when he got the new job, although it was no longer considered a management job (but Benschop did not manage anyone anyway).  *See*, Exhibit 11, p. 61, ll. 11-20.

87.  Plaintiff:  "This was Kaily [Bissani] simply creating a position for Benschop. Kaily claimed that my job and Diron's job were combined into one, and that's why I had to be laid off.  That now turns out to be totally false.  Diron's job remained the same, only Kaily simply gave it a new title to make it seem like a legitimate reorganization."

88.  Benschop's supervisor confirmed that plaintiff was indeed fully qualified for the new (but secret) job that was handed to Benschop.  *See*, Exhibit 11, p. 76, ll. 9-20. [**A.**  [By Forry] I guess I would have to change my answer.  Yes, she [plaintiff] would be qualified to take that job [the new job that Benschop was given]."

89.  Eventually in his deposition, Bissani conceded that he never considered Benschop for RIF in the first place.  *See*, Exhibit 12, p. 64, l. 24 through p. 65, l. 6.

90.  Thus, plaintiff was treated disparately, and drastically so, as compared to Benschop, whose job was saved by simply giving it a new title (while the duties remained exactly the same).  Note:  Plaintiff would have accepted the field technician job had she been offered it, "To stay employed."  *See*, Exhibit 4, p. 32, ll. 10-24.

91.  At the same time, it was also false that Forry took over a "combined" job, i.e. combining Benschop's old duties with plaintiff's old duties.  The incoming Forry assumed none of Benschop's duties in "metro":  **Benschop testified:  "Specifically**

**none."**  *See*, Exhibit 10, p. 19, ll. 14-24.

92.  Instead, even according to Benschop himself, Forry took over "managing the long-haul technicians."  *See*, Exhibit 10, p. 19, l. 25 through p. 20, l. 10.  This had been plaintiff's old job.  *See*, Exhibit 1, ¶ 22.  Plaintiff:  "This was an artificial 'reorganization,' which Level 3 is famous for.  There was no 'reorganization.'  I was simply replaced by Steve Forry and they thought they could get away with it by declaring it to be a 'reorganization'."

93.  Indeed, Forry took over the supervision of plaintiff's subordinates.  *See*, Exhibit 10, p. 31, l. 25 through p. 32, l. 8.  Forry then had no other subordinates (except for Benschop).  *Id.*

94.  **Indeed, Forry telephoned plaintiff weeks before his re-hiring at Level 3 and apologized to her, as he had been told by Bissani that he would be taking <u>plaintiff's job.</u>**  *See*, Exhibit 4, p. 92, ll. 13-25.  [emphasis added]; p. 185, ll. 9-12.  Forry said he had been offered plaintiff's job over lunch with Bissani, and the date of the lunch was around April 20 or 22, 2006.  *Id.*, at p. 100, ll. 2-24; p. 186, ll. 8-10 ["He said he was sorry he was taking my job and that he would see what he could do to keep me on in the company."].

95.  Plaintiff was told by another employee, Ian Yuland, that a conversation had been overheard in the Denver Gateway on Pearl Street that plaintiff "was going to be replaced by Steven Forry."  *See*, Exhibit 4, p. 186, l. 14 through p. 187, l. 17.  Thus, Bissani had permitted the information to leak out, or leaked it himself.

96.  When Forry was hired back at Level 3 in Denver, plaintiff had already been terminated -- but Forry claimed never to have received any information as to why.  *See*, Exhibit 11, p. 16, l. 23 through p. 17, l. 13.  Thus, Forry's testimony should be considered with great care, as it was Forry himself who had previously telephoned plaintiff to apologize for taking her job, as discussed *supra*.

97.  Forry also testified that he saw plaintiff's job as OSP manager posted before she was terminated.  *See*, Exhibit 11, p. 63, ll. 12-21.  [**A.**  I believe I called her [plaintiff].  **Q.**  Why?  **A.**  Because I had seen the job posted.  **A.**  You had seen what job posted?  **A.**  Outside plant manager.  **Q.**  And why would that lead you to call her?  **A. Because I knew she held that position**."].  [emphasis added].

98.  Thus, even as Bissani was planning to terminate plaintiff, her job was being advertised to be filled, as discussed *supra*.  This comprises the very essence of pretext.

>    **Plaintiff was not only more qualified for the job that was created for Benschop, but she was more qualified than Forry when he was brought in from the outside**.

99.  Forry's prior experience included only two years of long haul experience. *See*, Exhibit 11, p. 70, l. 22 through p. 71, l. 8.  Plaintiff's included six and one-half years, as discussed *supra*.

100 .  Forry's recent prior experience had included managing only two people as an outside plant manager.  *See*, Exhibit 11, p. 71, ll. 5-8.  Plaintiff's prior experience at Level 3 included managing six, seven or eight at various times, as discussed *supra*.

101 .  Forry's prior experience had included maintaining a mere 180 miles of fiber optic network.  *See*, Exhibit 11, p. 71, ll. 15-17.  Plaintiff's included "Between two and 3,000" miles, according to Forry himself.  *See*, Exhibit 11, p. 72, ll. 9-11.  Note:  Plaintiff would say that the mileage figure is not as high as 3,000 but somewhere between 1,000 and 2,000 miles.

102 .  Plaintiff:  "Now that documents have been produced in this litigation, I can say that there was no comparing Steve's prior experience to mine.   By any objective measure, I was more qualified than Steve.  Not only that, Steve told me he was on a performance plan when he was previously laid off from Level 3.  That was one of the reasons why he was laid off.  If you are on a performance plan, you are the first to be laid off.  So they hired back a guy who was on a performance plan to replace me.  This only makes sense in the context of the good old boy network."  *See*, Exhibit 1, ¶ 23.

**Bissani scrambled to create any plausible reason to justify having fired plaintiff, because the "reorganization" rationale was not going to be believed by anyone.  Bissani's <u>alternative</u> reason was also patently pretextual.**

103 .  Eventually in his deposition Bissani added a new reason for firing plaintiff.  He claimed she had been "disrespectful" to him.  *See*, Exhibit 12, p. 47, l. 21 through p. 48, l. 13.  Bissani claimed that said disrespect was reflected in "a couple of e-mails."  *Id.*, at p. 48, l. 20 through p. 49, l. 15.

104 .  Bissani then confirmed that he was referring to a <u>single</u> e-mail.  *See*, Exhibit

12, p. 68, l. 24 through p. 69, l. 6.  That e-mail is Exhibit 13 and dated April 24, 2006.

