# Exhibit 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00922-RPM-CBS

REBECCA A. CAPPS,

    Plaintiff,

vs.

LEVEL 3 COMMUNICATIONS LLC,

    Defendant.

---

DEPOSITION OF REBECCA ANN CAPPS

August 29, 2007

---

Page 29

1 Ms. Capps, at Level 3? You said you started in operations
2 as the field operations manager. Did that title change?
3   A. As we would merge with other -- the outside
4 plant, inner city division, merged with the metro
5 department, and I think every communications company calls
6 the same individual by different titles, but I maintained
7 the same position the entire time I was at Level 3.
8   Q. So -- and I kind of want to draw a distinction
9 between titles and job duties, so let's start with just
10 the title. Did your title itself change?
11   A. My -- as far as I perceived, no. Field
12 operations area manager was -- I'm not -- I couldn't tell
13 you exactly what, you know, other people called it, but
14 operations manager.
15   Q. Okay.
16   A. Field operations manager, inner city
17 operations manager, they were all the same title, but the
18 individuals called it by different things.
19   Q. What about your day-to-day job duties, can you
20 walk me through how those changed throughout your tenure
21 at Level 3?
22   A. Those didn't. I maintained the same job the
23 entire time.
24   Q. Tell me what your day-to-day job duties were.
25   A. I managed a crew of people who maintained the

Page 30

1 outside plant, including locating the fiber. We also
2 maintained the repeater buildings or region sites, all the
3 environmentals in those buildings, all the electronic
4 equipment, all the optronics. We also were prepared for
5 any type of emergency as far as a cable cut, environmental
6 emergencies, or outages.
7   Q. Anything else?
8   A. That's it.
9   Q. Did the geographic region you were working in
10 change?
11   A. Yes.
12   Q. Tell me what changes you saw throughout your
13 employment at Level 3.
14   A. Initially I had to Stratford, Texas, and the
15 route went through the Oklahoma panhandle and came up into
16 Colorado to Denver, and then from Denver I had to Evanston
17 or -- actually, it went all the way to Ogden, Utah, my
18 route did, and then for the most part it was reduced to
19 the Evanston area, Evanston, Wyoming area.
20   Q. When?
21   A. To probably -- actually, that occurred in
22 2004. And in 2002 my southern area was reduced to Spruce,
23 Colorado and then increased out to Haigler, Nebraska. So
24 it -- the mileage didn't decrease, it just changed. It
25 shifted out east and reduced down south.

Page 31

1   Q. What did you think of these changes in the
2 geographic region you were given?
3   A. It causes you to lose direct reports and gain
4 direct reports. When you have an individual that works
5 for you for several years, you know, you develop a
6 rapport, so you're sorry to see someone not report to you
7 anymore because you have, you know, somewhat of a working
8 relationship with them, but it's good to see challenges
9 and new things come along. It's just adjustments. It's
10 part of it.
11   Q. Any other changes in the geographic region you
12 were assigned throughout your employment?
13   A. My area changed towards corporate. We have a
14 fiberoptic route that came down Highway 52 towards
15 headquarters and it changed. We also did builds and
16 increased areas in Cheyenne and in the Metro Denver area,
17 so the cable was always changing. We had some other
18 builds that were government projects.
19   Q. Was there a trend or anything that you can
20 describe the way that the geographic region you had
21 developed one way or another during your employment? For
22 instance, did it continue to steadily decrease? Did it
23 just change depending on business needs? Did it increase
24 or decrease? Is there any way you can give us a summary
25 of how that worked?

Page 32

1   A. If it changed at all, it increased due to new
2 builds, you know, building fiber into different customers
3 and things; otherwise, it stayed the same, relatively the
4 same.
5   Q. Did you receive any promotions while you were
6 at Level 3?
7   A. No. Well, we were given raises, periodically
8 given raises. We were evaluated every quarter, but my job
9 title never changed.
10   Q. Were you ever demoted while you worked at
11 Level 3?
12   A. No.
13   Q. Would you have accepted a demotion?
14   A. Yes.
15   Q. To what type of positions?
16   A. Like a field technician.
17   Q. When?
18       MR. OLSEN: Objection. Calls for speculation.
19 You may answer.
20   A. Well, pretty much at any point.
21   Q. (By Ms. Martinez) And why do you say you
22 would have accepted that demotion?
23       MR. OLSEN: Same objection. You may answer.
24   A. To stay employed.
25   Q. (By Ms. Martinez) Would you have accepted

### Page 49

1 transaction?
2   A. I can't recall. I mean, I know there was talk
3 of the merger occurring, and I don't think that we
4 actually had a -- like, we typically have a sitdown where
5 we talk about the merger and where the company's going. I
6 know I had an e-mail that listed the VP of our area and
7 then the director levels in our region.
8   Q. Meaning who was going to be the VP after the
9 merger between Level 3 and WilTel?
10  A. Yes.
11  Q. Okay. And was this merger in the beginning of
12 '05, the end of '05? Do you have any idea?
13  A. Yeah, it was in the beginning.
14  Q. Of '05?
15  A. Yes.
16  Q. Do you recall about how much time elapsed
17 between when this merger happened and when you were let
18 go?
19  A. Not much.
20  Q. Okay. And were you consulted in any way about
21 the transaction?
22  A. By whom?
23  Q. By anyone. Were you in any meetings where
24 there was feedback or due diligence or any questions asked
25 of you as a manager?

### Page 50

1   A. No.
2   Q. Anything like that?
3   A. No, not that I recall.
4   Q. Do you have any understanding as to why there
5 was a merger between these two companies?
6   A. Joining of networks. You know, retaining the
7 other company's customers, providing more network to our
8 existing customers.
9   Q. Do you have an opinion on what the general
10 state of the telecommunications industry was in the first
11 half of 2006?
12      MR. OLSEN: Objection. Calls for a legal
13 conclusion. You may answer.
14  A. I think it was starting to become steadier.
15 Communications had been doing really well and then it
16 slumped.
17      (Whereupon, Ms. Martinez's phone rang.)
18      MS. MARTINEZ: Excuse me.
19      (A discussion was had off the record.)
20  Q. (By Ms. Martinez) And when you say there had
21 been problems, what are you referring to?
22  A. Oh, downsizing, layoffs, merger of companies,
23 things like that.
24  Q. Did that impact Level 3 in any way?
25  A. Yes.

### Page 51

1       (Whereupon, the phone rang.)
2       MS. MARTINEZ: Let me turn that off. I
3 apologize.
4   Q. (By Ms. Martinez) Okay. Did those impact
5 Level 3 in way?
6   A. Yes.
7   Q. How so?
8   A. Level 3 experienced layoffs and downsizing,
9 selling of assets.
10  Q. During the entire time you were there or
11 during a specific period of time?
12  A. More of a specific period of time.
13  Q. When?
14  A. I'd say from sometime in '02 to '04.
15  Q. And why do you say that it stopped in '04?
16  A. Well, I think things started to level out
17 more.
18  Q. What do you base that on?
19  A. Just an assumption.
20      (A discussion was had off the record.)
21  Q. (By Ms. Martinez) Were you ever present when
22 any Level 3 employees were laid off?
23  A. Yes.
24  Q. How many times?
25  A. Two.

### Page 52

1   Q. Do you recall the employees' names?
2   A. Kathy Bennett most recently. Ray Roseberry.
3   Q. When were these two individuals laid off?
4   A. Kathy was laid off about a week before myself,
5 and Ray Roseberry in '03, '04. I don't have --
6   Q. Did Ray work directly for you?
7   A. Yes.
8   Q. Did you make the decision to lay off
9 Ms. Bennett?
10  A. No.
11  Q. Do you know who did?
12  A. Yes.
13  Q. Who?
14  A. Pete Smith.
15  Q. Did you make the decision to lay off
16 Mr. Roseberry?
17  A. No.
18  Q. Do you know who did?
19  A. Pete Smith.
20  Q. Were you aware that Level 3 had been laying
21 off groups of employees in Reductions In Force?
22  A. Yes.
23  Q. Do you know how many Reductions In Force
24 Level 3 had undergone before May of 2006?
25  A. No. I had -- no, I don't know.

## Page 57

1  A. The company.
2  Q. Anyone in particular at the company?
3  A. Field operations.
4  Q. I'm trying to figure out if there's someone in
5 particular, like a name.
6  A. No. I mean, it's just a general, across the
7 country, across the world.
8  Q. Did you work with Diron on a day-to-day basis?
9  A. No. He maintained the Metro area. We had
10 defined lines drawn in the dirt where he started and I
11 left off.
12  Q. Did you do any of his work in the Metro area?
13  A. I did when he was absent.
14  Q. Did he do any of your work outside the Metro
15 area?
16  A. No.
17  Q. What would happen when you were absent?
18  A. I would have a direct report fill in for me.
19  Q. How often did you fill in for Diron?
20  A. Officially, I'd say two times. I did -- you
21 know, I did go down and help him out in his area on
22 several occasions, but as far as him being completely
23 absent from work and myself taking over his workload,
24 about twice.
25  Q. When?

