Exhibit 5

Peter Smith

1

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3     Civil Action No. 07-CV-00922-RPM-CBS

4     REBECCA CAPPS,

5     Plaintiff,

6
      vs.

7

8     LEVEL 3 COMMUNICATIONS, INC.,

9     Defendant.

10    _____

11              DEPOSITION OF PETER F. SMITH

12    _____

13

14              PURSUANT TO NOTICE, the

15    above-entitled deposition was taken on behalf of the

16    Plaintiff at 410 17th Street, 22nd Floor, Denver,

17    Colorado, on December 19, 2007, at 9:40 a.m.,

18    before Dawn E.  Eastman (Calderwood), Certified

19    Shorthand Reporter, Registered Professional

20    Reporter, and Notary Public.

21

22

23

24

25
```

**Page 2**

```
1   APPEARANCES:
2   For the Plaintiff:
        MEGHAN MARTINEZ, ESQ.
3       Brownstein Hyatt Farber Schreck, P.C.
        410 17th Street, 22nd Floor
4       Denver, Colorado 80202
        (303) 223-1133
5       E-mail: Mmartinez@bhfs.com
6   For the Defendant:
        JOHN R. OLSEN, ESQ.
7       Olsen & Brown
        8362 Greenwood Drive
8       Niwot, Colorado 80503
        (303) 652-1133
9
    Also Present:
10      Rebecca Capps
11
12
13
14
15            EXAMINATION INDEX
16  By Mr. Olsen          Page 3
17
18            EXHIBIT INDEX
19            (None marked.)
20
21
22
23
24
25
```

**Page 3**

```
1            P R O C E E D I N G S
2         WHEREUPON, the following proceedings
3    were taken pursuant to the Federal Rules of Civil
4    Procedure.
5         *     *     *     *     *
6              PETER F. SMITH,
7    having been first duly sworn to state the whole
8    truth, testified as follows:
9                 EXAMINATION
10   BY MR. OLSEN:
11       Q.   Would you please state your full name.
12       A.   Peter Smith.
13       Q.   Mr. Smith, do you have a middle
14   initial?
15       A.   F.
16       Q.   Where do you live, what state?
17       A.   Littleton.
18       Q.   There's going to come a point in this
19   case where we're going to need to subpoena you, if
20   you don't mind. And to do that, normally, I have to
21   go to your house and knock on your door and find you
22   when you're home to give you a subpoena. But that's
23   very inconvenient for you and for us.
24         So I always ask if the company's
25   attorney will be willing to accept service for you
```

**Page 4**

```
1    to save trouble. If not, then I have to ask you
2    your home address. Normally, I would not ask you
3    that question. So do you want to confer about that?
4        A.   Either way.
5             MS. MARTINEZ:  I can accept service
6    for you.
7             THE DEPONENT:  That's fine.
8             MR. OLSEN:  Then I won't be needing to
9    know your home address. That's the only reason I do
10   that. I try not to intrude into personal things.
11            THE DEPONENT:  Not a problem.
12       Q.   (By Mr. Olsen) Where are you employed
13   right now?
14       A.   Level 3.
15       Q.   When did you first start to work
16   there?
17       A.   July of 1998.
18       Q.   And have you worked there continuously
19   since then?
20       A.   No.
21       Q.   You departed and came back?
22       A.   Correct.
23       Q.   When did you leave?
24       A.   April 2006.
25       Q.   When did you come back?
```

**Page 5**