105 .  However, Bissani's new assertion that he fired plaintiff because of the allegedly disrespectful e-mail is proven to be a blatant falsehood, because by then Bissani <u>had already told Forry that Forry was replacing plaintiff</u>.  This is reflected in Exhibit 13 itself.  If one reads the e-mail, plaintiff was calling Bissani's attention to the fact that she had already been told that she was out of a job.  Plaintiff:  "I wrote that e-mail after Steve [Forry] called earlier that day -- April 24th -- to tell me that Kaily [Bissani] said he was taking my job, and Steve was real sorry about it.  Steve assumed I had already been told, but it was a complete shock to me."

106 .  It was the very next morning, April 25, 2006, that plaintiff was informed that she was being fired.  *See*, Exhibit 23.

107 .  One day later, on April 26, 2006, plaintiff informed her acquaintances via e-mail that she was no longer with Level 3.  *See*, Exhibit 19.

108 .  Thus, in deposition and under oath, Bissani got his story backwards, and plaintiff's allegedly disrespectful e-mail came only <u>after</u> Bissani had already decided to fire plaintiff, and thus it could not have been <u>a cause of</u> her firing.

109 .  Forry's own testimony confirms plaintiff's chronology, in that Forry asserted that he spoke with Bissani about taking the new job "somewhere in the middle of April."  *See*, Exhibit 11, p. 12, l. 24 through p. 13, l. 2.  Plaintiff knows that Forry called her on April 24, 2006, which is what prompted her e-mail of that same date to Bissani, as discussed *supra*.

110 .  That Bissani's reason for firing plaintiff (now shown to be more personalized than he had originally portrayed) overshadowed his claim that it was a mere "reorganization" is proven by e-mails obtained through discovery in this litigation.  *See*, Exhibit 20.  Bissani wrote to HR Manager Gregory Daub that Bissani needed to "RIF" plaintiff "ASAP" (as soon as possible) because of plaintiff's e-mail in which she complained that Bissani needed to "let me [plaintiff] know what is going on. . . "  Thus, plaintiff was not "RIFed" because of the manpower needs of the company or any alleged reorganization.  She was not "RIFed" at all.  Rather, she was simply fired because of Bissani's personal quest to get her fired, which was triggered because Bissani had already hired Forry to replace plaintiff -- and Forry had already telephoned to apologize to plaintiff for taking her job.  Of course, Bissani did not inform Daub in the HR Department of this important chronology nor that Bissani himself had created ample cause for plaintiff to express extreme concern in her e-mail to Bissani (by Bissani letting others, including Forry, know that Forry was being hired to replace plaintiff).

111 .  If one reads Bissani's e-mail to Daub carefully, it is apparent from its very language that Bissani had previously broached the subject with Daub of firing plaintiff: "This is the reason why I need to RIF her ASAP."  *See*, Exhibit 20.  Thus, Bissani targeted plaintiff soon after being demoted to Denver, just like he targeted the other females.  Thereafter, it became a scramble for Bissani to fabricate barely plausible, but provably false, *ex post facto* excuses to deal with plaintiff's claim of discrimination and the instant litigation.

27

112 .  It is also telling that once Bissani sent his e-mail to Daub, Daub realized that the discussion needed to proceed *without a documentary trace*.  ["Kaily -- what's your Gateway phone number?  Thanks! Gregg.'].

113 .  Note:  it was simply unprofessional for Bissani to leak the information that Forry had already been hired to replace plaintiff, before plaintiff herself was told.  *See*, Exhibit 4, p. 198, l. 21 through p. 199, l. 15.

114 .  In his scramble for a quasi-plausible *ex post facto* explanation for (a) firing plaintiff, (b) getting rid of all the women, (c) hiring an old male pal, and (d) keeping Benschop, Bissani came up with yet another patently pretextual reason for passing over plaintiff and hiring Forry from the outside instead.  Bissani claimed that plaintiff was unwilling to move to Denver to take the job that Forry would eventually get.  Indeed, Bissani claimed that he spoke with plaintiff "at least" ten times to entice her to come to Denver ostensibly for the new job.  *See*, Exhibit 12, p. 57, l. 14 through p. 58, l. 1. This, too is false.  Plaintiff not only was willing and able to move [*see*, Exhibit 1, ¶ 26)], but she already had been staying in Denver when she worked in the "metro" offices and had living arrangements, as might be needed, with a friend, Becky Shepard.  *Id.*  Those "living arrangements" were explained to Bissani.  *See*, Exhibit, 4, p. 114, l. 10 through p. 116, l. 8.  But Bissani refused to speak with plaintiff on the topic.  *Id.*

115 .  Shepard:  "Level 3's lawyers contacted me and tried to get me to sign a false statement that said that Becky [plaintiff] and I did not have a rental agreement when Becky would stay with me in Denver.  Becky paid me to stay with me, and that was

under an agreement whenever she had to be in Denver for her company." *See*, Exhibit 15, ¶¶ 1-5.

116 .  Plaintiff had agreed to pay rent of $300 per month to stay with Shepard while working in Denver. *See*, Exhibit 4, p. 117, ll. 10-23.

117 .  As another *ex post facto* excuse for not considering plaintiff for the supposedly new job that Forry got, the defendant corporation has more recently claimed that plaintiff never applied for the opening.  *See*, Defendant's Discovery Responses, Exhibit 18, p. 7, ¶ 1.  ["Mr. Bissani was never specifically required to address whether Plaintiff must be selected for the Field Manager position, however, because Plaintiff never applied for that position."].

118 .  Plaintiff:  "I never saw any advertisement for the job that they stuck Steve Forry in.  A couple of days after being told I was fired, a friend informed me by e-mail that my job was already being posted on the Level 3 "Career Opportunities" board.  When I read the "Requirements" of the job posting, I realized that it was my job they were advertising.  Level 3 was advertising for applicants for the job I had just been fired from."  *See*, Exhibit 1, ¶ 28; Exhibit 17 [the job posting for her old job].  The e-mail to plaintiff notifying her that her job had been posted (now that she had been fired) is Exhibit 16 [top note].

119 .  The defendant corporation has also claimed that Bissani directly encouraged plaintiff to apply for the new job that Forry eventually got.  In its discovery responses, the company has averred as follows:  "And prior to Plaintiff's separation from

Level 3, Mr. Bissani encouraged the Plaintiff to apply for the Field Manager position.

He also informed her that the new position would be posted.  Mr. Bissani made it clear to

Plaintiff that the structure of Level 3 was changing and that she had to apply to be

considered for the Field Manager position."  *See*, Exhibit 18, p. 10, ¶ 4.  Plaintiff's

response:  "Absolutely false!"  Kaily Bissani informed plaintiff that, based upon Smith's

recommendation, she was already slated to get the job.  *See*, Exhibit 4, p. 109, ll. 13-21.