## Page 58

1  A. Right before May and June -- I mean, April and
2 May.
3  Q. 2006?
4  A. '5.
5  Q. Did you participate in any discussions
6 regarding reducing head count at Level 3 in 2006?
7  A. In regards to what?
8  Q. Anyone.
9  A. No.
10  Q. Do you have any secondhand knowledge about
11 what happened in those communications about reducing head
12 count at Level 3 in 2006?
13  A. No.
14  Q. Do you know who first raised your name as an
15 individual who would be impacted in the May 2006 RIF?
16  A. No.
17  Q. Do you know who made the decision to include
18 you within the May 2006 RIF?
19  A. Kaily Bissani.
20  Q. Anyone else?
21  A. No.
22  Q. How do you know that Kaily made the decision
23 to include you within the RIF?
24  A. He laid me off.
25  Q. Meaning he notified you?

## Page 59

1  A. Yes.
2  Q. Other than the fact that he notified you, do
3 you know anything about Mr. Bissani's participation in the
4 selection of individuals for a RIF?
5  A. I -- I was told that he had discussions with
6 the -- with our -- about our group with Peter Smith.
7  Q. Who told you that?
8  A. Pete Smith did.
9  Q. Other than your communications with Mr. Smith,
10 do you know anything about what motivated Mr. Bissani to
11 select you for the RIF?
12  A. No.
13  Q. Tell me what you learned from Mr. Smith about
14 Mr. Bissani's decision to include you within the RIF.
15  A. I didn't learn from -- Mr. Smith was laid off.
16 I didn't learn -- I just know what Pete talked about with
17 our group and -- or with me specifically about his
18 recommendations before he was let go to Kaily.
19  Q. Okay. I need to back up. When was Mr. Smith
20 let go?
21  A. I know there was a transition period, but I
22 don't know his exact date. He was -- he had left the
23 company before I did.
24  Q. A couple of months before or a year before?
25  A. I would say weeks.

## Page 60

1  Q. So in approximately the spring of 2006
2 Mr. Smith left the company?
3  A. May. I would say in May also.
4  Q. Okay. And before he left the company, he
5 talked to you about your inclusion within the RIF?
6  A. No, he talked to me about his recommendations
7 to Kaily, who was replacing him, as far as how the
8 department -- how the Denver division, you know, what his
9 recommendations were on how to operate.
10  Q. What did he say his recommendations were?
11  A. He told me that he recommended that I was the
12 most qualified individual for the position if there was a
13 combined position of the Metro and Long Haul area manager.
14  Q. Anything else?
15  A. No.
16  Q. Did he tell you that he knew what
17 Mr. Bissani's decision would be?
18  A. No.
19  Q. Did he tell you anything to indicate that he
20 knew what Mr. Bissani was thinking?
21  A. No.
22  Q. So what you knew was that Mr. Smith had given
23 a positive recommendation about you to Mr. Bissani?
24  A. Yes.
25  Q. Did you know anything else about whether or

Page 85

1  A. Yes, but no specifics.
2  Q. And other than what you've told me, do you
3  recall anything in general about your communications with
4  him about this review?
5  A. I got a raise.
6  Q. Anything else?
7  A. Just, for the most part, it was the same thing
8  him and I discussed for several years; I maintained my
9  group the way I maintained it, and we talked about things
10 that he would like to see happen and -- no specifics.
11 Q. Did you agree with his rating of at or above?
12 A. Yes, I agree. I -- I've had exceeds,
13 exceptionally exceeds ratings, but I think the way the
14 organization was running, we -- you performed your job,
15 you performed it well, you were an at or above.
16 Q. Did you understand this review to mean that
17 Mr. Smith had some concerns with your job performance?
18 A. Yeah. I think that he was frustrated with me
19 on -- a lot of times, but as it also states in here, my
20 group caused his performance to be within the hundred
21 percent range of overall division ratings, you know. He
22 was in the top five every quarter, every week on all of
23 our performance and that was directly responsible of my
24 group.
25 Q. But you see in here there's some positive

Page 86

1  things about your job performance, right?
2  A. Absolutely.
3  Q. And there's also some negative things about
4  your job performance, right?
5  A. They're negative, but they're -- they're not
6  negative to me. They're just -- it's the way things are.
7  You can't get everything done. You're going to have
8  problems. You're going to have personnel issues. Yeah,
9  him and I discussed those on many occasions.
10 Q. But you understand that from his perspective
11 there were some things that were negative about your job
12 performance during this time period?
13 A. Yes, but I also understand that we performed
14 exceptionally daily for Pete.
15 Q. Meaning your team?
16 A. Yep, my team and myself.
17 Q. Did you think that Mr. Smith was picking on
18 your team?
19     MR. OLSEN: Objection as to form.
20 A. I think Pete picked on his team, my team. It
21 was the type of individual that he was.
22     MS. MARTINEZ: Okay. Why don't we take a
23 lunch break.
24     (A lunch recess was taken from 12:05 p.m. to
25     1:20 p.m.)

Page 87

1     (Deposition Exhibit 4 was marked for
2     identification.)
3  Q. (By Ms. Martinez) Ms. Capps, I've handed you
4  what's been marked as Defendant's Exhibit 4 for
5  identification -- or Deposition Exhibit 4 for
6  identification. Do you recognize this document?
7  A. Quarter one, 2006 quarterly evaluation.
8  Q. Did you have an opportunity to review this
9  before we went on the record?
10 A. Yes.
11 Q. Did you receive a copy of this while you were
12 employed at Level 3?
13 A. I don't recall receiving a copy of this.
14 Q. Did you know that you had this review?
15 A. I did my input, and then it sits into a queue,
16 but I don't recall seeing what Kaily's input of it was,
17 but it may have been available to me and I didn't see it.
18     MR. OLSEN: Only testify to what you know.
19 A. Yeah, I didn't see this, what his comments
20 were to me.
21 Q. (By Ms. Martinez) Okay. What I'm trying to
22 figure out is if you know that you didn't see it or you
23 don't have a recollection of seeing it? Because those are
24 two different things, so I want to make sure I understand
25 what your response is.

Page 88

1  A. I don't recall seeing this.
2  Q. Okay. Do you agree with the supervisor's
3  rating of at or above?
4  A. Yes, I agree.
5  Q. Do you agree with the narrative information
6  that Mr. Bissani put in the supervisor evaluation portion?
7  A. No.
8  Q. Do you disagree with all of it?
9  A. I disagree with all of it, yes.
10 Q. Would you concur that there are some positive
11 comments about you in this supervisor's evaluation?
12 A. No.
13 Q. You believe this is all negative?
14 A. Yes.
15 Q. Is that why you disagree with it?
16 A. No, I disagree with it because it's incorrect.
17 Q. What about his evaluation is incorrect?
18     MR. OLSEN: Objection. Asked and answered.
19 She said all of it, but if you want her to read --
20     THE DEPONENT: Well, I guess there's one --
21     MR. OLSEN: You may answer.
22     THE DEPONENT: Sorry.
23     MR. OLSEN: Go ahead.
24 A. There's one sentence in there that says I'm
25 very technical and I understand OSP construction aspects

Page 89

1  of business.
2  Q. (By Ms. Martinez) Are you saying that you
3  agree with that sentence?
4  A. I'd say it's a fairly accurate statement.
5  Q. Would you describe that sentence as a positive
6  statement about you?
7  A. It's positive, but it's vague.
8  Q. So you agree with the positive portion, but
9  none of the negative; is that fair?
10 A. Yes.
11 Q. And tell me specifically what it is you
12 disagree with about the supervisor evaluation portion?
13 A. He states that I lack leadership management
14 skills. He states that I have never managed a Metro OSP
15 market before, and that's inaccurate. He states that I
16 was rarely available for anyone that doesn't live in
17 Wyoming, and that's absolutely inaccurate. Closer to -- I
18 saw my Colorado people more than I did my Wyoming people.
19 And he was only around a few days to even make any of
20 these statements.
21     And then he goes on to say I'm glad that
22 I'm -- that I'm part of the team and he hopes we can work
23 together as a team.
24 Q. Do you disagree with that portion of the
25 evaluation?

Page 90

1  A. Yeah. I don't think he was glad that I was
2  part of the team.
3  Q. Why not?
4  A. Up until that point in time, he really hadn't
5  had any kind of discussions with me like he did with the
6  other people in our group.
7  Q. What other people?
8  A. His other direct reports or soon-to-become
9  direct reports.
10 Q. So you didn't believe that he was glad to be
11 working with you?
12 A. Yeah, I believed that he wasn't glad to be
13 working with me.
14 Q. And that's because you hadn't talked to him
15 very frequently?
16 A. It's because when I attempted to speak with
17 him, he would have very short conversations with me on
18 extremely important topics relative to the Denver
19 division, and he would have extremely long conversations
20 with other direct reports in the group about --
21 Q. How did you know that?
22 A. I could overhear him. His office was next to
23 where my office was.
24 Q. And who are these others who he had long
25 conversations with?