```
1        A.   February 2007.
2        Q.   Why did you leave?
3        A.   Pursued other interests.
4        Q.   You weren't laid off?
5        A.   No.
6        Q.   Did you leave of your own free will,
7    is what I'm saying?
8        A.   Yes.
9        Q.   Why did you come back?
10       A.   I needed a job.
11       Q.   And they were happy to have you back,
12   I presume, from what I know about you?
13       A.   Correct.
14       Q.   What is your present job title?
15       A.   Director of operations.
16       Q.   When you first went to work at Level
17   3, what was your title, if you remember?
18       A.   I was a city engineer.
19       Q.   And could you outline for us how your
20   titles changed over the time you were employed there
21   all the way through to today?
22       A.   Sure. I was hired in as a city
23   engineer. My boss was a director of operations. He
24   was let go, and I was hired to replace him as
25   director of operations.
```

2 (Pages 2 to 5)

Peter Smith

**10**

1   MS. MARTINEZ: Objection to form.
2   MR. OLSEN: You may answer.
3   THE DEPONENT: No. Actually, it was
4 to discuss my departure from the company.
5   Q.   (By Mr. Olsen) Okay. So had you
6 already informed the company that you were leaving?
7 I need to know the timing, how this unfolded.
8   A.   I had already – yes.
9   Q.   Okay. When was the first time you
10 discussed your departure from the company with the
11 company?
12   A.   March 2006.
13   Q.   And who was it that you discussed that
14 with?
15   A.   That was Frank Mambuca.
16   Q.   Was that a telephone conversation?
17   A.   Yes.
18   Q.   What did you say to him and what did
19 he say to you, to the best of your recollection, in
20 that conversation?
21   A.   I told him that I was choosing to
22 leave the company to pursue an opportunity that I
23 had.
24   Q.   Now, as of that moment you had that
25 particular discussion, were you already aware that

**11**

1 Kaily Bissani would be replacing you?
2   A.   No.
3   Q.   Did you have any idea, at that
4 juncture, who would be replacing you?
5   A.   No.
6   Q.   So what did Mr. Mambuca say back to
7 you?
8   A.   I believe his question to me was: Are
9 you sure?
10   Q.   Go on and tell me everything that was
11 said in that conversation. That way, I don't have
12 to break up your response with questions.
13   A.   I had mentioned that I had an
14 opportunity that I would like to pursue outside of
15 Level 3. Frank was a representative of Level 3,
16 asked me if I was sure of my decision. And when I
17 said: Yes, I am, he said he would get back to me.
18   Q.   And when did he get back to you next?
19   A.   Within a couple of days.
20   Q.   And what was the purpose of getting
21 back to you, if you recall?
22   (Beginning of separation agreement.)
23   THE DEPONENT: To finalize a
24 separation agreement.
25   Q.   (By Mr. Olsen) So in that separation

**12**

1 agreement, you agreed to accept the separation sum
2 of money?
3   A.   Correct.
4   Q.   And why did you feel, or why was a
5 separation agreement used in that situation, since
6 you were just leaving; right?
7   MS. MARTINEZ: Mark this part of the
8 transcript confidential, please.
9   Q.   (By Mr. Olsen) Did you have a claim
10 against the company of some kind?
11   A.   No, not at all.
12   Q.   Did you, upon returning to Level 3 in
13 February 2007, have to return any of that money to
14 Level 3?
15   A.   No.
16   Q.   What, presently, is your annual
17 salary?
18   A.   96,000.
19   MR. OLSEN: We can designate the whole
20 thing.
21   MS. MARTINEZ: That's okay.
22   Q.   (By Mr. Olsen) So you voluntarily
23 left. At that point, upon that second discussion
24 with Mr. Mambuca in which the separation package was
25 discussed – I think that's what you were saying –

**13**

1 at that point, did he tell you who would replace
2 you?
3   A.   Yes.
4   Q.   Prior to that moment in time, did you
5 know who would replace you?
6   A.   No.
7   Q.   Who did he tell you would replace you?
8   A.   That was Kaily Bissani.
9   MS. MARTINEZ: You can end it now.
10   Q.   (By Mr. Olsen) Now, when you had that
11 conversation with Mr. Mambuca, that second one in
12 which your package was discussed, where were you
13 located?
14   MS. MARTINEZ: Don't end it yet.
15   THE DEPONENT: I believe I was in my
16 office at 1850 Pearl Street.
17   Q.   (By Mr. Olsen) In what city?
18   A.   Denver.
19   Q.   And do you know, at that moment, where
20 it was that Kaily Bissani was employed, what
21 location?
22   A.   Yes, Broomfield.
23   MS. MARTINEZ: Okay.
24   (End of confidential portion.)
25   Q.   (By Mr. Olsen) Did you then hear a

18

1    A.    I believe he's Moroccan.
2    Q.    Why do you believe that? For
3  instance, did he say something to you about his
4  heritage?
5    A.    No.
6    Q.    Do you know if he's an American
7  citizen?
8    A.    No.
9    Q.    Do you know if he speaks any foreign
10  languages?
11    A.    No.
12    Q.    Is he married?
13    A.    Yes.
14    Q.    Does he have children?
15    A.    Yes.
16    Q.    At the time that he replaced you, just
17  prior to that, do you know what his job title was?
18    A.    I believe he was vice president of
19  operations, western region.
20    Q.    And do you know who tapped him to
21  replace you?
22        MS. MARTINEZ:  Objection to form.
23        THE DEPONENT:  That was Frank Mambuca.
24    Q.    (By Mr. Olsen)  And do you know why
25  they selected Mr. Kaily Bissani to replace you?

19

1        MS. MARTINEZ:  Objection to form.
2        THE DEPONENT:  No.
3    Q.    (By Mr. Olsen)  Do you know if he
4  voluntarily took that assignment?
5    A.    No.
6    Q.    You don't know?
7    A.    No, I was not involved with those
8  decisions.
9    Q.    Do you know if that was a demotion for
10  him or a promotion for him?
11    A.    I would say it was a demotion.
12    Q.    Why do you say that?
13    A.    Because he was a vice president, and
14  then he took a director position.
15    Q.    When he took the director position, do
16  you know who replaced him as the vice president?
17    A.    I think it was Paul Sidore.
18    Q.    Spell that last name if you could,