[**Q.** So was it your understanding that Mr. Bissani offered you the field manager

position.  **A.** He told me I had the job.  **Q.** The field manager position?  **A.** Yes.].

120 .  Plaintiff did not apply for the job after she was fired, because she had been

told that Forry had already been hired for the job.  *See*, Exhibit 4, p. 138, l. 24 through p.

139, l. 24.

121 .  As additional evidence of pretext, the loss of documents in this case is

suggestive of the element of mendacity.   Bissani claimed to have taken notes in his

pivotal conversations with plaintiff.  *See*, Exhibit 12, p. 63, ll. 2-9.  But he could not

remember where they were.  *Id.*  And the defendant has never produced them in

discovery.  *See*, Exhibit 14, ¶¶ 1-5.

122 .  Plaintiff:  "I realize now, after seeing all of the documents in this litigation,

that this was all a bad joke.  Kaily had no intention of keeping me employed."  *See*,

Exhibit 1, ¶ 30.

123 .  Bissani then refused to speak with plaintiff at all:  "He refused to talk with

me."  *See*, Exhibit 4, p. 111, ll. 8-22.  This was even though they were "10 feet from each

other" in the same building.  *Id.*  She asked about the new position, and he refused to

answer.  *Id.*, at p. 112, ll. 5-15.

124 .  Eventually, Bissani simply refused to acknowledge plaintiff's presence.

*See*, Exhibit 4, p. 113, ll. 10-24.  Even when she walked directly up to him in his office,

he refused to speak to her.  *Id.*  "[H]e ceased to acknowledge my existence."  *See*, Exhibit

4, p. 120, ll. 21-25.

125 .  Plaintiff:  "It was very disconcerting.  At first, I thought he was just being

juvenile.  Then I realized that something else was going on -- that he could not deal with

women in positions of responsibility.  He just refused to do it anymore."  *See*, Exhibit 1,

¶ 30.

126 .  Plaintiff one day informed Bissani that she needed to take time off for back

surgery.  "He said that he didn't give a shit."  Then Bissani refused to talk with her any

more.  *See*, Exhibit 4, p. 201, l. 24 through p. 203, l. 10.

127 .  Plaintiff had noticed this disconcerting quality about Bissani -- inability to

communicate with a female and a significantly different way of interfacing with men and

women -- from the first time he showed up.  *See*, Exhibit 4, p. 193, l. 4 through p. 195, l.

7.

### A "smoking gun" document regarding Bissani's *sub rosa* strategy to get rid of his last female subordinate was found after this litigation was begun.

128 .  Exhibit 21 is an e-mail produced among hundreds of pages in this litigation,

and it proves Bissani targeted plaintiff for firing not because of the needs of the company

associated with any <u>current</u> RIF <u>but for Bissani's own personal reasons</u>.  Daub wrote to

another manager:  "We've added Becky Capps to the RIF list.  For this wave.  Kaily was planning on RIFing her next wave, <u>but wanted to move it up</u>."  *See*, Exhibit 21 [emphasis added].

> **Another document produced in this litigation belies the company's main defense.**

129 .  Recall that the company claims that it did not consider plaintiff for the job that Forry was hired into -- even though it was substantially her old job -- *because she never applied for the job*.  Once again Bissani is getting his stories crossed up -- because another manager, Tim Elbert, has asserted in writing that plaintiff <u>was</u> interviewed for the new job:  "The following people were interviewed for the new position:  Becky Capps.  She is the current OSP Long Haul Manager. . . ."  *See*, Exhibit 22, ¶¶ 2-3.

130 .  Credibility problems with the defense witnesses continue to abound.

**B.  Response to Defendant's Statement of Alleged Undisputed Material Facts.**

1 .  As to Defendant's Alleged Fact Nos. 3, 5, 7-10, 19, 21-22, 24-25, 30, 34, 39-45, 47, 49-50, 52-58 **admit**.

2 .  As to Defendant's Alleged Fact Nos. 1, 2 and 4, **admit** that Level 3 has been involved in acquisitions and various reorganizations <u>for many years</u>.  *See*, Exhibit 1, ¶ 22.  However, the evidence in this case confirms that, "This was an artificial 'reorganization,' which Level 3 is famous for.  There was no 'reorganization.'  I was

simply replaced by Steve Forry and they thought they could get away with it by declaring it to be a 'reorganization'."  As discussed above, not only was plaintiff <u>simply replaced</u>, head for head, the person who replaced her, Forry, was hired in from outside the company.  Forry did not work for any *acquired* company.  He got the job because he was an old friend of Bissani's, including an old social friend whose father had worked with Bissani, as discussed above.

In addition to creating the (allegedly) *new* job that Forry got  -- but which was actually plaintiff's old job, as established by the hard evidence -- Bissani created a new job *title* <u>for Benschop</u> also, as discussed above.  But Benschop just kept doing his old duties at Bissani's request, according to Benschop himself.  *See*, Exhibit 10, p. 18, ll. 2-8. Thus, this was <u>not</u> a RIF (reduction in force). Benschop's new job was a "new headcount."  *See*, Exhibit 11, p. 19, l. 25 through p. 20, l. 4.  If giving both Forry and Benschop new jobs constituted a RIF, it was a RIF *in reverse*.

The evidence is overwhelming that "reorganization" was a false rationale seized upon by Bissani to try to justify a personal quest to eliminate plaintiff and rid the unit of all women, a segment of society that he had a difficult time dealing with civilly.

3 .  As to Defendant's Alleged Fact No. 6, **admit** that Bissani *claimed* to be combining the "metro" jobs with the "long haul" jobs, but **deny** the implication that this was anything but a false and pretextual *ex post facto* rationalization for a decision that Bissani had already made, to bring in an old pal, Forry.  Indeed, Bissani informed Forry of Forry's hiring even before plaintiff was formally told, such that Forry telephoned

plaintiff prematurely to apologize for taking her job (not some other, or new, job -- but plaintiff's job), as discussed *supra*.  And to boot, the "metro" and "long haul" jobs were not combined.  Even after the alleged "reorganization," Benschop kept doing the same "metro" job with the identical duties even after he was given a new job title.  When Benschop was asked under oath what of his "metro" duties did Forry assume upon his arrival, Benschop responded, "Specifically none."  *See*, Exhibit 10, p.19, ll. 14-24.  Bissani asked Benschop to keep doing the same duties.  *Id.*, at p. 18, ll. 2-8.  Again, it was a bogus "reorganization."