Page 91

1  A. Drew Snow, Diron, Rawley Dickie -- Diron
2  Binshop, Rawley Dickie, even a few technicians in the
3  Gateway that were two steps below him.
4  Q. Who?
5  A. He had a couple of extensive conversations
6  with some of the WilTel people coming in. I'll have to
7  come back on the names. I can't recall the technicians in
8  the Gateway. I know there's one individual, and I can't
9  think of his name specifically.
10 Q. Did you tell Mr. Bissani that you needed to
11 have longer conversations with him about your job?
12 A. I made attempts to talk to him about several
13 things.
14 Q. Okay. Did you tell him that you needed to
15 have more lengthy conversations with him?
16 A. I never specifically worded it like that, no.
17 Q. And did he tell you why he wouldn't have
18 longer or more in-depth conversations with you?
19 A. He did not, but he did go into his office and
20 shut the door, and then I didn't have an opportunity to
21 discuss anything with him.
22 Q. Did you hear through anybody else or any other
23 source why Mr. Bissani was not talking with you more about
24 your job?
25 A. Yes, I did, but I need to -- can I ask Jack a

Page 92

1  question? Can I talk to Jack for a minute?
2     MR. OLSEN: No, you can't. You have to go
3  ahead and answer the question.
4  A. Okay. Yes.
5  Q. (By Ms. Martinez) Tell me what you heard.
6  A. I received a phone call from Steven Forry, who
7  was a Level 3 employee and no longer worked for the
8  company --
9     MR. OLSEN: What was that?
10    THE DEPONENT: He no longer worked for the
11 company.
12    MR. OLSEN: Oh, okay.
13 A. And Steven Forry called me telling me that --
14 he was basically apologizing for what was going on, and
15 Steven let me know that he would make every attempt to try
16 to find or maintain employment for me under him -- as a
17 direct report under him. And Forry basically stated that
18 he had an interview with Kaily Bissani and that he had
19 been offered what I considered was my job.
20 Q. (By Ms. Martinez) Is that what Forry said or
21 is that what you took it to mean?
22 A. Forry said he was offered the outside plants
23 operation job.
24 Q. Did he call it that?
25 A. Yes.

### Page 93

1  Q. Or did he call it field manager?
2  A. He may have called it field manager,
3  operations manager.
4  Q. Had you interviewed for the position at that
5  point, the position of field manager?
6  A. No, not that I'm aware of.
7  Q. Did you ever interview for the position of
8  field manager?
9  A. No.
10  Q. Did you ever apply for the position of field
11  manager?
12  A. I was under the impression that the -- there
13  was talk, but never -- I was never told fully, but there
14  was talk of combining the Metro and Long Haul, and that --
15  I'm trying to make sure I get it in sequence.
16      This conversation was before the Steven Forry
17  conversation. They were looking to combine the two
18  positions and create one.
19  Q. Who told you that?
20  A. I believe it was Pete Smith initially who told
21  me that and then Kaily told me that. So in the discussion
22  of the combined areas, Pete informed me that there would
23  be -- they're looking to do one position, and it would be
24  myself, Diron Binshop, and a WilTel employee.
25  Q. Everett McCane?

### Page 94

1  A. Yep, who -- and the three of us were basically
2  in line for this position.
3  Q. What do you mean by "in line"?
4  A. Well, they had to make a decision between the
5  three of us, and either demote the rest of us or have
6  layoffs or find other positions for us, you know, however
7  it works.
8      So I made arrangements to have housing in
9  Denver and had a lengthy conversation with my family
10  because, basically, they told me this position is in
11  Denver. It would be based out of Denver, and I would have
12  to live in Denver to have this position. So I made all
13  those arrangements, and -- at this time this is when Pete
14  Smith said that I was -- that he would be telling Kaily
15  that I was the most qualified individual for this position
16  and his recommendation would be, as long as I worked out
17  of Denver, that I assume this role, and that's about it.
18  Q. Do you know whether or not Pete Smith actually
19  told Kaily Bissani that you were the most qualified and he
20  was recommending you?
21  A. Pete Smith told me that he would tell him.
22  Q. Okay. I understand, but my question is a
23  little different. Pete Smith told you he would tell him
24  that. My question is --
25  A. Yes.

### Page 95

1  Q. -- do you know whether or not he actually told
2  him that?
3  A. I do know that because Kaily did say that to
4  me. He did say to me that "Pete has recommended you for
5  this position; that you're the most qualified for this
6  position."
7  Q. When did he tell you that?
8  A. Kaily?
9  Q. Um-hum.
10  A. We were in a vehicle together. I was giving
11  him a ride to somewhere.
12  Q. So tell me what interview or consideration
13  process you went through at Level 3 for this field manager
14  position.
15  A. I don't think -- there wasn't an official --
16  that I'm aware of. There wasn't an official interviewing
17  process where -- you know, we weren't told, okay, you're
18  coming into this room. These people are going to speak to
19  you about your qualifications and your role in the
20  company. Those things didn't happen.
21  Q. Do you know whether or not the position was
22  posted?
23  A. I do know it was posted after I left the
24  company, after I was let go.
25  Q. Was it posted externally, internally, or both?

### Page 96

1  A. I know it was posted internally. I don't know
2  if it was posted externally.
3  Q. How do you know it was posted internally?
4  A. I was told by an individual.
5  Q. Who?
6  A. One of my -- an individual who used to report
7  to me directly, Justin Aimone.
8  Q. Did you apply for that position?
9  A. I didn't, no.
10  Q. Why not?
11  A. I had just been let go from that position. I
12  also knew from my conversation with Forry that they had
13  already hired Steven Forry for the position.
14  Q. You said there was no official interviewing
15  process to your knowledge. Do you know, even through
16  secondhand knowledge, what the different steps were that
17  Level 3 took to combine or to create a new position --
18  A. No.
19  Q. -- out of the old ones?
20  A. No.
21  Q. Were you allowed to give any input on whether
22  or not the positions would be combined or whether there
23  would be a new position or how they would structure it?
24  A. No.
25  Q. Do you have any knowledge other than this

### Page 97

1 conversation with Steve Forry about what the new position
2 was actually going to be, this field manager position?
3     A. Yes.
4     Q. Through whom?
5     A. Pete and Kaily and just my general knowledge
6 of the area, of the Denver division, and knowing that they
7 were going to combine the Metro department and the Long
8 Haul department, so I knew both of those jobs. I knew the
9 scope of work that would occur.
10     Q. Did you know whether or not they were going to
11 change the scope of work?
12     A. There would be no way of changing it. I mean,
13 there are specific things that have to go along with this
14 job and they would have remained the same.
15     Q. Well, do you know one way or another whether
16 or not they changed?
17     A. I don't know if they changed. I don't see
18 how.
19     Q. Did -- did Diron Binshop ever work for you?
20     A. No.
21     Q. Did you ever supervise him?
22     A. No.
23     Q. Did you ever provide any input on his job
24 performance to individuals who were supervising him?
25     A. No.

### Page 98

1     Q. Were you ever asked to?
2     A. No. I was asked to show him certain aspects
3 of the job and do some type of on-the-job training for
4 Diron, yes.
5     Q. Did you ever supervise Everett McCane?
6     A. No.
7     Q. Did you ever work with him daily?
8     A. No.
9     Q. Did you ever give any input on his job
10 performance?
11     A. No. I may have said at one point in time that
12 he had a good reputation with Level -- or with WilTel
13 Communications, and I had worked -- communication
14 companies all lie in the ground very close to each other,
15 so you do work in conjunction with other companies and
16 people there, so I had worked around Everett McCane in
17 different aspects of projects.
18     Q. And who did you say that he had a good
19 reputation to?
20     A. I'm -- I know I told Pete and I know I told
21 Kaily Bissani.
22     Q. When?
23     A. Within those couple of weeks of Kaily assuming
24 the role of division leader at Level 3.
25     Q. Do you know what happened to Everett McCane?