19  please.
20    A.    S-i-d-o-r-e.
21    Q.    Don't know him.
22        Now, on the day before he replaced
23  you, can you tell me what the structure was beneath
24  you in global field services, Denver division? For
25  instance, let's start by asking, roughly, how many

20

1  subordinates did you have?
2    A.    I believe it was a 16-person group.
3    Q.    And can you give me a feeling for the
4  titles that these folks had?  First, maybe I should
5  ask:  Were there any subunits in that group?  Like
6  when I was in the army, I had a company; beneath me,
7  I had four squads.
8        Do you see what I mean by that?
9    A.    Sure.
10    Q.    Was there a subunit there?
11    A.    I'm not sure I would call it a
12  subunit, but I was a manager of managers.
13    Q.    So you had some managers reporting to
14  you?
15    A.    Right.
16    Q.    And how many?
17    A.    We had one.
18    Q.    Who was that, if you recall?
19    A.    That was Becky.
20    Q.    And do you recall what her title was?
21    A.    Either field manager or outside plant
22  manager, I'm not sure.
23    Q.    And who was beneath -- of the 16
24  people in your global field services, Denver
25  division, how many reported to Becky Capps?

21

1    A.    Six.
2    Q.    And to whom did the others report?
3    A.    They were direct reports of mine.
4    Q.    Okay.  When you joined the company in
5  July 1998, was Becky Capps already employed there,
6  if you remember?
7    A.    No, I don't believe she was.
8    Q.    Do you know how it came to pass --
9  well, when you acquired your title director of
10  operations, global field services, Denver division,
11  was she already in that unit?
12    A.    No.
13    Q.    How did it come to pass that she then
14  joined your unit?
15    A.    It was a reorganization.
16    Q.    And who created that reorganization,
17  if you know?
18    A.    I think, at that time, it was Frank
19  Mambuca, also.
20    Q.    And where did Rebecca Capps come from
21  when she joined your unit, if you know?
22    A.    I believe the group name was long haul
23  field services.
24    Q.    Do you know why it was or who decided
25  she would join your unit?  When I say "your unit,"

22

1  I'm referring to global field services, Denver
2  division. Do you know who it was that decided she
3  would join your unit?
4      A.   I would say Frank Mambuca made the
5  decision.
6      Q.   How did you learn about that decision?
7      A.   Through communication of a
8  reorganization.
9      Q.   And when you say "through
10 communication," did somebody orally tell you that
11 Rebecca Capps would be joining your unit? Or was it
12 announced, perhaps?
13     A.   During a reorganization, there's
14 communication among the leadership team. And at
15 that time, it was communicated to me.
16     Q.   Did you have any part in that decision
17 for her to join your team?
18     A.   No.
19     Q.   Now, at that moment that she joined
20 your team, did anyone else join your team, too?
21     A.   Becky's direct report team came over
22 with Becky.
23     Q.   So her team of, perhaps, six or seven,
24 came over at the same time?
25     A.   I don't recall the exact number, but

23

1  yes.
2      Q.   Now, the day before her team arrived,
3  how many subordinates did you have, if you're able
4  to recall?
5      A.   I don't recall at that time what the
6  size of the group was.
7      Q.   Was it smaller than 16 then?
8      A.   I think it was right around 16.
9      Q.   So when her group came in, on the day
10 her group arrived, she and her people arrived, how
11 many people did you have then as your subordinates,
12 roughly?
13     A.   Again, I'm not sure of the exact size
14 of the group. But I'm going to speculate it was in
15 the 20 to 25 range.
16     Q.   And then at the time --
17         MS. MARTINEZ: Don't guess.
18     Q.   (By Mr. Olsen) -- you departed the
19 unit, why was it down to 16?
20     A.   Level 3's need to reduce operating
21 expense.
22     Q.   Are you saying to get down to 16,
23 certain people were laid off?
24     A.   Yes.
25     Q.   Do you remember who they were? I know

24

1  I'm testing your memory here; aren't I?
2      A.   No, I don't remember exactly who was
3  laid off.
4      Q.   Now, let's go back, then, in time to
5  the moment that Becky Capps and her team arrived.
6         At that point in time, were there any
7  women subordinates in your unit, subordinates of
8  you, besides Becky Capps?
9      A.   Yes.
10     Q.   And do you recall their names?
11     A.   Kathy Bennett.
12     Q.   And anyone else?
13     A.   No.
14     Q.   And does that mean all the remainder
15 of your team at that time were males?
16     A.   Yes.
17     Q.   Now, from the day you became director
18 of operations in global field services, Denver
19 division, did you ever have any other females in
20 your unit besides Kathy Bennett and Rebecca Capps?
21     A.   Yes.
22     Q.   Can you remember the name or names of
23 those females?
24     A.   Karen Svetics.
25     Q.   Would you repeat that?

25

1      A.   Karen Svetics.
2      Q.   And can you spell the last name, if
3  possible?
4      A.   S-v-e-t-i-c-s.
5      Q.   And would you do that one more time?
6      A.   S-v-e-t-i-c-s.
7      Q.   And anyone else who were females?
8         MS. MARTINEZ: Objection to form.
9         THE DEPONENT: No.
10     Q.   (By Mr. Olsen) And so from the date
11 that you became director of operations to the date
12 you departed in April 2006, there were only ever
13 three women in that unit?
14     A.   Correct.
15     Q.   Now, upon your departure from the
16 company in April 2006, was Kathy Bennett still in
17 your unit?
18     A.   Yes.
19     Q.   Was Karen Svetics still in your unit?
20     A.   No.
21     Q.   Why wasn't she still there; do you
22 know?
23     A.   Karen took a transfer out of Denver to
24 go to Philadelphia.
25     Q.   And were you her boss when she took

7 (Pages 22 to 25)

Peter Smith

26

1 that transfer?
2    A.   Yes.
3    Q.   Who replaced her, if you recall?
4    A.   I don't recall.
5    Q.   Was it a male?
6    A.   I don't recall.