4 .  As to Defendant's Alleged Fact No. 11, **admit** that Benschop and plaintiff were doing the same job.  Indeed, even Benschop himself admitted,  "[W]e did the same job. . . ."  *See*, Exhibit 10, p. 39, ll. 19-20.  Thus, the defense has inadvertently conceded in its own legal brief that (a) plaintiff has established a prima facie case of discrimination in that Benschop was a perfect comparator treated disparately better by the same boss (and protected from firing by the creation of a new job for him), and the defense has in essence conceded that (b) there is no plausible business reason for not having retained plaintiff, instead of Benschop (or at least considering her for the newly created job), in that plaintiff was far better qualified than Benschop by any and all measures, as discussed *supra*.  Forry himself confirmed that plaintiff was indeed fully qualified for the new job that was handed to Benschop.  *See*, Exhibit 11, p. 76, ll. 9-20.  [**A.**  [By Forry] I guess I would have to change my answer.  Yes, she [plaintiff] would be qualified to take that job [the new job that Benschop was given]."

34

**Deny** that <u>three</u> former positions were allegedly combined into one, for the same reasons as discussed above.  Indeed, Bissani's explanation has now morphed yet again. He testified in deposition that he was required to lay off plaintiff, "Because the head count allocation called for us to combine <u>two</u> jobs into one job."  *See*, Exhibit 12, p. 39, ll. 7-23. [emphasis added].  Bissani repeated "<u>two</u>-jobs-into-one" throughout his deposition.  Another example:  "Well, I had to make a decision to combine the <u>two</u> jobs." *Id.*, at p. 11, ll. 2-3.  [emphasis added].  Another example:  "Well, we had to make a decision to combine the <u>two</u> jobs under one leadership."  *Id.*, at ll. 11-12.  [emphasis added].  Another example:  "It's me and my superiors, because we combined <u>two</u> responsibilities under one."  *Id.*, at p. 14, ll. 7-8.  [emphasis added].  Another example: ""It was the decision to combine the <u>two</u> job functions as the one. . . ."  *Id.*, at p. 66, ll. 20-21. [emphasis added].

It is simply disingenuous for the defense -- and Bissani -- to morph the pretextual explanation even further with an *ex post facto* claim that it was actually <u>three</u> jobs combined into one.  After Bissani testified as cited above, on five separate occasions in the same transcript, no jury is going to believe that it was suddenly a combination of <u>three</u> jobs into one.  Recall plaintiff's comment that Bissani is, "a very, very crafty person."  *See*, Exhibit 1, ¶ 12; Exhibit 4, p. 88, ll. 5-16;  p. 89, ll. 14-20.  At the very least, the mutating explanation for terminating plaintiff -- in a concerted effort to make it more believable as a defense to a discrimination case -- demonstrates that the company's explanation is all over the board and <u>not specific enough</u> to withstand the legal analysis

as to pretext.  *See*, *Considine v.  Newspaper Agency Corporation*, 43 F.3d 1349, 1363 (10th Cir. 1994) [*citing E.E.O.C. v. Flasher*, 986 F.2d 1312, 1316 (10th Cir. 1992)].

5.  As to Defendant's Alleged Fact No. 12, **deny.**  To the contrary, Forry simply moved into plaintiff's former job.  The "metro" duties stayed with Benschop and Forry assumed "specifically none" of those, according to Benschop himself.  *See*, Exhibit 10, p.19, ll. 14-24.  As for the "long haul" duties, Forry himself telephoned plaintiff prematurely to say he was sorry for taking <u>her</u> job.  *See*, Exhibit 4, p. 92, ll. 13-25; p. 185, ll. 9-12; p. 100, ll. 2-24; p. 186, ll. 8-10.  And he did take her job.  He took her routes, her subordinates and her responsibilities.

5 .  As to Defendant's Alleged Fact No. 13, **admit** that the job was posted *eventually*, after plaintiff was terminated.  *See*, Exhibit 1, ¶ 28; Exhibit 17.  But **deny** that it was a legitimate posting.  By then, Forry had already been <u>pre-selected</u>, and the job posting was a farce.  Forry had been told he was getting the job <u>weeks before</u>, such that he even telephoned plaintiff to apologize for taking her job, as discussed *supra*.  Forry did not know that plaintiff had not yet been informed that she was about to be out of work.  *See*, Exhibit 4, p. 92, ll. 13-25.  [emphasis added]; p. 185, ll. 9-12; p. 100, ll. 2-24; p. 186, ll. 8-10.

6 .  As to Defendant's Alleged Fact No. 14, **admit** that Forry was hired, but **deny** that it was a "combined position."  Forry simply took plaintiff's old job, just as he informed her in his apologetic telephone call to her, as discussed *supra*.  Forry said he was taking <u>her</u> old job, as instructed by Bissani himself.  And Benschop's old duties

stayed <u>with Benschop</u>, according to Benschop himself, as discussed *supra*.

7. As to Defendant's Alleged Fact No. 15, **deny.** *See*, prior discussion above. Forry himself said he took the job <u>that was posted</u>, and the posting is Exhibit 17. That job -- as described in the posting, Exhibit 17 -- <u>was plaintiff's old job</u>. Plaintiff: "A couple of days after being told I was fired, a friend informed me by e-mail that my job was already being posted on the Level 3 "Career Opportunities" board. When I read the "Requirements" of the job posting, I realized that it was <u>my</u> job they were advertising. Level 3 was advertising for applicants for the job I had just been fired from." *See*, Exhibit 1, ¶ 28.

8. As to Defendant's Alleged Fact No. 16, **deny.** Please see prior discussion above. In addition, plaintiff did not *admit* that it was a new position. Rather, she testified that a manager -- "Ed" -- called it a new position. *See*, Exhibit 4, p. 114, ll. 7-24. This turned out not to be true. The company could call it anything it wanted, but the duties, not the title, defined the position, and it was the same job that plaintiff did before she was terminated, as discussed *supra*, all the way down to the very job description.