### Page 99

1     A. I know that he was laid off.
2     Q. Do you know when?
3     A. I'm assuming the same time I was laid off.
4 But, actually, now that I think about it, he was laid off
5 after I was. I don't know when, but after.
6     Q. Do you know if he was laid off in 2006 or this
7 year?
8     A. No.
9     Q. No, you don't know?
10     A. I don't know.
11     Q. Okay. Do you know why he was laid off?
12     A. No.
13     Q. Do you think that Level 3's decision to lay
14 Mr. McCane off was improper or unfair in any way?
15     A. I -- I have never given it really any thought.
16     Q. Okay. Do you know what happened to Diron
17 Binshop?
18     A. I believe he was demoted. He didn't maintain
19 the same role that he had while I was employed there.
20 He -- as far as I know, he received, like, a lesser
21 role -- what I would consider a lesser role, but I don't
22 know for sure.
23     Q. Do you think that he was treated unfairly or
24 improperly by Level 3?
25     A. I don't know. I didn't -- no. I mean, I

### Page 100

1 don't know. I've never given that any thought either.
2     Q. Do you know who made the decision to hire
3 Steven Forry?
4     A. Steven Forry himself told me that Kaily
5 Bissani hired him over lunch.
6     Q. What did he tell you about that?
7     A. He just said that he met with him at lunch and
8 he was offering him my position.
9     Q. Is that what Forry said or is that what you
10 took it to mean?
11     A. That's what Forry said.
12     Q. Did he say that Kaily had referred to it as
13 your position or are you --
14     A. Forry referred to it as my position.
15     Q. When was that lunch?
16     A. I don't -- I'd say -- I'm guessing. Somewhere
17 around the 22nd, 20th of May.
18     Q. April?
19     A. April? No.
20     Q. Your RIF day was May 5, 2006 for frame of
21 reference.
22     A. Okay. So April, yeah. April. Somewhere in
23 the 20th -- between the 20th and -- I don't know the
24 exact date.
25     Q. Did you know that you were going to be part of

Page 101

1 a RIF before you received a call from Steven Forry?
2  A. No. And even after I received the call from
3 Steven Forry, I -- you know, you kind of take everything
4 with a grain of salt, so I didn't -- basically it's not
5 over until it's over.
6  Q. What else did Mr. Forry say, if anything,
7 about his lunch conversation with Kaily Bissani?
8  A. I don't know. I don't recall anything
9 specifically.
10  Q. Looking at Page 2 of Exhibit 4, the supervisor
11 evaluation portion has a clause that says, "However, I did
12 receive input from her previous manager." Do you see
13 that?
14  A. I did see that. Yes.
15  Q. And do you understand that to mean Kaily
16 received input from Peter Smith?
17  A. Yes.
18  Q. And then the next part is a colon and it says,
19 "Becky is very technical and understands the OSP
20 construction aspect of the business." Do you see that?
21  A. Yes.
22  Q. And did you take this to mean that Peter Smith
23 had told Kaily that you were very technical and understood
24 the OSP construction aspect of the business?
25  A. Yeah. I'd say that's -- I would assume that's

Page 102

1 correct, yes.
2  Q. And then there's another comment that "Becky
3 lacks leadership and management skills." Did you
4 understand from reading this that Peter Smith also made
5 that comment to Kaily Bissani?
6  A. Yes, I would say.
7  Q. And then there's a phrase that you were rarely
8 available for anyone that doesn't live in Wyoming. Did
9 you understand that to mean that Mr. Smith relayed that
10 information to Mr. Bissani?
11  A. I would say I'm a hundred percent positive
12 that Pete Smith would not say that about me. He knows how
13 much time I spent in Colorado -- in the southern Colorado
14 area.
15  Q. Did you discuss any of these issues with Kaily
16 Bissani?
17  A. No.
18  Q. Do you know whether or not Mr. Bissani
19 believed that these deficiencies existed in your
20 performance?
21  A. I -- I don't know. I never had a conversation
22 with him about this.
23  Q. Did you write a rebuttal to this review or
24 otherwise document your comments about it?
25  A. No. As I stated earlier, I don't recall

Page 103

1 seeing this response from Kaily. I looked for a date on
2 here.
3  Q. Does this look like one of the documents that
4 you produced to Level 3?
5  A. No. I don't have this.
6  Q. Are you familiar with a gentleman named Sean
7 English?
8  A. Oh, yes.
9  Q. Who is he?
10  A. Sean English was the Metro manager at -- under
11 Pete in Denver for -- I don't know how long he was, but
12 for some time.
13  Q. Did he still work at Level 3 when you were
14 RIF'd?
15  A. I think so. He was in another department, but
16 I believe he did.
17  Q. Did you report to him?
18  A. No.
19  Q. Did he report to you?
20  A. No.
21  Q. Did you report to the same person?
22  A. Yes.
23  Q. At the same times?
24  A. Yes.
25  Q. What were his job duties?

Page 104

1  A. He maintained the Metro area in Denver under
2 Pete.
3  Q. Were you ever involved in doing a performance
4 review for Mr. English?
5  A. Not that I recall, but maybe.
6  Q. What about giving any input into his
7 performance?
8  A. I may have co-reviewed him, but I don't
9 remember.
10  Q. What do you mean by "co-review"?
11  A. Sometimes in this system a manager has the
12 ability to ask someone to put input in on an individual,
13 so that may have occurred, but I don't remember at all.
14  Q. Did you ever co-review Diron Binshop?
15  A. I don't remember if I did. It's possible, but
16 I don't recall.
17  Q. Did you ever co-review Everett McCane?
18  A. Not that I know of.
19  Q. Would you have felt comfortable providing
20 input on their day-to-day performance? Let me start with
21 Mr. Binshop.
22     MR. OLSEN: Objection. Calls for speculation.
23 You may answer.
24  A. Yeah, I could have. Yes, I could have put
25 input on their day-to-day operations.

**Page 109**

1 proceed with my normal operations.
2    Q. And what job was he talking about?
3    A. The outside plant manager job.
4    Q. And is that the one that you had been
5 performing or the one that you say was being created?
6    A. I would say it's the one I've been performing
7 and the one they were creating. And at the same time, you
8 know, I knew there was a change. I was going to be
9 getting new direct reports. I already had individuals
10 speaking to me and, you know, asking me what their roles
11 were as my direct reports, even though those people didn't
12 officially report to me yet.
13   Q. So was it your understanding that Mr. Bissani
14 offered you the field manager position?
15   A. He told me I had the job.
16   Q. The field manager position?
17   A. Yes.
18   Q. When?
19   A. The same car conversation that lasted 20
20 minutes, the most he ever spoke to me, and the same time
21 he told me that Pete said I was the most qualified.
22   Q. And what did Mr. Bissani say?
23   A. Just to proceed and continue to manage the way
24 I was going.
25   Q. But what did he say that led you to believe

**Page 110**

1 that you were going to take the field manager position?
2    A. "Don't worry about your job. You're the most
3 qualified individual," and "Proceed."
4    Q. Was this car conversation with Bissani before
5 or after the call from Steve Forry?
6    A. It was before.
7    Q. Did you go to talk to Mr. Bissani or attempt
8 to talk to him after this call with Mr. Forry?
9    A. No.
10   Q. Is that because you guys were both busy?
11   A. After this initial car ride, he wouldn't --
12 basically, he had no more conversations with me. Every
13 attempt of conversation I had with him, what I talked
14 about before, was brief. He wouldn't talk to me. He
15 wouldn't talk about projects that I needed answers on. He
16 ceased to communicate with me.
17   Q. Did you e-mail him?
18   A. Yes.
19   Q. Do you have those e-mails?
20   A. I have one that I believe you have.
21   Q. The one about the cortisone injection?
22   A. No. Don't you have it?
23   Q. Well, what was it about?
24   A. It was about -- I was informing Kaily of a
25 project that we were proceeding with, and then I forwarded

**Page 111**

1 him an e-mail, I think, from one of my individuals, and
2 then he kicked the e-mail back to me and said, "Go ahead
3 and proceed with this." And I said back to him, "That's
4 what we're doing and I'm informing you that we're
5 proceeding with this." And I showed some frustration with
6 his lack of interest in, you know, what we were doing in
7 the field.
8    Q. Okay. Other than that e-mail, what were the
9 attempts that you made to communicate with him about what
10 was going to happen with the job?
11   A. Going into his office.
12   Q. And what happened when you went into his
13 office?
14   A. He just refused to talk to me.
15   Q. He just sat there at his desk?
16   A. And then he shut his door and no longer opened
17 his door. And quitting time would come, he would leave.
18 And when it was time for -- in the mornings when he came
19 into the office, he went directly into his office and shut
20 his door.
21   Q. Did you ever call him?
22   A. We were 10 feet from each other.
23   Q. I know, but did you call him?
24   A. I'm positive I did, but I don't recall what --
25 when you're dealing with projects and, you know, urgent

**Page 112**

1 matters and you need okay on your decision making, you're
2 letting him know what I'm doing and this is -- we're
3 proceeding with this. Yeah, I mean, you communicate with
4 your boss daily.
5    Q. So are you saying that you had no opportunity
6 to ask him what's going on with the new job?
7    A. I did ask him.
8    Q. And what was his response?
9    A. No response.
10   Q. He just looked at you?
11   A. Pretty much, yes. Well, he wouldn't look at
12 me, no, but he just sat there.
13   Q. So he wouldn't say anything back, he would
14 just look at you?
15   A. Right.
16   Q. And then what did you do?
17   A. Left the room. I -- at one point in time I
18 talked to him about that I have a lot of people that are
19 reporting to me, I have people that are going to be
20 reporting to me, everybody's concerned about, you know,
21 how we're going to operate, how things are laying out,
22 we're all waiting for you to convey down the line how it's
23 going to proceed out from here.
24   Q. And what did you mean by "proceed out"?
25   A. Well, typically in a merger situation, the