7    Q.   Well, could it have been Kathy
8 Bennett?
9        MS. MARTINEZ:  Objection to form.
10       THE DEPONENT:  No, it wasn't Kathy.
11   Q.   (By Mr. Olsen)  So it had to be a man,
12 then, since Kathy Bennett and Rebecca Capps were the
13 only other females; right?
14       MS. MARTINEZ:  Objection to form.
15       THE DEPONENT:  Correct.
16   Q.   (By Mr. Olsen)  Are you able to deduce
17 the person who replaced Karen had to be a man?
18   A.   No.
19   Q.   So is it possible that there was a
20 woman that came in to replace her?
21   A.   I don't recall.
22   Q.   Do you recall any other women who ever
23 worked in the unit while you were the director of
24 operations?
25   A.   No.

27

1    Q.   Do you think that Karen was possibly
2 not replaced by anyone?
3    A.   That's what I don't recall.  We
4 could -- we may have not backfilled her position.
5    Q.   Okay.  Now, I think I just asked
6 you -- and maybe I didn't -- is Kathy Bennett still
7 employed at Level 3?
8    A.   No.
9    Q.   And were you the director of
10 operations when she departed Level 3?
11   A.   No.
12   Q.   So when you left that unit in
13 April 2006, she was still in the unit?
14   A.   Yes.
15   Q.   Do you recall what her job title was?
16   A.   Technician II or Technician I.
17   Q.   Did you later learn that she had left
18 the company?
19   A.   Yes.
20   Q.   Who did you hear that from?
21   A.   I don't recall.
22   Q.   Did anyone impart any information to
23 you as to why she left the company?
24   A.   No.
25   Q.   Do you have any information as to why

28

1 she left the company?
2    A.   Yes.
3    Q.   And what information -- first of all,
4 do you recall where you got the information?
5    A.   No.
6    Q.   What information was it?
7    A.   That she was part of the workforce
8 reduction.
9    Q.   Do you remember approximately when?
10   A.   No.
11   Q.   When she became part of the workforce
12 reduction, does that mean she was involuntarily
13 terminated in a layoff?
14   A.   Yes.
15   Q.   And at the time that happened to her,
16 was Kaily Bissani her superior?
17   A.   I don't know.
18   Q.   Do you know who else was laid off in
19 that same workforce reduction?
20   A.   No.
21   Q.   Did you also learn or receive any
22 information that Rebecca Capps departed the company?
23   A.   Yes.
24   Q.   Do you remember who you heard that
25 from?

29

1    A.   No.
2    Q.   And what information had you heard
3 about that?
4    A.   That she was no longer with the
5 company.
6    Q.   Did anybody ever impart any
7 information as to why she was no longer with the
8 company?
9    A.   No.
10   Q.   When Kathy Bennett left the company,
11 do you know if anybody else was involved in the same
12 workforce reduction?
13   A.   No.
14   Q.   Do you believe other people were?
15       MS. MARTINEZ:  Objection to form.
16       MR. OLSEN:  I will withdraw that
17 question.
18   Q.   (By Mr. Olsen)  You weren't working
19 there then; were you?
20   A.   No, I wasn't working for the company
21 then, so I don't know.
22   Q.   So it doesn't do much good for us to
23 go there.  We'll find that out from other folks who
24 actually were there at the time.
25       Do you know if Rebecca Capps was laid

Calderwood-Mackelprang, Inc. 303.477.3500

Peter Smith

**Page 30**

1  off in a workforce reduction? Did you ever hear
2  that from anybody?
3  A. Yes.
4  Q. Who did you hear that from?
5  A. I don't know.
6  Q. Did you ever speak with anybody about
7  why Rebecca Capps was no longer at the company?
8  A. No.
9  Q. Did you ever learn from any source any
10  information, of any kind whatever, about why she was
11  no longer with the company?
12  A. Yes, I had to have heard that she was
13  let go in a RIF.
14  Q. You're deducing that you had to have
15  heard that; is that correct?
16  A. Yes.
17  Q. Do you know who made the decision to
18  let her go in the RIF?
19  A. No.
20  Q. Did you ever participate in a RIF
21  while you were employed at Level 3?
22  A. Yes.
23  Q. Did you have -- did you participate in
24  the decision-making as to whom to RIF?
25  A. Yes.

**Page 31**

1  Q. And at any time was that in your unit?
2  And global field services, Denver division is what
3  I'm talking about as your unit.
4  A. Yes, I did.
5  Q. How many people were laid off from
6  your unit while you were the director of operations?
7  A. I don't have a count on that.
8  Q. Was that before you left in April of
9  2006?
10  A. Yes.
11  Q. And who was it that was laid off while
12  you were the director of operations?
13  A. I don't remember every name.
14  Q. Can you name as many as you can?
15  A. Yes.
16  Q. Go ahead.
17  A. Tracy Jackson, Dennis Romero.
18  Q. Dennis Romero?
19  A. Yes. Souk Shanhowa (phonetic).
20  Q. What was that first name?
21  A. Souk.
22  Q. Duke?
23  A. Souk.
24  Q. Can you spell that?
25  A. No. I'm just kidding. It was

**Page 32**

1  S-o-u-k, but that's short for, like --
2  Q. Oh, he's Cambodian?
3  A. Exactly. Souk is a shortened version
4  of his name.
5  Q. He might be Indonesian?
6  A. No, he's Cambodian -- no, he's
7  Laotian.
8  Q. I went to school over in Viet Nam with
9  some Laotians. They were terrific people.
10  So question for you: Who else, if you
11  can remember anybody else, was --
12  A. I'll do my best. Ray Roseberry. I
13  don't recall anybody else at the moment.
14  Q. When you departed in April of 2006,
15  were there any other managers in your unit besides
16  you and Rebecca Capps?
17  A. No.
18  Q. And just to make sure: At that point,
19  Kathy Bennett was still in your unit?
20  A. Yes.
21  Q. Well, in that RIF that you had, that
22  you just described, why wasn't Rebecca Capps laid
23  off?
24  MS. MARTINEZ: Objection to form.
25  THE DEPONENT: For the record, there

**Page 33**

1  was multiple RIFs. But why Becky wasn't laid off
2  was because she was a manager of people, and we were
3  reducing synergies or overlaps of employees.
4  Q. (By Mr. Olsen) Would you explain what
5  you meant by that? I'm sorry.
6  A. Okay. Becky was managing a group of
7  six or seven at that time; I don't remember. And we
8  were trying to find ways to reduce the workforce