9. As to Defendant's Alleged Fact No. 17, **deny.** After Bissani's often false and otherwise contradictory deposition testimony, all of his averments should be viewed with caution. The citation for this defense averment of fact, No. 17, is to the company's discovery responses, which were verified by Bissani himself and only by Bissani. *See*, Defendant's Exhibit A, p. 16 [Bissani signature]. Thus, in these discovery responses, Bissani moves to his new argument that it was <u>three</u> jobs rolled into one. *See*,

Defendant's Exhibit A, p. 5.  These discovery responses were signed by Bissani on January 23, 2008.  *Id.*, at p. 16.  Yet, a mere one month <u>before</u>, on December 21, 2007, Bissani had repeatedly (five times), vehemently, even angrily, testified in deposition that it was <u>two</u> jobs rolled into one.  *See*, Exhibit 12, p. 1 [for date of deposition].  Either Bissani cannot keep his stories straight, or he signed discovery responses that he never read, let alone wrote.[3]  There has been a concerted effort to mutate the company's explanation for firing plaintiff from: (a) rolling *two* jobs into one, to (b) rolling *three* jobs into one, to (c) denying plaintiff the Denver job because she would not move to Denver, to (d) denying plaintiff the Denver job because she never applied for it, to (e) denying plaintiff the Denver job because she was not qualified for it, to (f) denying plaintiff the Denver job because she was insubordinate, to (g) denying plaintiff any job at all because she was not qualified to hold even her old job after six and one-half years of doing it, as Bissani told her to her face.

10.  As to Defendant's Alleged Fact No. 18, **deny.**  Benschop himself testified that, **"[W]e did the same job. . . ."**  *See*, Exhibit 10, p. 39, ll. 19-20 [emphasis added].  This is apart from the overwhelming evidence that plaintiff did "metro" work, dealt regularly with contractors, had from six to eight subordinates (Benschop had none), managed 1,000 or more miles of network, and had worked in a management capacity at

---

[3] Another high-level manager parroted the same *initial* line, that the alleged reorganization was only supposed to involve combining plaintiff's "long haul" job with Benschop's "metro" job.  Smith:  "A.  It was a consolidation of two jobs that were currently being held by one person -- or by two people down to one person.  Q.  Who were those two people?  A.  That was Becky [plaintiff] on the long haul and Diron Benschop on the metro."  *See*, Defendant's

Level 3 far longer than Benschop (who had been negatively criticized by his prior boss for not doing a good job), as discussed *supra*.

11.  As to Defendant's Alleged Fact No. 20, **admit** that Smith resigned but **deny** that the two jobs were indeed combined.  As discussed *supra*, Benschop simply continued on with his same duties, and plaintiff was simply replaced by someone hired from outside the company.

12.  As to Defendant's Alleged Fact No. 23, **deny** that these events reduced the headcount, as Benschop was retained, and doing his same duties, and Forry simply replaced plaintiff.  To reduce the headcount, Bissani would have had to terminate Benschop or decline to hire someone to replace plaintiff, and he not only did not do either, he supplanted plaintiff with Forry and then created a job for Benschop (although it involved the identical duties Benschop had been performing before).  This is the very essence of disparate treatment, and it is explainable only within the context of the good old boy network.

13.  As to Defendant's Alleged Fact Nos. 26, **deny** that Smith said this, or that, if he did, his opinion was anything other than a 100 per cent subjective assessment that was belied by plaintiff's performance reviews for nearly seven years, her always being rated "At/Above," and Smith's personal praise for her and her team.  Smith was telling plaintiff to her face that she was the best qualified and that he recommended her for the job.  *See*, Exhibit 4, p. 60, ll. 11-13.  Bissani himself confirmed that Smith had told Bissani that

---

Exhibit H, p. 43, ll. 19-24.

plaintiff was the best qualified for the job.  *Id.*, at p. 95, ll. 3-6;  p. 196, ll. 2-17.

14.  As to Defendant's Alleged Fact No. 27, **deny** that Smith said this, or that, it was anything other than a totally subjective assessment, as discussed above.  Indeed, plaintiff had been handling contractors and doing paperwork for nearly seven years at Level 3 and always been rated "At/Above."  Apart therefrom, when Forry came in and assumed plaintiff's job (after telephoning to tell her so), he did not take over any of the "metro" duties that supposedly involved so much paperwork.  Instead, as discussed *supra*, Benschop was retained in a new title but doing the same old duties.  Thus, the "metro" paperwork was never a real issue.  Benschop could have continued to do all of the paperwork for plaintiff, just as he was doing for the incoming Forry.

15.  As to Defendant's Alleged Fact No. 28, **deny** that Smith criticized plaintiff more or less than anyone else.  He was very picky as to everyone, as discussed *supra*.  Nonetheless, Smith "always rated my performance as 'At or Above'.  And I always got the best raises in my salary.  So regardless of what the company is saying now, Pete Smith always told me that he thought highly of my service, and he rated me 'At or Above' and said, year after year, that my team did a 'great' job.  *See*, Exhibit 1, ¶ 4.

16.  As to Defendant's Alleged Fact No. 29, **deny** that Smith said this, or that, if he did, his opinion was anything other than a 100 per cent subjective assessment that was belied by plaintiff's performance reviews for nearly seven years, her accomplishments maintaining more than 1,000 miles of the system, and the lack of any objective support for any such criticisms of plaintiff.

Once again, the defense is mixing apples and oranges, because Forry did not come in and do both Benschop's "metro" job and plaintiff's "long haul" job. First, as Benschop himself testified, he (Benschop) kept doing the same duties, although in a new job title given to him by Bissani. Thus, Forry did not perform any combined duties, and, with Benschop still doing his old duties, there should have been no workload issue with plaintiff, Forry or anyone else.

Second, the merger of Benschop's job with plaintiff's job did not occur until December 2007. At the time of the deposition of one of the subordinates on the team that was taken over by Forry, Bob Cooper testified (on December 20, 2007) that combining of those two jobs had not occurred until, "Just last week." *See*, Exhibit 9, p. 28, l. 17.

17. As to Defendant's Alleged Fact No. 31, **deny.** The two jobs were not combined until December 2007, and so no one had to do them both simultaneously. Bissani knew without a doubt that the workload would not increase, as it was Bissani who gave Benschop the new job title but told him to keep doing the same duties. *See*, Exhibit 10, p. 18, ll. 2-8. [**Q.** How did you learn what the duties of the job would be? **A.** [Benschop] I just continued doing the same job functions that I had the day before. **Q.** Who told you to continue doing the same job functions? **A.** Kaily.].

Thus, the claim that plaintiff was ruled out for the new job that Forry got because she could not do the "combined" duties or could not handle the "increased workload" is bogus. The duties were not combined and the workload did not increase.

18.  As to Defendant's Alleged Fact No. 32, **deny.**  Plaintiff had made rental arrangements with a friend in Denver and reported that to Bissani -- but Bissani would consistently ignore her, turn his back, say nothing and walk away.  *See*, Exhibit 15; Exhibit 4, p. 111, l. 8 through p. 112, l. 15; p. 115, l. 25 through p. 117, l. 25.