### Page 113

1 managers go to their teams and discuss things that are
2 going on, the time frames, how long they'll be laying
3 people off, when it will end, how we're going to proceed
4 with less head count, more workloads, things like that.
5     You have all these different individuals
6 hanging out there, they don't know if they have jobs, they
7 don't know where their jobs are going to be, they don't
8 know who their boss is, it's a confusing state and it's
9 hard to stay operational.
10    Q. So when you said to him I need some input or
11 follow-up on what's going to happen, what did he say?
12    A. He refused to speak to me.
13    Q. But did he say anything?
14    A. No, he didn't look at me. He wouldn't speak
15 to me. He would walk directly over to another individual
16 and have an entire conversation with him and he wouldn't
17 speak to me.
18    Q. So he would just not acknowledge your
19 presence?
20    A. Exactly.
21    Q. Did you ever go into his office?
22    A. Yes. I stood right in front of him.
23    Q. And he would just not look at you?
24    A. Right.
25    Q. And how long would you stand there?

### Page 114

1    A. Not very long. Thirty seconds, a minute, I
2 don't know. I mean, you don't time it.
3    Q. And who was Mr. Bissani's supervisor at that
4 point?
5    A. I don't remember his last name, but his first
6 name was Ed I think. He was a WilTel individual.
7    Q. Did you make any efforts to talk to Ed?
8    A. I did meet with Ed.
9    Q. When?
10   A. He came into the Denver division to meet with
11 people. He came specifically into my office and sat down.
12 We had talked about -- I guess if there's any type of an
13 interview, this would have been as close to it as
14 possible. But I talked about my team, how we performed
15 things, some ideas that I had for integrating the two
16 groups, some things that I knew WilTel needed to address
17 and how we, at Level 3, address those issues in our
18 company and we could help them, you know, come into the
19 fold.
20        And then he asked -- he, basically, at that
21 point in time talked to me about this new position and was
22 I interested in this job, and I said, "Absolutely." You
23 know, "I want this job." And then he said, "Well, you
24 realize it's in Denver?" And I said, "Yes." And I
25 explained to him the living arrangements that I had made,

### Page 115

1 the discussion I had with my family about commuting to
2 work and being home on weekends and things.
3        And he asked me at that point in time, "Have
4 you conveyed this information to Kaily?" And I said,
5 "Yes. I've told him everything." And he said, "Well, you
6 need to reiterate it, you know. Tell him again. Let him
7 know." And we had a really excellent conversation, and I
8 felt like it went really well and he liked a lot of my
9 ideas, and, you know, it was positive and upbeat.
10   Q. So did you recommunicate that information to
11 Kaily?
12   A. I tried.
13   Q. How?
14   A. I went into his office and I talked to him
15 about, you know, "I've made arrangements to live in Denver
16 to be here for this job, and I want this job."
17   Q. And what did he say?
18   A. He didn't speak to me.
19   Q. Did he acknowledge that you were in his
20 office?
21   A. Somewhat, but, no.
22   Q. What do you mean by "somewhat"?
23   A. Well, you know someone's there. We're closer
24 than you and I are right now.
25   Q. What did you tell him about the arrangements

### Page 116

1 that you made?
2    A. Just that I had a place to stay during the
3 weekdays while I was at work, and that I would work out of
4 the Denver office and that I would commute home on
5 weekends.
6    Q. What were the arrangements that you had
7 actually made at that point?
8    A. Those were the arrangements.
9    Q. And who were you going to stay with?
10   A. Becky Shepherd.
11   Q. Do we have her contact information?
12   A. No, but I can get that for you.
13   Q. Where does she live?
14   A. I don't know the exact address. It's off of
15 Santa Fe, south of Denver.
16   Q. She has an apartment there?
17   A. She has a house that she lives in.
18   Q. And was that the same place that you were
19 going to stay --
20   A. Yes --
21   Q. -- with her in?
22   A. -- and I had already started staying with her.
23 I had clothes moved down there and was renting a room from
24 her.
25   Q. So you were -- as of the spring of 2006, you

**Page 117**

1 were already paying rent and living down in Denver part
2 time?
3   A. Yes. I -- yes. Well, I wouldn't call it the
4 spring. Within those two weeks I had been down there and
5 moved clothing and moved bathroom things.
6   Q. Did you pay her?
7   A. I did pay her, yes.
8   Q. How?
9   A. Cash.
10   Q. When did you -- you started paying her those
11 two weeks?
12   A. Yes.
13   Q. And how long did you pay her?
14   A. I think I initially just paid her a month.
15   Q. Meaning May or part of April?
16   A. I think we settled on -- it was going to be
17 300 a month or something like that, so I just paid her
18 300. That's it. I didn't -- I don't think I stayed there
19 a whole lot of days, but I paid up a month.
20   Q. Okay. And you paid her just cash?
21   A. Um-hum.
22   Q. Yes?
23   A. Yes.
24   Q. Okay. Did you pay her after that one month?
25   A. No. I was -- I no longer had a job.

**Page 118**

1   Q. How many nights did you stay with Becky
2 Shepherd?
3   A. Oh. I don't know.
4   Q. Do you have any idea?
5   A. Hum-um. I'd say probably less than seven.
6   Q. Did you have -- you had children at home at
7 this time, right?
8   A. Um-hum, yes.
9   Q. What plans did you make for day care and child
10 care that you were going to be gone during the week?
11   A. I was the primary bread winner in our family,
12 and Mike was the care giver, in a sense, a stay-at-home
13 father.
14   Q. So he had made arrangements not to work during
15 the time period --
16   A. Right.
17   Q. -- that you were going to be doing the new
18 job?
19   A. Right. Keeping in mind we live on a family
20 ranch and he manages that.
21   Q. Does he have a separate side business?
22   A. Yes.
23   Q. And was he going to be doing any of that work?
24   A. Periodically, yes.
25   Q. When did you first meet Kaily?

**Page 119**

1   A. I couldn't tell you.
2   Q. Was it the last year of your employment or --
3   A. No.
4   Q. -- before that?
5   A. Before that.
6   Q. Do you remember where you first met
7 Mr. Bissani?
8   A. At corporate I'm sure.
9   Q. Do you have any recollection of interaction
10 with him before he became your supervisor or did you just
11 kind of know of him?
12   A. I knew of him. I never worked -- I worked
13 directly with people that reported to him, but I never
14 worked directly with Kaily.
15   Q. How would you describe your opinion of him
16 before you started working for him?
17   A. I don't really -- I guess I didn't really have
18 an opinion of him.
19   Q. What had you heard from people who worked for
20 him?
21   A. I think -- one time I had a conversation with
22 an individual about him, but I can't remember what it
23 pertained to. We just talked about, you know -- our
24 discussion was about working for supervisors and our roles
25 as far as, you know, performing for them basically, but I

**Page 120**

1 don't recall anything specifically about Kaily.
2   Q. Do you remember if it was positive or negative
3 or --
4   A. I'd say it was just run of the mill.
5   Q. How did you find out he was going to be your
6 direct supervisor?
7   A. From Pete Smith.
8   Q. What did Mr. Smith say about that?
9   A. Just that Kaily was taking his position, and
10 he wasn't sure yet what he was going to do, if he was
11 going to take the layoff package or if he was going to
12 stay and take, like, my job or someone in the Gateway's
13 job.
14   Q. Were you concerned that Kaily would be your
15 direct supervisor when you heard about it?
16   A. No, actually I wasn't. Initially, no.
17   Q. Did you ever become concerned with Mr. Bissani
18 as your supervisor?
19   A. Yes.
20   Q. Why?
21   A. When he ceased to acknowledge my existence.
22   Q. Would you agree that you and Mr. Bissani did
23 not have a good working relationship?
24   A. I would say that -- I wouldn't call it that.
25 I mean, he just stopped acknowledging my existence.

### Page 137

1 female?
2    A. No.
3    Q. Do you recall whether you had any contact with
4 that individual beforehand?
5    A. No.
6    Q. No, you don't recall or no, that wasn't
7 somebody you knew?
8    A. I don't recall having -- I don't recall who it
9 was.
10      (Deposition Exhibit 7 was marked for
11      identification.)
12    Q. (By Ms. Martinez) Ms. Capps, I've handed you
13 a one-page document marked Exhibit 7. Do you recognize
14 this document?
15    A. Yes.
16    Q. What is it?
17      (A discussion was had off the record.)
18    Q. (By Ms. Martinez) Do you recognize this
19 document?
20    A. Yes, I do.
21    Q. What is it?
22    A. This was the job listing that I pulled up on
23 Level 3 Career Opportunities.
24    Q. Did you pull it up on May 3rd, 2006 or is
25 that just when you printed it?