9  without impacting the business. And removing a
10  manager at that time was not a decision we made to
11  support Level 3 business.
12  Q. But it was discussed, I take it?
13  A. I think every person in an
14  organization is a discussed during workforce
15  reduction periods.
16  Q. So during the multiple RIFs that you
17  just described, the termination of everybody was
18  discussed in some way; is that fair?
19  A. I wouldn't say "termination."
20  Solutions to continue the business, as normal,
21  without impacting the business.
22  Q. But she was retained through those
23  RIFs because of her value to the company; is that
24  it?
25  MS. MARTINEZ: Objection to the form.

9 (Pages 30 to 33)

Calderwood-Mackelprang, Inc. 303.477.3500

Peter Smith

34

1    THE DEPONENT: Yeah, at that point,
2    yes.
3    Q.   (By Mr. Olsen) Now, were any other
4    managers let go in those multiple RIFs that you
5    described that occurred before you departed in April
6    of 2006?
7    A.   I don't recall who was let go around
8    the country.
9    Q.   Do you ever recall discussing with
10   anybody whether Rebecca Capps should be terminated
11   in any RIF?
12   A.   Yes.
13   Q.   And do you remember who you discussed
14   that with?
15   A.   Those discussions, during any RIF,
16   happened with your manager.
17   Q.   Can you name anybody, by name, with
18   whom you discussed the possibility of Rebecca Capps
19   being terminated in a RIF?
20   A.   John Hansen.
21   Q.   Anyone else?
22   A.   I don't recall. I've had various
23   managers throughout my tenure with Level 3, so I
24   don't recall when John took over and when Becky and
25   I started working together.

35

1    Somewhere it was -- if John wasn't my
2    manager when Becky first came in, then I would have
3    to say it was with a manager other than John.
4    Q.   Well, whichever manager it was that
5    you spoke upon that subject with, do you remember
6    what you said to him? It was a male manager; wasn't
7    it?
8    MS. MARTINEZ: Objection to form.
9    Q.   (By Mr. Olsen) That was a two-part
10   question.
11   I'm going to ask you now what you said
12   to that particular manager with whom you discussed
13   the topic of a potential RIF termination of Rebecca
14   Capps.
15   But, first, I'm going to ask you if
16   that manager was not John Hansen, can you deduce the
17   sex of the manager with whom you did talk? For
18   instance, were all the managers men?
19   MS. MARTINEZ: Objection to form.
20   THE DEPONENT: My managers have all
21   been men.
22   Q.   (By Mr. Olsen) There you go. So in
23   speaking with that person, whoever it was, what did
24   you say and what did they say?
25   A.   I don't recall the conversation.

36

1    Q.   Well, who first brought up the
2    discussion point of a potential termination of
3    Rebecca Capps?
4    A.   I think -- I don't know if we had
5    specific discussions around any one individual. We
6    talked about the entire organization.
7    Q.   Did you have a discussion about not
8    laying off Rebecca Capps?
9    A.   Becky didn't get laid off so,
10   certainly, we discussed not laying her off or not
11   including her in the RIF.
12   Q.   Are you saying you're deducing that
13   you must have discussed not laying her off? Or do
14   you actually remember discussing it? Do you see the
15   difference?
16   A.   I don't really see the difference.
17   But, no, I would say that during a RIF period, you
18   look at discussions surrounding who you're going to
19   lay off.
20   Q.   Do you remember any words you said on
21   the subject of whether Rebecca Capps should be laid
22   off or not?
23   MS. MARTINEZ: Objection to form.
24   THE DEPONENT: I don't recall the
25   conversations.

37

1    Q.   (By Mr. Olsen) Well, did you believe
2    she should be laid off?
3    MS. MARTINEZ: Objection to form.
4    THE DEPONENT: If I believed she
5    should have been laid off, I would have --
6    MS. MARTINEZ: Are you talking about
7    at that time?
8    Q.   (By Mr. Olsen) Is there ever a time
9    that you believe she should have been laid off?
10   A.   Discussing the period of time when
11   Becky worked with me?
12   Q.   Right. Thanks.
13   A.   I think -- I'm trying to recall
14   conversations that I had about that, and I don't --
15   no.
16   Q.   So what reasons were there for not
17   laying her off?
18   A.   I think it goes back to the need for a
19   manager in the position that Becky held.
20   Q.   Did it have anything to do with her
21   performance, how she was doing?
22   A.   I believe there's a combination of
23   both: You have to do your job, and you have to have
24   a need for that role.
25   Q.   Well, while you were her supervisor

10 (Pages 34 to 37)

Peter Smith

38

1 during the last year while you were director of
2 operations, how was her performance?
3     A.   Can you be more specific?  Which
4 period of time?
5     Q.   During the year before you departed --
6 which your departure was April of 2006; correct?
7     A.   I always felt Becky did an adequate
8 job.
9     Q.   And did she have any positive traits
10 that you can recall?
11     A.   Yes.  My opinion was that I thought
12 Becky had good OSP knowledge.
13     Q.   Did you prepare any performance
14 evaluations for her?
15     A.   Yes.
16     Q.   And when you prepared those, did you
17 tell the truth in them?
18     A.   Every time.
19     Q.   Did you also prepare performance
20 evaluations for any of the people who were her
21 subordinates?
22     A.   No.
23     Q.   Did you ever talk with Rebecca Capps
24 about women in the industry?
25     A.   Not that I recall.

39

1     Q.   Did you ever speak with her about the
2 need to have more women become involved in those
3 kinds of jobs?
4         MS. MARTINEZ:  Objection to form.
5         THE DEPONENT:  No.
6     Q.   (By Mr. Olsen) While you were the
7 director of operations and she was a subordinate of
8 yours, did you develop any reasons, of any kind
9 whatever, to think that she should leave the
10 company?
11         MS. MARTINEZ:  Objection to form.
12         THE DEPONENT:  You'll have to repeat
13 that question.