19.  As to Defendant's Alleged Fact No. 33, **deny.**  This is an outrageous representation by Bissani, whose tactic of "overkill" was designed to defeat plaintiff's claim of discrimination.  When he asked her about moving to Denver, she went ahead and made arrangements, as discussed *supra*.  She had already secured a place to stay for her prior stays in Denver.  This is yet another incongruity and an example of Bissani's credibility deficit.  On the one hand he maintained that she was incompetent and certainly not qualified for the new job in Denver.  On the other hand he claims to have asked her to move to Denver to take the job ten times!

20.  As to Defendant's Alleged Fact No. 35, **deny.**  Such an averment is disingenuous -- both Smith and Bissani told plaintiff she was the best qualified for the job and Bissani said she would get the job.  Bissani point-blank informed plaintiff that, based upon Smith's recommendation, she was already slated to get the job.  *See*, Exhibit 4, p. 109, ll. 13-21.  [**Q.**  So was it your understanding that Mr. Bissani offered you the field manager position.  **A.**  He told me I had the job.  **Q.**  The field manager position?  **A.** Yes.].

21.  As to Defendant's Alleged Fact No. 36 **admit** that it was posted *eventually* -- after plaintiff was fired, as discussed *supra*.

22.  As to Defendant's Alleged Fact No. 37, **deny**.  Bissani point-blank informed plaintiff that, based upon Smith's recommendation, she was already slated to get the job.  *See*, Exhibit 4, p. 109, ll. 13-21.  [**Q.**  So was it your understanding that Mr. Bissani offered you the field manager position.  **A.**  He told me I had the job.  **Q.**  The field manager position?  **A.** Yes.].

Moreover, the company has forgotten that one of its manager wrote an internal report that said that plaintiff had already been interviewed for the job.  *See*, Exhibit 22, ¶ 1-2:  "The following people were interviewed for the new position: . . . . Becky Capps . . . ."

23.  As to Defendant's Alleged Fact No. 38, **admit**.  However this was after she was fired, which itself was after Forry telephoned her to break the news to her that he was taking her job, as discussed *supra*.

24.  As to Defendant's Alleged Fact No. 46, **deny**.  To the contrary, Bissani was so intent on keeping Benschop that he created a new job for Benschop at a time when there was supposed to be a reduction in headcount and also at a time when Forry was supposed to come in and take over Benschop's duties.  There is no other way to look at this than an act of disparate treatment in favor of Benschop, to plaintiff's detriment.

25.  As to Defendant's Alleged Fact No. 48, **deny** that the offer of a new job for Benschop came from Forry.  That is a gross deception by the defense.  To the contrary, Benschop himself testified as follows [*see*, Exhibit 10, p. 14, l. 23 through p. 15, l. 4]:  "[I]t was at that time that Kaily offered me the senior field -- well, at the time it was

titled different, but he offered me senior field tech position, basically a demotion. . . . He [Bissani] told me that, you know, he has this position available if I want it."

26.  As to Defendant's Alleged Fact Nos. 51 and 59, **deny**, as those claims are being dropped from the case by the plaintiff.

## DISCUSSION

### A.  Plaintiff's *prima facie* cases of discrimination are well-presented.

Plaintiff's prima facie cases of discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., are established in alternative ways by showing that plaintiff was (1) in a protected class or classes (2) she suffered an adverse employment action, and (3) was treated less favorably than similarly situated employees not in the protected classes.  *See*, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Note: the employer's stated reasons for its adverse action cannot be interposed to challenge the sufficiency of plaintiff's prima facie case.  *See*, *Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1469-70 (10th Cir. 1992).  This is another way of saying that the defense cannot attack plaintiff's prima facie case by arguing that the company's *ex post facto* allegation that she was an unsatisfactory or "disrespectful" performer (although she was not) destroys a sometimes erroneously-cited prima facie element of "satisfactory

performance."  However, even as to any possible issue of "satisfactory performance," plaintiff can show that she was performing satisfactorily, if not excellently, for six and one-half years, was consistently rated "At/Above," and was cited for operating a "great" team that made her own boss "look good" while maintaining one of the largest fiber optic networks in the United States.

As for the similarly situated comparators for plaintiff's prima facie cases of discrimination, they are males Diron Benschop and Steve Forry, as discussed *supra*. Benschop's job and career were salvaged and plaintiff was fired, even as she was being replaced head-for-head by Forry -- all under the same conditions by the same supervisor (Bissani).


### B.  Plaintiff has shown pretext by overwhelming evidence.

Pursuant to ample Supreme Court and Tenth Circuit decisions, all plaintiff need do is present some evidence of pretext for the factfinder to be permitted to find intentional discrimination.  *See*, *Reeves, supra,* 530 U.S. 133, 120 S.Ct. 2097, 2108-09, 147 L.Ed.2d 105 (2000).  In *Reeves*, a unanimous Supreme Court wrote at 2103:

> [I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.   Specifically, we stated:
>
>> "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the

defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination."  *Id.*, at 511, 113 S.Ct. 2742.

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.  *See Id.*, at 517, 113 S.Ct. 2742 . . . . Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves*, at 2108-2109.

In *Reeves, supra*, at 2110, the Supreme Court went on to reverse the circuit court's supplanting of the jury in determination of <u>matters of credibility</u>.  Wrote the unanimous Supreme Court:

[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.  *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-555, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990);  *Liberty Lobby, Inc., supra*, at 254, 106 S.Ct. 2505 [*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)]; *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Liberty Lobby, supra*, at 255, 106 S.Ct. 2505."

While legal scholars have called the unanimous opinion in *Reeves, supra,* a "landmark" decision, it merely reaffirmed abundant prior Tenth Circuit caselaw as follows:  Within the Tenth Circuit, it has consistently been held that evidence of pretext or mendacity, and nothing more, suffices to allow a finding of intentional discrimination (and will defeat a motion for summary judgment).  *Reynolds v. School Dist. No. 1*, 69 F.3rd 1523 (10th Cir. 1995) [prima facie case coupled with proof of pretext defeats summary judgment]; and *Ingels v. Thiokol Corp.*, 42 F.3d

616, 620-21 (10th Cir. 1994) [prima facie case coupled with suspicion of

mendacity defeats summary judgment].[4]

It has been well-established within the Tenth Circuit that if the plaintiff

produces <u>some</u> evidence that the defendant's proffered nondiscriminatory reasons

for its actions are false,

> "[t]he factfinder's disbelief of the reasons put forward by the defendant
> (particularly if disbelief is accompanied by a suspicion of mendacity) may,
> together with the elements of the prima facie case, suffice to show
> intentional discrimination.  Thus, rejection of the defendant's proffered
> reasons, will *permit* the trier of fact to infer the ultimate fact of intentional
> discrimination, . . . '[n]o additional proof of discrimination is required'."
> *Ingels, supra*, at 621 [*citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,
> 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)] [emphasis in original in
> both *St. Mary's* and *Ingels*].