### Page 138

1    A. That's when I printed it.
2    Q. When was the first time you saw this?
3    A. It would have to be close to the time of the
4 e-mail from Justin Aimone, which I couldn't tell you when
5 because I sent my e-mail out April 26th and he
6 responded, but I don't know when he responded.
7    Q. Did you have ten years of inside and outside
8 plant responsibilities, knowledge, and experience?
9    A. Yeah. I believe I did, yes.
10    Q. And how did you have that ten years?
11    A. Six years at Level 3, two years at Qwest, and
12 two years with Sprint.
13    Q. Were you doing the same exact things at Qwest
14 and Sprint?
15    A. You know, some of the optronics change, but --
16 the capacities on them change, but it's all the same type
17 of equipment, yeah.
18    Q. Did you have experience in splicing fiber
19 optics, OTDR, Sonet, Nortel Optera system, troubleshooting
20 technics?
21    A. Yes.
22    Q. All of those?
23    A. Yes.
24    Q. Did you contact Kaily Bissani once you saw
25 this posting?

### Page 139

1    A. No.
2    Q. Why not?
3    A. I was under the impression that Steven Forry
4 had already been chosen for this job.
5    Q. Why were you under that impression?
6    A. Steven Forry told me that.
7    Q. Okay. But you called that a rumor, right?
8    A. Yes.
9    Q. So did you attempt to communicate with anyone
10 at Level 3 about this job?
11    A. Well, I called it a rumor, and then I got laid
12 off, so it became a non-rumor to me. At that point it
13 became fairly legitimate, and then he was hired, so...
14    Q. When did you find out that Mr. Forry was
15 hired?
16    A. Officially, I don't recall the exact date.
17    Q. It was after you saw this information online,
18 though, right?
19    A. I think that they -- that I had heard that he
20 was hired before I saw this online. I'm positive that I
21 heard that.
22    Q. So what was your understanding of why this
23 would be online?
24    A. I don't know.
25    Q. And did you ever communicate with anyone at

### Page 140

1 the company about this posting?
2    A. No.
3      (Deposition Exhibit 8 was marked for
4      identification.)
5    Q. (By Ms. Martinez) Mrs. Capps, I've handed you
6 a one-page document marked as Exhibit 8 for
7 identification. Do you recognize this document?
8    A. Yes.
9    Q. What is this?
10    A. This is Kaily and Greg Daub and myself
11 communicating about the layoff of Kathy.
12    Q. Was anyone else besides Kathy being let go on
13 or around this day?
14    A. Not at this particular conference call.
15    Q. Okay. But across the company was there anyone
16 besides Ms. Bennett being let go at or around this date?
17    A. I'm under the assumption that, yes, there were
18 others being let go.
19    Q. So this was part of a Reduction In Force as
20 you understood it?
21    A. Yes.
22    Q. Did you have any concerns with Kathy
23 Bennett's -- or the selection of Kathy Bennett for
24 termination?
25    A. Kathy was the newest individual in my group.

Page 185

1  Q. And where were you when he called?
2  A. I was leaving the Denver Gateway and driving
3  north.
4  Q. Oh, so he called you on your cell phone?
5  A. Yes.
6  Q. And tell me exactly what was said in that
7  phone conversation between you two.
8       MS. MARTINEZ: Objection. Asked and answered.
9  A. He called me on my cell phone. I was leaving
10 the Gateway, and he proceeded to tell me that he had a
11 lunch the day before with Kaily Bissani, and that Kaily
12 Bissani told him that he was going to hire him for my job.
13 Q. (By Mr. Olsen) Okay. Now, why in the world
14 would this guy call you, Steven Forry, call you to tell
15 you that? Do you know?
16      MS. MARTINEZ: Objection. Calls for
17 speculation.
18 A. Well, he --
19 Q. (By Mr. Olsen) You know, let's just stick
20 with what he said. What else did he say?
21 A. He also said that he would try to talk to
22 Kaily about finding me a position under him.
23 Q. Under Steven Forry?
24 A. Yes.
25 Q. Did he say anything else in that phone

Page 186

1  conversation?
2  A. Just that Kaily had informed him that --
3  Q. Don't say again what you said before. Is
4  there anything else that he said to you? For instance,
5  did he say, "I'm sorry"?
6  A. Yes, he did. He apologized.
7  Q. Tell me what words he said in that respect.
8  A. He said he was sorry he was taking my job and
9  that he would see what he could do to keep me on in the
10 company.
11 Q. Okay. Anything else said in that
12 conversation?
13 A. Not that I recall right now.
14 Q. Okay. And so at that point in time had you
15 been told by anybody that you were about to lose your job?
16 A. I had had a conversation with Ian Yuland, a
17 direct report of mine, that he --
18 Q. Who was that again?
19 A. Ian Yuland.
20 Q. Okay. You may be asked to spell that later
21 for the deposition reporter. And where were you when you
22 had that conversation?
23 A. I was probably in Cheyenne.
24 Q. Okay. And was that a cell phone conversation?
25 A. No, we were in person, face to face.

Page 187

1  Q. And what did this man say to you?
2  A. That he had heard that Bissani was going to
3  hire Steven Forry to replace me.
4  Q. Okay. And where did he say he had heard that?
5  A. From Rawley Dickie, an individual he was
6  friends with in the Gateway.
7  Q. And what's the Gateway?
8  A. The Gateway is the office that we worked out
9  of on Pearl Street.
10 Q. Okay. And so this fellow told you he had
11 heard that where, at the Gateway or outside the Gateway?
12 A. This individual called him from the Gateway
13 and they were having a conversation and told him that I
14 was going to be replaced by Steven Forry.
15 Q. After this many years at the company, did that
16 news upset you?
17 A. Yes.
18 Q. Okay. Up until that point in time had
19 Mr. Bissani ever said anything to you about replacing you?
20 A. No.
21 Q. Or terminating you for any reason?
22 A. No.
23 Q. Or moving you or demoting you or any change in
24 your job?
25 A. No.

Page 188

1  Q. Okay. When did you first -- let me just ask
2  you about Exhibit 10. Can you take a look at that for a
3  minute?
4  A. Okay.
5  Q. With regard to Exhibit 10, did this
6  interchange -- this exchange of e-mails occur before or
7  after you heard from these two individuals that Mr. Forry
8  was going to take your job?
9  A. It -- the initial e-mail on the
10 21st occurred before.
11 Q. This was April 21st, 2006?
12 A. Right.
13 Q. Okay. Occurred before what?
14 A. I started the e-mail before I knew that I --
15 before I had heard from Ian Yuland and before I had heard
16 from Steven Forry. And then by the 23rd and the 24th,
17 I had had that conversation.
18 Q. So you can pinpoint when you heard that you
19 were going to be fired, can't you?
20      MS. MARTINEZ: Objection. Leading.
21 A. Relatively, yes.
22 Q. (By Mr. Olsen) And would it have been on
23 April 21st or 22nd then?
24      MS. MARTINEZ: Objection. Leading. Calls for
25 speculation.

Page 193

1  where were you when you first met him?
2      A. Probably -- probably in a hallway somewhere at
3  corporate.
4      Q. Okay. And do you remember anything about
5  your -- how many times you interfaced with him face to
6  face before you were fired?
7      A. Initially, in the company --
8      Q. Just tell me approximately how many times you
9  interfaced with him before you were fired, face to face.
10     A. When he became my manager --
11     Q. Right.
12     A. -- I interfaced with him probably four or five
13 times.
14     Q. Okay. Prior to him becoming your manager, had
15 you ever interfaced with him?
16     A. A couple passings in the hallway, mass
17 meetings I would have seen him.
18     Q. Okay. After he became your boss?
19     A. Four or five times.
20     Q. And when you first met him, and during those
21 ensuing four or five meetings, did you notice anything
22 unusual in the way he was interfacing with you?
23          MS. MARTINEZ: Objection to form. Leading.
24     A. Yes. He would never look me in the eye. He
25 would barely acknowledge me. If it was -- he -- he

Page 194

1  treated other individuals -- he would treat the guys in
2  the room, have conversations with them. If I walked into
3  a room and there was a group of people, he would turn and
4  leave.
5      Q. (By Mr. Olsen) Did you have any trouble even
6  getting him to acknowledge you were standing there talking
7  with him?
8      A. Yes.
9      Q. What did he do when you tried to talk with him
10 face to face?
11     A. He would walk away or just ignore me
12 completely.
13     Q. And where would he go?
14     A. Go into his office and shut the door or
15 just --
16     Q. Did you see any difference in the way he
17 treated men and women?
18     A. Yes.
19          MS. MARTINEZ: Objection to form. Leading.
20     Q. (By Mr. Olsen) What was the difference?
21     A. He was friendlier. He --
22     Q. Friendlier with who?
23     A. With the men.
24     Q. Okay.
25     A. He would have conversations with them, ask

Page 195

1  them about their personal life, what did you do this
2  weekend, where did you go to dinner last night kind of
3  thing, and he would not even have work conversations with
4  me.
5      Q. Did you discuss with anybody else the fact
6  that he appeared to treat men and women differently?
7      A. No. I don't --
8      Q. Can you tell me anything about his heritage,
9  where his -- where he was born, where he's from, anything
10 like that?
11     A. He's from Morocco.
12     Q. Do you think he was born in Morocco?
13     A. Yes.
14     Q. Why do you think that?
15     A. I think I was told somewhere along the line.
16     Q. Did he ever tell you that?
17     A. No.
18     Q. Did he ever tell you why he was treating you
19 that way from the very outset of your relationship?
20          MS. MARTINEZ: Objection to form.
21     A. No.
22     Q. (By Mr. Olsen) Did you wonder why?
23     A. Yeah.
24     Q. Okay. How long at that point had you worked
25 at Level 3?