14         MR. OLSEN:  Could you read that back?
15         (The record was read back by the
16 reporter as requested.)
17         MS. MARTINEZ:  Objection to form.
18         THE DEPONENT:  No.
19     Q.   (By Mr. Olsen) Were you satisfied
20 with her performance while you were her boss?
21     A.   Yes.
22     Q.   Now, when Mr. Kaily Bissani was tapped
23 to replace you, did you then confer with him?
24         THE DEPONENT:  Do you mind if I have a
25 break?

40

1         (Discussion off the record.)
2         (A recess was taken.)
3         (The question was read back by the
4 reporter as requested.)
5         THE DEPONENT:  Confer with him about
6 what?
7     Q.   (By Mr. Olsen) About anything.
8     A.   Yes.
9     Q.   Did you meet with him face-to-face?
10     A.   Yes.
11     Q.   How many times, in relation to your
12 departure and him taking over?
13     A.   One time.
14     Q.   And where were you located at that
15 time?
16     A.   Le Peep.
17     Q.   Excuse me?
18     A.   Le Peep.
19     Q.   In what city?
20     A.   Denver.
21     Q.   Was anybody else present?
22     A.   No.
23     Q.   What was the purpose of that meeting,
24 if you recall?
25     A.   To transition my job to Kaily.

41

1     Q.   And in that process, did you provide
2 any paperwork to him?
3     A.   No.
4     Q.   Had you ever prepared any paperwork
5 that went to him about how your team or your group
6 was doing?
7     A.   No.
8     Q.   When you were the director of
9 operations, did you maintain any files on your
10 subordinates?
11     A.   No.
12     Q.   Did you have --
13     A.   Other than the performance workbench
14 reviews that Level 3 maintains, which is a quarterly
15 write-up of each person's performance.
16     Q.   And can you recount for me the
17 discussion that you had with Mr. Bissani at Le Peep?
18     A.   In what regard?
19     Q.   Anything.  Just tell us what you
20 remember was said in that meeting at Le Peep.  You
21 ordered pancakes -- just kidding, go ahead.
22     A.   Waffles.
23     Q.   Sounds good to me right now.  Anyway,
24 go ahead.
25         Did you discuss the members of the

11 (Pages 38 to 41)

Calderwood-Mackelprang, Inc. 303.477.3500

Peter Smith

42

1   group with him?
2       A.   Yes.
3       Q.   Did you discuss Rebecca Capps with
4   him?
5       A.   Yes.
6       Q.   And do you remember what you said
7   about Rebecca Capps in that discussion?
8       A.   Yes.
9       Q.   Go ahead and tell me that.
10      A.   I gave him my opinion about Becky and
11  the ability to perform a new role in the
12  organization.
13      Q.   A what role?
14      A.   A new role in the organization.
15      Q.   Okay. Well, rather than telling me
16  the topic, just tell me what you said. How's that?
17      A.   I said that I didn't think Becky could
18  do the new role in the organization.
19      Q.   Would you repeat that? I didn't quite
20  hear the first part.
21      A.   I said I didn't think Becky could
22  perform the new role in the organization.
23      Q.   And what new role were you referring
24  to?
25      A.   The combined long haul/metro

43

1   operations outside plant role.
2       Q.   I'm going to ask you say that again.
3   Combined long haul. . .
4       A.   Long haul and metro outside plant.
5       Q.   Were there more words to it than that?
6   Combined long haul and metro outside plant what?
7       A.   Role.
8       Q.   Now, who brought up the subject of
9   whether she could do that role in the meeting at
10  Le Peep?
11      A.   The discussion was brought up by me.
12      Q.   Well, when did you first hear about
13  the combined long haul and metro outside plant role?
14      A.   I don't recall the exact time line on
15  that.
16      Q.   Well, what was the combined long haul
17  and metro outside plant role? Was it a new role
18  being created somewhere, somehow?
19      A.   It was a consolidation of two jobs
20  that were currently being held by one person -- or
21  by two people down to one person.
22      Q.   Who were those two people?
23      A.   That was Becky on the long haul and
24  Diron Benschop on the metro.
25      Q.   And who is it who said that they were

44

1   going to be combined?
2            MS. MARTINEZ:  Objection to form.
3            THE DEPONENT:  I don't recall who
4   exactly said it. It was part of the reorganization
5   of the field services.
6       Q.   (By Mr. Olsen)  Where did you hear
7   about that combination of roles from?
8       A.   I don't recall. It was part of the
9   reorganization of the company.
10      Q.   Was it your idea?
11      A.   No.
12      Q.   And I take it you were told this
13  privately by someone in the company, that this would
14  happen?
15      A.   Yeah, as a director of an
16  organization, there's conversations that you have.
17      Q.   Did it mean, as you understood it,
18  that someone was going to have to be laid off?
19      A.   I wasn't thinking about the layoff
20  impact. I was thinking about the combination of the
21  jobs and who would perform that job.
22      Q.   Well, as you were considering that,
23  did you consider about what the other person who
24  didn't do that job would be doing after the jobs
25  were combined?

45

1       A.   I didn't give it a lot of thought.
2       Q.   But just so I understand this:  You
3   were told that the jobs were going to have to be
4   combined, the job that Rebecca Capps was doing and
5   the job that Diron Benschop was doing. Is that
6   right? You were told that; right?
7       A.   That is correct.
8       Q.   You didn't make that decision
9   yourself; did you?
10      A.   No, I did not.
11      Q.   Were there any other jobs within your
12  sphere of supervision that were also combined?
13           MS. MARTINEZ:  Objection to form.
14           THE DEPONENT:  Which jobs would you be
15  talking about?
16      Q.   (By Mr. Olsen)  Any.
17           MS. MARTINEZ:  Objection to form.
18      Q.   (By Mr. Olsen)  You've described to me
19  two jobs. Was Mr. Benschop one of your
20  subordinates?
21      A.   Yes.
22      Q.   And you've just described two jobs
23  that were supposed to be combined. Were any of the