Thus, a mere "suspicion of mendacity" is fatal to such a motion for

summary judgment.

In *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995), the Tenth

Circuit definitively re-stated the principle as follows: "The defendant fails to

appreciate that the Supreme Court has said that discriminatory animus *may be*

*inferred* from the simple showing of pretext."  As the Court of Appeals has ruled

specifically in a summary judgment context:

> "To defeat a summary judgment motion [plaintiff] would have to simply
> point to evidence establishing a reasonable inference that the employer's
> proffered explanation is unworthy of credence."  *Cone v. Longmont United*

---

[4] "Mendacity" is defined as being characterized by deception or falsehood, including
deception or falsehood that is not necessarily intended to genuinely mislead or delude.
<u>Webster's New Collegiate Dictionary</u>, G. & C. Merriam Co.  "Pretext" is defined as a purpose
or motive used to cloak the true intention or state of affairs.  *Id.*

*Hospital,* 14 F.3d 526, 530-32 (10th Cir. 1994).

"[0r] is not credible." *Trujillo v. Grand Junction Regional Center*, 928 F.2d 973, 977 (10th Cir. 1991).

The Tenth Circuit has ruled that a summary judgment motion shall be defeated if the plaintiff can create "a genuine issue concerning the *sincerity* of the proffered reasons for her termination." *Cone, supra*, at 530 [emphasis added]. This is true because such an initial showing raises a doubt as to the existence of pretext, but it is also because summary judgment is not ordinarily an appropriate procedure for settling issues of intent or motivation. *Setliff v. Memorial Hosp. of Sheridan County*, 850 F.2d 1384,1393, n. 12 (10th Cir. 1988); *Romero, supra,* at 1309.

In *Green, supra*, at 1193, the Tenth Circuit noted that the typical way that pretext is shown is by presenting evidence that the stated reason for the adverse action was simply false.

Against such a legal framework, plaintiff's evidence of pretext is overwhelming, demonstrating the falsehood of those mutating reasons proffered by the company for its actions against plaintiff and with regard to saving Benschop's job, hiring Steve Forry and firing plaintiff. Such evidence is coupled with mendacity, weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions -- evidence of which abounds in this case, including the following supported by Plaintiff's Statement of Undisputed Facts *supra*:

1. The company's proffered reasons for terminating plaintiff have been plainly inconsistent and contradictory, evolving drastically over time, depending upon the stage of the litigation. They have thus not been "reasonably specific and clear" as required under the pertinent case law. *See*, *Considine*, *supra*.

2. The company's initial reason for terminating plaintiff -- that it was merging her job with the job of another employee (Benschop) and thus only one of them would wind up with the "combined" job -- was false. Neither got the "combined" job -- but only plaintiff was terminated.

3. The company went to great pains to save Benschop, creating a job for him, and did not even attempt to do the same for plaintiff.

4. The company didn't even consider plaintiff for the job that Benschop got, even though she was better qualified than Benschop for it.

5. Bissani claimed that plaintiff had no "metro" experience and that's why her job was not saved (like Benschop's), which was plainly false. Even Benschop himself admitted, "[W]e did the same job. . . ." *See*, Exhibit 10, p. 39, ll. 19-20.

6. The company claimed that it RIFed plaintiff but never told her that that was the reason for her termination. Rather, Bissani claimed to her face that she simply was not qualified for her job. Thus, the company's reasons for firing plaintiff evolved over time and were contradictory.

7. What Bissani asserted when he told plaintiff that she was fired -- that she simply was not qualified for her job -- was patently false and ludicrous. She had been doing the job for six and one-half years and had always been rated "At/Above" by her boss, and also rated high by her subordinates. Any criticisms of her work were consistent with the way her prior boss criticized all of his subordinates. He always maintained that she and her team did a great job, and plaintiff made him "look good." That same boss resigned from the company and was replaced by Bissani, who came in after being demoted himself from a vice presidency.

8. Bissani belatedly claimed "RIF" *to reduce head count* -- a claim that was obviously false when it came to plaintiff's firing. The firing of plaintiff, the retention of Benschop *in a newly created job*, and the hiring of Forry resulted in no reduction in head count. Indeed, Benschop's new job was a "new headcount." *See*, Exhibit 11, p. 19, l. 25 through p. 20, l. 4.

9.  During a time of alleged RIF, Bissani not only did not reduce head count, he
    hired an old pal from outside the company (Forry) and also *created* a new
    job for Benschop.

10. Bissani belatedly disclosed that he fired plaintiff because *she was
    insubordinate* -- when the single e-mail that reflected plaintiff's alleged
    insubordination was provoked by Bissani's having disclosed to others that he
    had decided to terminate plaintiff and replace her with Forry. Her e-mail was
    understandably precipitated by Forry calling plaintiff to say he was sorry
    about taking her job. Thus, Bissani's claim of insubordination was the very
    essence of pretext. This was like Japan justifying its attack on Pearl Harbor
    by America's angry reaction to the first wave of dive-bombers.

11. Bissani's interaction with women was so grossly sexist as to be like something
    "seen in the movies."

12. Bissani's defensive assertion that plaintiff decided to fire one of the women
    herself is egregiously false.

13. Bissani's comment about one of the women he fired being pregnant was
    telltale, especially in relationship to his grossly rude interaction with
    females through his brief tenure.

14. Bissani's got rid of all the females within 25 days of his arrival, even as he
    hired an old pal from outside the company and created a new job for
    Benschop.

15. Bissani claimed it was a new job for Benschop but, in actuality, he just
    kept doing his previous duties.

16. Bissani claimed that it was a new job for Forry, but, in actuality, he simply
    took over plaintiff's long haul duties, and little more. This was confirmed
    even by one of the current team members, who with some trepidation,
    testified: "I didn't think he [Forry] performed much metro duties, I'm
    sorry." *See*, Exhibit 9, p. 37, ll. 3-6.

17. Indeed, when Benschop was asked under oath which of his metro duties
    did Forry assume upon his arrival, Benschop responded, "Specifically
    none." *See*, Exhibit 10, p.19, ll. 14-24.

18. These events occurred against the background of a male-dominated

organization in a male-dominated industry.  After the women were all fired, Bissani was left with an all-male unit.