Page 196

1      A. Six years.
2      Q. Had he ever made a comment about what he was
3  told about your performance?
4      A. In the car ride together he was told that I
5  was --
6      Q. He said what?
7      A. He --
8          MS. MARTINEZ: Objection. Asked and answered.
9      A. He said that I was the most qualified
10 individual for that position in Denver.
11     Q. (By Mr. Olsen) The position you already held?
12     A. Yes.
13     Q. Well, at that point in time did you ever have
14 any inkling that he was thinking about changing the makeup
15 of the company or that position?
16          MS. MARTINEZ: Objection. Asked and answered.
17     A. No.
18     Q. (By Mr. Olsen) So why would he be saying to
19 you that you were the most qualified person?
20          MS. MARTINEZ: Objection. Calls for
21 speculation.
22     Q. (By Mr. Olsen) If you know. Did he say why
23 he was even bringing that up? I'll withdraw that
24 question.
25          Go to the start of that conversation and tell

Page 197

1  us everything that was said.
2       MS. MARTINEZ: Objection. Asked and answered.
3       Q. (By Mr. Olsen) You're in the car with him,
4  right?
5       A. Yes.
6       Q. Just tell us everything you remember about
7  what was said in that conversation. If you can't
8  remember, don't worry, but tell us what you do remember.
9       MS. MARTINEZ: Objection. Asked and answered.
10      A. He talked about -- he told me not to worry
11 about my job, that I was the best qualified individual,
12 and that I needed to just proceed with the, you know, work
13 that needed to be done and continue on, and -- you know,
14 basically that I wasn't --
15      Q. (By Mr. Olsen) And how long after that was it
16 that you heard from Steven Forry that he was taking your
17 job?
18      MS. MARTINEZ: Objection to form.
19      A. I don't -- probably a few days.
20      Q. (By Mr. Olsen) At least a few days or --
21      A. Yeah.
22      Q. -- about a few days?
23      A. About a few days.
24      Q. But during that phone conversation, you had
25 not heard that Steven Forry was going to -- during that

Page 198

1  car conversation --
2       A. Right.
3       Q. -- you had not heard from Steven Forry yet; is
4  that correct?
5       A. No, I hadn't.
6       Q. So you had no inkling at that point that you
7  were going to be fired?
8       A. Right.
9       Q. Okay. Now, when you testified earlier, you
10 were asked about Exhibit 10, which you're still holding
11 there, and you were asked if some parts of it were
12 disrespectful and I think you said no, frustration --
13 frustrating. Is that true?
14      A. Yes.
15      Q. Did you think anything you wrote under the
16 circumstances that were occurring was disrespectful to
17 him?
18      A. Under the circumstances?
19      Q. Yes, that's my question.
20      A. After the way he treated me, no.
21      Q. Okay. Now, was there anything unprofessional
22 in the way Mr. Bissani was handling himself?
23      A. Yes.
24      Q. And what was that?
25      A. Disregard of me, disregard of the work I was

Page 199

1  doing.
2       Q. Okay. But what about in the decision to
3  replace you, anything unprofessional about the way that
4  happened?
5       A. Well, getting a phone call from an individual
6  letting me know that I'm going to lose my job.
7       Q. Well, what is it that Mr. Bissani did that was
8  unprofessional?
9       A. Speaking outside of the company, talking to
10 other individuals about existing employees.
11      Q. Before you got the word?
12      A. Yes.
13      Q. Okay.
14      A. And my direct reports having second and
15 third-hand knowledge of Kaily's decision.
16      Q. When he became your boss, how many women were
17 in your unit?
18      A. Three, including myself.
19      Q. Okay. What happened to those three women?
20      A. We were all let go within days of each other.
21      Q. By who?
22      A. It was Kaily's decision.
23      Q. How do you know that?
24      A. I was informed of the layoffs, of who would be
25 let go.

Page 200

1       Q. Were any men laid off in his unit?
2       A. There was a WilTel individual that was let go.
3       Q. A WilTel individual?
4       A. Yes.
5       Q. The three women who were laid off, other than
6  you, who were they?
7       A. Kathy Bennett and Patty -- Patricia. I can't
8  remember her last name.
9       Q. At the time that Mr. Forry called you to tell
10 you that he was taking -- he had been told by Mr. Bissani
11 that he was taking your job, had Mr. Bissani had any
12 opportunity to observe your work?
13      MS. MARTINEZ: Objection to form. Calls for
14 speculation.
15      A. I would say no.
16      Q. (By Mr. Olsen) Had he interviewed you or
17 asked you about what you did or how you liked things? Any
18 kind of interview to learn about you at all?
19      A. No.
20      MS. MARTINEZ: Objection to form.
21      Q. (By Mr. Olsen) Did he have any basis, to your
22 knowledge, to even evaluate how you were doing?
23      A. No.
24      Q. Earlier you testified -- you can put
25 Exhibit 10 back over here.

Page 201

1    A. Okay.
2    Q. Oh, by the way, you were asked if -- with
3 regard to some of the e-mails in Exhibit 10 if your
4 subordinate had written that to you, would you have
5 tolerated that, and you said no; is that right?
6    A. Right.
7    Q. What would you have done though if an e-mail
8 had come from a subordinate who had that kind of concern,
9 what would you have done to try to communicate with that
10 person?
11    A. I would have re-addressed the issue, found out
12 what was concerning them, and handled it with them.
13    Q. Did Mr. Bissani ever try to do that with you?
14    A. No.
15    Q. Never even followed up with an inquiry?
16    A. No phone call. I waited, there was no phone
17 call.
18    Q. Okay. And no e-mail either --
19    A. No.
20    Q. -- to follow up?
21    Had you ever been treated like that by any
22 professional at Level 3 before?
23    A. No.
24    Q. Now, you described reporting that you were
25 going to have back surgery; is that correct?

Page 202

1    A. Yes.
2    Q. And who did you tell out there that you were
3 going to have that?
4    MS. MARTINEZ: Objection. Asked and answered.
5    A. Pete Smith and Kaily Bissani.
6    Q. (By Mr. Olsen) And when you told Mr. Smith
7 that, was anybody else present?
8    A. I don't think so.
9    Q. Okay. So why did you tell him then?
10    A. To let him know that I would be needing a few
11 days off to recover.
12    Q. And did you -- and so when you told
13 Mr. Bissani that, that was at a separate time, was it?
14    A. Yes.
15    Q. Okay. Who else was present then?
16    A. No one.
17    Q. Was that in a face-to-face conversation or on
18 the telephone?
19    A. Face to face.
20    Q. Where were you?
21    A. In Kaily's office.
22    Q. And why were you telling him this?
23    A. To let him know that I would need some time
24 off; to preinform him that I was going to get back
25 surgery.

Page 203

1    Q. Okay. And did he say anything at all in
2 response?
3    A. He said that he didn't --
4    MS. MARTINEZ: Objection. Asked and answered.
5    Q. (By Mr. Olsen) I'm sorry, I didn't hear that.
6 What?
7    A. He said that he didn't give a shit.
8    Q. And then what did he do immediately after he
9 said that?
10    A. He proceeded to not talk to me anymore.
11    Q. And then you left?
12    A. No. I tried to explain to him how I would
13 cover the area, for him not to be concerned that I would
14 be absent from work.
15    Q. And did he say anything in response to that?
16    A. He was just negative and turned --
17    Q. But did he say anything in response to that?
18    A. No.
19    Q. And then did you just leave his office?
20    A. Yes.
21    Q. Okay. What was the look on his face when he
22 said, "I don't give a shit"?
23    A. Just disgust and zero concern.
24    Q. When you left the office, did that upset you?
25    A. Yeah.