24  other jobs affected by this planning that you've
25  described?

12 (Pages 42 to 45)

62

1　A.　No.
2　Q.　Well, what was the new job going to
3　entail that was different than what they were
4　already doing, each one?
5　A.　Well, the outside plant metro is a
6　different job than the outside plant long haul.
7　Q.　Who had been doing that?
8　MS. MARTINEZ: Objection to form.
9　THE DEPONENT: So the outside plant
10　metro and outside plant long haul are two separate
11　jobs in the organization.
12　Becky had been doing long haul.  Diron
13　had been doing metro.  Distinctly different jobs,
14　distinctly different responsibilities.
15　Q.　(By Mr. Olsen) Were there any
16　responsibilities of the job that Becky was not doing
17　that you felt she couldn't do?
18　A.　Which job?
19　Q.　Well, what job was she doing?  Long
20　haul?
21　A.　Correct.
22　Q.　Were there any of the responsibilities
23　of the metro job that you felt she could not do?
24　A.　I thought Becky's job – her attention
25　to detail and paperwork was her shortfall.  And in

63

1　the metro area, where you're awarding a lot of
2　contracts and handling a lot of money, that was
3　going to be a problem.
4　Q.　Okay.  Any other shortfalls for
5　Rebecca Capps that led you to believe that she
6　couldn't do the combined job?
7　A.　My opinion is that Becky was doing her
8　current job, and she was not going to be able to do
9　the combined job, which would increase the workload
10　on her.
11　Q.　So there were no other shortcomings in
12　her performance that suggested to you – other than
13　her ability to do paperwork – that suggested to you
14　that she shouldn't do the combined job; is that
15　fair?
16　MS. MARTINEZ: Objection to form.
17　Mischaracterizes his testimony.
18　THE DEPONENT: You mean –
19　Q.　(By Mr. Olsen) I'll withdraw the
20　question. I need to make clear what I'm driving at,
21　so I understand.
22　I want to know why you wouldn't think
23　she could do the combined job.  And so far, I have
24　heard you give one reason; and that is that her
25　attention to detail and paperwork was her shortfall.

64

1　Were there any other reasons why you
2　didn't think she could –
3　A.　It was a shortfall.
4　Q.　So my question is:  Were there any
5　other reasons or shortfalls that led you to conclude
6　that she couldn't do the combined job?
7　A.　I think there was going to be an
8　increase in the workload.  And my opinion is that
9　Becky was not going to be able to handle both
10　workloads.
11　Q.　Okay.  Anything else?
12　A.　No.
13　Q.　Now, with regard to Diron Benschop,
14　were there any shortfalls, as you use that word,
15　that led you to believe that he couldn't do the
16　combined roles, the combined job, I mean?
17　MS. MARTINEZ: Objection to form.
18　THE DEPONENT: I had used Diron in a
19　managerial capacity in the past, and he did not do a
20　good job for me.
21　Q.　(By Mr. Olsen) Anything else?
22　A.　Again, an opinion that the combined
23　job would be a larger job than he could handle –
24　similar to Becky – where the combined job, in
25　theory, would double your workload and would

65

1　challenge him.
2　Q.　So what you're saying is you didn't
3　think Diron Benschop could handle the workload, the
4　increased workload, from the combined jobs?
5　A.　Correct.
6　Q.　Now, did you tell Kaily Bissani any of
7　the reasons why you didn't think Rebecca Capps could
8　handle the combined job when you were sitting in
9　Le Peep?
10　A.　I don't recall that exact
11　conversation.  But, again, the gist of that
12　conversation was that we had an outside plant issue
13　because neither person, in my opinion, could do the
14　combined job.
15　Q.　Now, I heard you say that before in
16　your testimony here today.  But I want to know if
17　you then went on to tell him why you felt that way?
18　MS. MARTINEZ: Objection to form.
19　Q.　(By Mr. Olsen) And maybe you didn't,
20　but I need to know.
21　A.　I think the conversation was brief, as
22　I recall.  And it consisted of the basic feedback I
23　just gave you, where I felt that each was challenged
24　in their individual role, each – and this is very
25　generalized statements; obviously, it's not

17 (Pages 62 to 65)

Peter Smith

70

1      Q.   Capable of what? I'm missing that
2    answer.
3      A.   I think your question was: Did he
4    have any construction skills for the job?
5      Q.   And you said yes.
6      A.   And I said yes.
7      Q.   Didn't Mr. Benschop and Rebecca Capps
8    have essentially the same kind of duties --
9          MS. MARTINEZ: Objection to form.
10     Q.   (By Mr. Olsen) -- in their two
11   different jobs?
12     A.   No, very distinctly different jobs.
13     Q.   How did they differ?
14     A.   Well, Diron worked in a metro
15   environment, which is what you're looking out of the
16   window for, where you do new building adds, you
17   construct building laterals into new buildings, you
18   work in an urban environment doing outside
19   plant-related activities.
20         Becky's job was a long haul route
21   manager, which was maintaining a long haul
22   fiberoptic cable and the maintenance of the
23   regeneration huts that Level 3 has based.
24     Q.   How many direct reports did
25   Mr. Benschop have?

71

1      A.   At what time?
2      Q.   Well, at the time that you left the
3    company.
4      A.   Zero.
5      Q.   And at that time, Ms. Capps had a half
6    dozen?
7      A.   Yes, six.
8      Q.   Why did she have or need direct
9    reports, and he did not?
10         MS. MARTINEZ: Objection to form.
11         THE DEPONENT: Well, because the long
12   haul manager's job has a -- I think, at that time,
13   we were at about 900 miles of routes from Denver to,
14   essentially, the outskirts of Salt Lake City, Denver
15   to Pueblo, and Denver to the Nebraska state line.
16         And we traditionally station
17   technicians -- well, it depends on the span, but a
18   hundred miles -- every hundred miles or so, you put
19   a person to maintain the fiber and maintain the
20   regeneration huts along the running line.
21         So we needed a manager for that group
22   of technicians that live in rural environments that
23   are maintaining our lines.
24     Q.   (By Mr. Olsen) In managing those