19. Plaintiff was more qualified than Forry for the job he was hired to take. She had more subordinates, more years of experience, and maintained thousands of miles of network, to Forry's two hundred.

20. Smith claimed that he negatively criticized both plaintiff and Benschop at a meeting with incoming Bissani at a Le Peep restaurant -- yet plaintiff was fired within days and Benschop was retained via the creation of a new position during a time of *alleged* RIF.

21. There are powerful indicia of a true "good old boys network" in operation, which network protected men and did not admit women, let alone protect them.

22. Benschop was saved from termination even though he had previously done a poor job for Pete Smith.

23. Bissani impression of plaintiff, which got her fired, was at worst, sexist, (based upon his alarmingly rude demeanor toward females) and at best <u>wholly subjective</u>.  He patently never checked out plaintiff's prior metro experience and her managerial accomplishments over six and one-half years, instead electing to fire her within 25 days of walking in the door.

24. Bissani's excuse for firing plaintiff then mutated even further, upon his belated assertion that she couldn't take the job that Forry got *because she declined to move to Denver*.  This was false, as plaintiff had already obtained a living situation in Denver, and Bissani certainly knew it, since she stayed in Denver when Bissani first arrived, and also because plaintiff told him about it.

25. Bissani's excuse for firing plaintiff then mutated even further, upon his belated assertion that she didn't get the job that Forry got *because she never applied for it*.  Yet, Bissani had already told her that she was going to get the job, at least in part because Smith had said she was the best candidate.  Note:  If she did not apply for it, or was not considered for it, as Bissani contends, why then did another high-level manager assert <u>that plaintiff had already been interviewed for the job</u>.  Tim Elbert:  "The following people were interviewed for the new position:  Becky Capps. She is the current OSP Long Haul Manager. . . ."  *See*, Exhibit 22, ¶¶ 2-3.

26. Bissani's various stories are absurdly self-contradictory.  For example, if plaintiff was not competent to do her existing job, why did Bissani discuss *the new job* with her and moving to Denver therefor "at least" **ten times**.  *See*, Exhibit 12, p. 57, l. 14 through p. 58, l. 1.  Summary judgment should be obviated by such contradictions within the very decision-making that led to the firing.  *See*, *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1380 (10th Cir. 1994).

27. Bissani prepared a career-killing performance appraisal of plaintiff (even though he had not been in Denver, let along Wyoming, long enough to observe her performance  -- Exhibit 4, p.200, ll. 9-23) -- *and never showed it to her*, as required by company procedures.  In *Green v. New Mexico*, 420 F.3d 1189, 1193 (10th Cir. 2005), the Tenth Circuit noted that pretext may be proven by showing that the company acted contrary to its own policy or practice when making the adverse employment decision.  Bissani did not want plaintiff to have a chance to rebut what he had written.

28. Bissani's claim that plaintiff did not tend to her Colorado responsibilities was wildly false.  She spent more time on them than her Wyoming responsibilities.  *See*, Exhibit 1, pp. 4-5, ¶ 12.

29. The company claims that the impetus for getting rid of plaintiff was a decision to merge the "long haul" functions with the "metro" functions.  However, that merger certainly did not occur when Forry was hired.  Indeed, it did not occur until one year and eight months later, according to one of the team members himself (and still employed at Level 3).  *See*, Exhibit 9, p. 28, l. 17.

30. The company failed to post Forry's job until after plaintiff was fired, and the company never posted the new job created for Benschop, despite Bissani's averments to the contrary.

31. Bissani claimed under oath that he had nothing to do with the creation of the new job and hiring of Benschop for it.  This was belied by Benschop himself.  *See*, Exhibit 10, p. 14, l. 23 through p. 15, l. 4 [[I]t was at that time that Kaily offered me the senior field -- well, at the time it was titled different, but he offered me senior field tech position, basically a demotion. . . . He [Bissani] told me that, you know, he has this position available if I want it."

32. Bissani claimed that he determined that plaintiff was not qualified for the new job created for Benschop.  Yet, Peters, who was Bissani's predecessor

for many years,  said the exact opposite.  *See*, Exhibit 11, p. 76, ll. 9-20. ["Yes, she would be qualified to take that job."].

**33.** All of Bissani's handwritten notes of these pivotal discussions and decision-making are missing.

What it boils down to is that Bissani decided inside of his own head to get rid of plaintiff along with the other females.  The subjectivity of such a decision, particularly in light of plaintiff's counter-presentation of objective facts, should raise significant issues for jury determination.  The Tenth Circuit has emphasized that such subjective determinations lead to an inference of pretext.  *See*, *Jones v. Barnhart*, 349 F.3d 1260, 1267-68 (10th Cir. 2003).  Such subjective judgments are viewed with skepticism in the pretext inquiry.  *See, Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1217-18 (10th Cir. 2002) [collecting cases and holding that subjectivity by decision-maker in termination decision is relevant evidence of pretext];  *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1328 (10th Cir. 1999) ["Evidence of pretext may include . . . the use of subjective criteria."];  *Bauer v. Bailar,* 647 F.2d 1037, 1046 (10th Cir. 1981) [stating that, although subjective criteria is not wrongful *per se,* "[o]bviously subjective decision making provides an opportunity for unlawful discrimination"].

Upon the above showing, any doubts as to the existence of pretext should be fairly resolved in plaintiff's favor.  *See*, *Morgan v. Hilti, Inc*., 108 F.3d 1319, 1323-24 (10th Cir. 1997):

## CONCLUSION

In *Villaneuva v. Carere*, 85 F.3d 481 (10th Cir. 1996), the Tenth Circuit highlighted a hallmark of discrimination analysis, namely that, "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." [*citing Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977)]. Such a sensitive analysis in this case should fairly lead to the conclusion that jury issues are presented as to all of those claims challenged by the defense (and not herein confessed), particularly when the facts and reasonable inferences are taken in a light most favorable to the plaintiff.

WHEREFORE, Plaintiff Rebecca Capps respectfully opposes (and partially confesses) Defendant's Motion for Summary Judgment.

RESPECTFULLY SUBMITTED,
OLSEN AND BROWN, LLC

s/John R. Olsen
By:  John R. Olsen
Attorney for the Plaintiff
8362 Greenwood Drive
Niwot, Colorado 80503
(303) 652-1133

Date: February 21, 2008

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and complete copy of the foregoing was on

February 21, 2008, electronically served upon Defendant's attorney:

Meghan Martinez, Esq.
Brownstein Hyatt Farber Schreck, P.C.
410 Seventeenth Street, Suite 2200
Denver, CO 80202

<u>s/ John R. Olsen</u>