Page 204

1    Q. Why is that? I'll withdraw it.
2    Have you ever been treated like that before at
3 Level 3 --
4    A. No.
5    Q. -- by your manager?
6    A. No.
7    Q. Had you ever seen any manager or supervisor
8 ever treat another employee like that?
9    A. No.
10    Q. Now, some of the exhibits we looked at today
11 included some quarterly evaluations for -- let me grab the
12 whole pile here.
13    A. Okay.
14    Q. Let me hand you a couple -- maybe several at
15 one time. Here's one, and it's Exhibit 4. Who prepared
16 that, do you know? Can you tell?
17    A. I guess it was Kaily Bissani.
18    Q. Okay. Had you ever seen that before today?
19    MS. MARTINEZ: Objection. Asked and answered.
20    A. I don't recall seeing this other than my own
21 input.
22    Q. (By Mr. Olsen) Right. If you had seen that
23 before today, would you remember it?
24    MS. MARTINEZ: Objection. Form.
25    A. I would think I would remember it.

Page 205

1   Q. (By Mr. Olsen) Why is that? Why do you think
2   you'd remember it?
3   A. Because it's pretty telling.
4   Q. Telling about who?
5   A. It's -- they're just -- the statements in here
6   are so incorrect, I would have had a discussion about
7   this.
8   Q. Okay. Now, pursuant to the procedures at
9   Level 3, was your supervisor supposed to talk with you
10  about this?
11  A. Yes.
12  Q. And why do you know that that's pursuant to
13  the procedures at Level 3?
14  A. We do -- we do these quarterly, and quarterly
15  you evaluate your individuals and you sit with them and
16  you have discussions on what they talked about on
17  themselves and then what you talked about with them.
18  Q. And did you notice in this that the supervisor
19  rating was at or -- at/above?
20  A. Yes.
21  Q. Now, looking at the other two that were handed
22  to you today -- by the way, how many of these did you
23  receive while you worked at Level 3?
24  A. Six years, four a year.
25  Q. May I have the bottom one back?

Page 206

1   A. Yeah.
2   Q. Take a look at these two. Who prepared them,
3   do you know?
4   A. Peter Smith.
5   Q. And did you also provide input for your
6   sections of both those documents?
7   A. Yes.
8   Q. And they're exhibit numbers what? Can you
9   read the exhibit numbers at the bottom, please?
10  A. Two and three.
11  Q. Did Mr. Smith also speak with you at or about
12  the time he made these comments about you?
13  A. Yes.
14  MS. MARTINEZ: Objection to form. Asked and
15  answered.
16  Q. (By Mr. Olsen) When he spoke with you, did he
17  tell you or try to tell you how you were performing?
18  A. Yeah.
19  Q. And what is it that he was saying to you at
20  this time -- these times about your performance?
21  MS. MARTINEZ: Objection. Asked and answered.
22  Q. (By Mr. Olsen) Let me take that bottle of
23  iced tea and put it somewhere else, otherwise it may fall
24  over.
25  A. We had -- we had lengthy conversations about

Page 207

1   these.
2   Q. Did he ever positively criticize you or
3   negatively criticize you in the face-to-face discussions
4   you had with him?
5   A. Yes.
6   Q. And what is it that he said to you?
7   A. Well, once -- when I would write my
8   evaluation, then he would come back with his evaluation,
9   it would go into the system, and then at that -- after
10  that point in time, then we would have a face-to-face
11  meeting and discuss the evaluation.
12  Q. Okay.
13  A. So I would argue some of the things that he
14  would write down about me. You know, just talk about the
15  workload and how I'm -- you know, I would be progressing
16  in certain areas that he implied I wasn't working on at
17  all, and, you know, oftentimes, he would tell me that
18  "You're right." He would say things, like he tended to be
19  a negative individual and that I performed well and -- you
20  know, we would talk about each individual thing
21  separately. And I would have an opportunity to give him
22  more information.
23  Q. How did -- what did he say to your face in
24  evaluating your performance? How did he say you were
25  doing?

Page 208

1   MS. MARTINEZ: Objection. Asked and answered.
2   A. He said that I was doing well.
3   Q. (By Mr. Olsen) Did he ever not say that?
4   MS. MARTINEZ: Objection. Asked and answered.
5   A. No.
6   Q. (By Mr. Olsen) Did his opinion ever vary from
7   that?
8   A. No.
9   Q. How often did he tell you you were doing well
10  over the time that he was your boss? Are we talking about
11  one or two times or more?
12  A. Many times. His -- one of his favorite
13  sayings is, "You make me look good." He would say that a
14  lot.
15  Q. How often did he say that to you?
16  A. Probably every project I worked on repeatedly.
17  Q. Did he ever -- did he ever describe your
18  performance to Mr. Bissani?
19  MS. MARTINEZ: Objection to form.
20  Q. (By Mr. Olsen) If you know.
21  A. I don't know. He did tell me that he would
22  tell Kaily Bissani that I was the most qualified person
23  for this position.
24  Q. Now, prior to Mr. Bissani becoming your boss,
25  did you hear rumors of possible layoffs --

Page 221

1 but because I've asked you so many, Ms. Martinez has the
2 right to follow up. So why don't you pull your chair all
3 the way back over here and turn that way, and we'll turn
4 the floor over to Ms. Martinez.
5            FURTHER EXAMINATION
6 BY MS. MARTINEZ:
7     Q. Ms. Capps, you said that Mr. Bissani's
8 heritage is Moroccan.
9     A. Yes.
10    Q. What does that matter?
11        MR. OLSEN: Objection as to form and
12 foundation.
13    A. I don't know.
14    Q. (By Ms. Martinez) Are you trying to imply
15 that because he's Moroccan, he's a sexist?
16        MR. OLSEN: Objection as to form and
17 foundation.
18    A. I don't know. I don't know how to answer
19 that.
20    Q. (By Ms. Martinez) Well, I'm asking you, are
21 you trying to imply because he's Moroccan that he would be
22 more likely than any other individual --
23        MR. OLSEN: Objection.
24    Q. (By Ms. Martinez) -- to discriminate against
25 women?

Page 222

1         MR. OLSEN: Objection. She wasn't trying to
2 imply something. She was simply answering the question,
3 but go ahead, whatever you want to say.
4     A. I don't really know anything about Moroccans.
5 He asked me what his nationality was and I said what it
6 was. I do know how Kaily Bissani treated me, and it
7 was -- seemed very sexist. It was sexist.
8     Q. (By Ms. Martinez) And that's because you were
9 not offered the position of field manager?
10        MR. OLSEN: Objection as to form and
11 foundation.
12    A. It was because he refused to speak to me. He
13 didn't look me in the eye. He treated the other
14 individuals in our office, the men, friendly. He had
15 lengthy discussions with them about their projects and
16 their jobs.
17        MR. OLSEN: You may keep going. I have to
18 silence the noise in the other room.
19    A. He would refuse to even speak to me at times.
20    Q. (By Ms. Martinez) What else? Anything else?
21    A. No.
22    Q. There were no other women in the office who
23 you regularly saw Mr. Bissani interacting with; isn't that
24 correct?
25    A. That's correct.

Page 223

1     Q. You don't believe that Mr. Bissani is a sexist
2 because he's Moroccan, do you?
3     A. I don't know.
4     Q. Now, there were a number of RIFs at Level 3 in
5 early 2006, weren't there?
6     A. I don't know that.
7     Q. Well, weren't you part of several RIFs in
8 2006?
9     A. Individuals or times of --
10    Q. You were in charge of assisting with the
11 termination meetings for people impacted by RIFs in 2006?
12    A. Not several.
13    Q. Some?
14    A. Yes.
15    Q. And you're aware that Kathy Bennett was not
16 part of the same Reduction In Force that impacted you?
17    A. That's not true.
18    Q. Kathy Bennett was let go in April, and you
19 were let go in May; isn't that correct?
20    A. Yes, but I'm aware that we were under the same
21 RIF.
22    Q. Are you aware of who the decision maker was
23 with respect to Ms. Bennett?
24    A. It was --
25    Q. No, my question is do you know who the

Page 224

1 decision maker was?
2     A. No, I guess I don't.
3     Q. Do you know -- and I want to know if you know.
4 I don't want you to speculate. Do you know who the
5 decision maker was with respect to this Patricia, whether
6 to let her go?
7     A. No.
8     Q. Now, Patricia was a WilTel employee you said?
9     A. Yes.
10    Q. And there were male WilTel employees who were
11 let go in 2006 too, correct?
12    A. Yes.
13    Q. For instance, Everett McCane?
14    A. Yes.
15    Q. He was a peer of yours, correct?
16    A. Yes.
17    Q. And there were other males who were let go in
18 the same RIF that impacted you, correct?
19    A. In the company or in our division?
20    Q. Yes. Well, let's start within the company.
21    A. I don't -- I'm assuming, yes, but I don't
22 know.
23    Q. And within your division there were other
24 males that were impacted by the same RIF that impacted
25 you?