25   people, what did Ms. Capps have to do? What kind of

72

1    management did she do of them?
2      A.   There's workload management, vacation
3    scheduling, performance reviews. I think that is a
4    fair summary.
5      Q.   And Mr. Benschop did not have to do
6    that; is that right?
7      A.   In the metro environment, we used
8    contractors to do all of our activities.
9      Q.   Did Ms. Capps ever work on any what
10   you would call larger jobs or contracts in her roie
11   while you were there?
12     A.   We had several projects that I would
13   consider large in Becky's area.
14     Q.   Do you remember what they were?
15     A.   Sure. We had a government project
16   that went on in the Colorado Springs area. And we
17   had a customer, EchoStar, in Cheyenne, Wyoming.
18     Q.   Any others?
19     A.   You have to be more specific on the
20   type of projects, because there's different
21   projects.
22     Q.   That's okay.
23         I would like to ask you if there is
24   any paperwork, that you're aware of inside Level 3,
25   that says anything to support the point of view that

73

1    Mr. Benschop could not do the combined jobs --
2          MS. MARTINEZ: Objection to form.
3      Q.   (By Mr. Olsen) -- that you know of,
4    any paperwork that we can obtain and subpoena.
5          MS. MARTINEZ: Objection to form.
6          THE DEPONENT: Not that I'm aware of.
7      Q.   (By Mr. Olsen) Same question for
8    Ms. Capps.
9          MS. MARTINEZ: Objection to form.
10         THE DEPONENT: Well, I'll retract that
11   and say that I think you have to review performance
12   evaluations and look for the commentary in there
13   that might suggest that there's areas of improvement
14   in their current role, not in a combined role. And
15   I think both of them would have that in there.
16     Q.   (By Mr. Olsen) Was there any other
17   paperwork besides performance reviews?
18         MS. MARTINEZ: Objection to form.
19         THE DEPONENT: No.
20     Q.   (By Mr. Olsen) For either of them?
21         MS. MARTINEZ: Objection to form.
22         THE DEPONENT: No.
23     Q.   (By Mr. Olsen) And so if -- well, did
24   you ever speak with Rebecca Capps about the
25   combination of those two jobs?

19 (Pages 70 to 73)

Peter Smith

74

1   A.   I believe I met with Becky at the
2  state line ILA. And I'm not sure, during that
3  conversation, if we discussed a requirement or the
4  reduction of OSP managers.
5       Q.   Did you ever discuss it with her?
6       A.   I don't recall.
7       Q.   Do you recall anything that you said
8  to her on that topic at any time?
9       A.   No.
10      Q.   Do you recall ever discussing with her
11 whether you would recommend her for the job or not?
12      A.   No.
13      Q.   Have you read any documents in
14 preparation for your deposition today?
15      A.   Yes.
16      Q.   What did you read?
17      A.   The deposition of -- Becky's
18 deposition.
19      Q.   Anything else that you read in
20 preparation for your own deposition today?
21      A.   The deposition and the, you know,
22 attachments, I guess.
23      Q.   And did you read her entire
24 transcript?
25      A.   Yes.

75

1       Q.   And did you find that she said
2  anything in that transcript that you believe is
3  untrue?
4       MS. MARTINEZ:  Objection to form. And
5  I'll let you know that I did not give him the whole
6  transcript.
7       Q.   (By Mr. Olsen) So in the parts of the
8  transcript -- I take it you weren't given the entire
9  transcript; is that right?
10      A.   I don't know what I was provided.
11      Q.   Do you have it with you?
12      A.   No.
13      Q.   Where did you read it?
14      A.   In fact, I might have sat here and
15 read it.
16      Q.   I'm sorry?
17      A.   I think I was in this conference room
18 going through the deposition.
19      Q.   And when was that?
20      A.   Last week.
21      Q.   And so was it a bound volume that you
22 were reading, or was it loose pages?
23      A.   I think it was loose.
24      Q.   Excuse me?
25      A.   Loose pages.

76

1       Q.   And did you read anything in those
2  loose pages that you believe Ms. Capps testified to
3  that you believe was untrue?
4       A.   Yes.
5       Q.   And what was that?
6       A.   I -- that I told her that I
7  recommended her for that job.
8       Q.   Why do you believe that's untrue?
9       A.   Because I never said it.
10      Q.   How can you tell me you never said it
11 if you can't remember what you said to her on that
12 topic, as you just testified to a few minutes ago?
13      MS. MARTINEZ:  Objection to form.
14      THE DEPONENT:  I can testify what I
15 know I believe in my heart, which was she was not
16 qualified for that job; therefore, I would never
17 have told her that I was recommending her for that
18 job.
19      Q.   (By Mr. Olsen) So you're deducing
20 that; is that right?
21      MS. MARTINEZ:  Objection to form.
22      THE DEPONENT:  Deducing what?
23      Q.   (By Mr. Olsen) That you did not
24 recommend her for that job, that you did not tell
25 her you were going to recommend her for that job;

77

1  right?
2       MS. MARTINEZ:  Objection to form.
3       Q.   (By Mr. Olsen) You're deducing that
4  you did not tell her that; right?
5       MS. MARTINEZ:  Objection to form.
6       THE DEPONENT:  I'm saying that I would
7  not say something that I don't believe.
8       Q.   (By Mr. Olsen) Now, do you remember,
9  at any time, discussing this topic with Rebecca
10 Capps?
11      A.   No, I do not.
12      Q.   You don't remember a single thing that
13 you said to her on this topic; is that right?
14      MS. MARTINEZ:  Objection to form.
15      THE DEPONENT:  That is correct.
16      Q.   (By Mr. Olsen) Did you say anything
17 to Mr. Benschop on this topic?
18      MS. MARTINEZ:  Objection to form.
19      THE DEPONENT:  I don't recall
20 conversations with Diron or Becky.
21      Q.   (By Mr. Olsen) And this topic of
22 Rebecca Capps in the combined job, did you ever
23 discuss it with anybody else besides Kaily Bissani?
24      A.   No.
25      Q.   Do you know when Mr. Benschop left the