Exhibit 8

```
                                                              1
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF COLORADO
 3      Civil Action No.: 07-CV-00922-RPM-CBS


 4

        REBECCA CAPPS,
 5
                  Plaintiff,
 6      vs.
 7      LEVEL 3 COMMUNICATIONS, INC.,
 8                Defendant.


 9
10           TELEPHONIC DEPOSITION OF JUSTIN C. AIMONE
11
12                PURSUANT TO NOTICE, the
13      above-entitled deposition was taken on behalf of
14      the Plaintiff at the offices of Olsen & Brown, LLC,
15      8362 Greenwood Drive, Niwot, Colorado, on December
16      28, 2007, at 9:17 a.m., before Jana Mackelprang,
17      Certified Realtime Reporter, Registered Professional
18      Reporter, and Notary Public.
19
20
21
22
23
24
25
```

**Page 2**

```
 1  APPEARANCES:
 2  For the Plaintiff:
        JOHN R. OLSEN, ESQ.
 3      Olsen & Brown, LLC
        8362 Greenwood Drive
 4      Niwot, Colorado  80503
        (303) 652-1133
 5
    For the Defendant:
 6      MEGHAN MARTINEZ, ESQ.
        Brownstein Hyatt Farber Schreck, P.C.
 7      410 17th Street, 22nd Floor
        Denver, Colorado  80202
 8      (Present telephonically)
 9
10
11
12
13              EXAMINATION INDEX
14  By Mr. Olsen              Pages 3, 35
15  By Ms. Martinez           Page 32
16
17
18
19              EXHIBIT INDEX
    FOR IDENTIFICATION          REFERENCE
20
21      (No exhibits were marked.)
22
23
24
25
```

**Page 3**

```
 1              P R O C E E D I N G S
 2      WHEREUPON, the following proceedings were
 3  taken pursuant to the Federal Rules of Civil
 4  Procedure.
 5              *   *   *   *   *
 6      MR. OLSEN:  Can we reach an agreement
 7  that the reporter here may swear in Mr. Aimone?
 8      MS. MARTINEZ:  That's fine.
 9      MR. OLSEN:  Can you swear in
10  Mr. Aimone, please.
11              JUSTIN C. AIMONE,
12  having been first duly sworn to state the whole
13  truth, testified as follows:
14              EXAMINATION
15  BY MR. OLSEN:
16      Q.  Would you please state your full name
17  for us.
18      A.  Justin Case Aimone.
19      Q.  And would you pronounce your last name
20  one more time for me.
21      A.  Aimone.
22      Q.  Great.  I thought I had that close.
23  Thank you.
24          Mr. Aimone, my name is Jack Olsen.  I
25  represent Rebecca Capps.  Can you hear me all right?
```

**Page 4**

```
 1      A.  Yes, sir.
 2      Q.  Have you ever been in a deposition
 3  before?
 4      A.  I have not.
 5      Q.  This is a bit of an unusual deposition
 6  in that it's being done by a three-way
 7  teleconference, with Ms. Martinez at another
 8  location away from you, and then also away from us.
 9          Where are you located right now?
10      A.  I am at a Level 3 IOA in Carter,
11  Wyoming.
12      Q.  And how many miles away from Denver is
13  that?
14      A.  440 miles.
15      Q.  And do you work at Level 3?
16      A.  Yes.
17      Q.  When did you first start working at
18  Level 3?
19      A   March of 2000.
20      Q.  And when you started, what was your
21  job title?
22      A.  Senior route technician.
23      Q   And what is your title now?
24      A.  The same.
25      Q.  When you started at Level 3, do you
```

**Page 5**

```
 1  remember who your supervisor was?
 2      A.  I was hired by Becky Capps.
 3      Q.  And did she remain your supervisor all
 4  the while you were there?
 5      A.  There was a brief period where
 6  divisions were changed around and I was under a
 7  different division for a few months; but other than
 8  that, she was my boss the entire time.
 9      Q.  And did you have an opportunity to
10  observe her performance?
11      A.  Yes.
12      Q.  Did you have to rate her performance
13  for the company at any time?
14      A.  I believe so, yes.
15      Q.  And was that called a 360-performance
16  evaluation or something like that?
17      A.  Something like that, performance
18  reviews, something of that nature.
19      Q.  And the company asked you all to do
20  that, did they?
21          MS. MARTINEZ:  Objection to form.
22      Q.  (By Mr. Olsen) Let's put it this way:
23  The company asked you to do it; is that right?
24      A.  Correct.
25      Q.  This was a routine thing, was it?
```

Page 6

1   MS. MARTINEZ: Objection to form.
2   Q. (By Mr. Olsen) Was it a certain time
3  of year or a number of times per year or what?
4   A. Usually we were required to evaluate
5  our own performance, I believe it was, twice a year.
6  And after that process was complete, then we usually
7  got a management survey.
8   Q. What did that management survey ask
9  you about your supervisor?
10  A. Just our attitude about our supervisor
11 and other supervisors. It usually wasn't specific
12 to just our immediate supervisor.
13  Q. In that process, did you have to
14 evaluate her performance?
15  A. Yes.
16  Q. How did you -- what did you say about
17 Ms. Capps?
18   MS. MARTINEZ: Objection to form.
19  Q. (By Mr. Olsen) In that survey, I
20 mean.
21   MS. MARTINEZ: Objection to form.
22  Q. (By Mr. Olsen) You may answer when
23 she objects.
24  A. Okay. Always excellent.
25  Q. Okay. Did you ever learn why she

Page 7

1  departed the company?
2   A. I was just told that she was laid off.
3   Q. Do you remember who told you that?
4   A. It would have been one of my
5  equivalents as far as another technician. I was
6  never informed officially by management or anything
7  like that.
8   Q. After she was laid off, who replaced
9  her?
10   MS. MARTINEZ: Objection to form.
11 Assumes facts not in evidence.
12   THE DEPONENT: The tech reports that I
13 worked with on a day-to-day basis informed me that
14 they were reporting to Steven Forry.
15  Q. (By Mr. Olsen) Okay. Did you ever
16 learn that directly from Mr. Forry?
17   MS. MARTINEZ: Objection to form.
18   THE DEPONENT: I did not.
19  Q. (By Mr. Olsen) When you were a senior
20 route technician, and right now as you are a senior
21 route technician, what unit or division or
22 department of the company are you in?
23  A. I am now in the Salt Lake division.
24  Q. And when Ms. Capps was there, what
25 were you in?

Page 8

1   A. The Denver division.
2   Q. And was there a further name of your
3  unit?
4   MS. MARTINEZ: Objection to form.
5   THE DEPONENT: Just outside plant
6  field operations for those divisions.
7   Q. (By Mr. Olsen) Do you know what
8  Ms. Capps' title was?
9   MS. MARTINEZ: Objection to form.
10   THE DEPONENT: She was an operations
11 manager, field manager.
12  Q. (By Mr. Olsen) Okay.
13  A. For the Denver division. I don't know
14 her specific title.
15  Q. Did her title have any -- or your job
16 have anything to do with long-haul work?
17  A. Correct, that's another word for it.
18  Q. Another word for what?
19  A. For route technician.
20  Q. Okay. Now, in your work in long haul,
21 did you have any metro duties?
22  A. No.
23  Q. Did you perform any metro work at any
24 time?
25   MS. MARTINEZ: Objection to form.

Page 9

1  Asked and answered.
2   THE DEPONENT: It depends on what
3  qualification you give to that. I performed install
4  duties, which, depending on who you ask, would fall
5  under metro work; but as far as working under a
6  metro facility, I did not.
7   Q. (By Mr. Olsen) What install duties
8  did you do that somehow related to metro?
9   MS. MARTINEZ: Objection to form.
10   THE DEPONENT: Installation of
11 equipment on the long-haul route in my area, and I
12 also did some work in the Denver division, in the
13 Denver Gateway and surrounding areas.
14  Q. (By Mr. Olsen) I missed your last
15 answer.
16  A. Most of that work, I guess, would
17 entail installation of communication gear on the
18 long-haul route in my area and in other areas, and I
19 also assisted in the Denver Gateway on a few
20 occasions.
21  Q. Did you consider that metro work?
22   MS. MARTINEZ: Objection to form.
23   THE DEPONENT: I did not, but it may
24 fall under that category.
25  Q. (By Mr. Olsen) Why do you say that?

Page 10

1  MS. MARTINEZ: Objection to form.
2  THE DEPONENT: Just because, depending
3  on what company you're talking with, that work can
4  be considered inside work versus outside work.
5  Q. (By Mr. Olsen) Well, was it inside
6  work or not?
7  MS. MARTINEZ: Objection to form.
8  Asked and answered. He said it was long haul.
9  Q. (By Mr. Olsen) Was it inside work or
10 not, sir?
11 MS. MARTINEZ: Objection to form.
12 THE DEPONENT: Yes, it was inside
13 work.
14 Q. (By Mr. Olsen) When you were doing
15 that inside work, who was your supervisor?
16 A. It would remain Becky Capps.
17 Q. What city was that inside work
18 performed in?
19 A. Various rural areas. The only major
20 area would be Salt Lake or Ogden, Utah, or Salt Lake
21 City, Utah.
22 Q. How about Denver?
23 MS. MARTINEZ: Objection to form.
24 THE DEPONENT: Denver, yes.
25 Q. (By Mr. Olsen) What about Denver?

Page 11

1  A. I did perform inside work in Denver.
2  Q. Who told you to go do that work?
3  A. Becky Capps.
4  Q. And do you know why it is that you
5  were asked to do that work in Denver?
6  A. It was all part of major projects
7  where we were building links between cities, such as
8  Denver and Ogden, and we're just completing that
9  work.
10 Q. Did you work with any outside
11 contractors?
12 A. Not regarding that work, no.
13 Q. Regarding any work?
14 A. I work with outside contractors when
15 we deal with cable-locating responsibilities.
16 Q. Well, was there any – was it you who
17 dealt with them, or was it Ms. Capps who dealt with
18 them?
19 MS. MARTINEZ: Objection to form.
20 THE DEPONENT: Ms. Capps dealt solely
21 in my area with outside contractors regarding
22 construction projects and things like that. I
23 specifically dealt with contractors regarding cable
24 locating, where they were actually digging their own
25 facilities.

Page 12

1  Q. (By Mr. Olsen) When you dealt with
2  outside contractors, did you have to deal with their
3  contracts themselves, the paperwork?
4  A. Not at all.
5  Q. Who did that?
6  MS. MARTINEZ: Objection to form.
7  THE DEPONENT: Becky Capps would have
8  done that, if it was needed.
9  Q. (By Mr. Olsen) When you say, "would
10 have," you mean she actually did that?
11 MS. MARTINEZ: Objection to form.
12 Calls for speculation, lack of foundation.
13 THE DEPONENT: Yes, she did that.
14 Q. (By Mr. Olsen) How do you know that?
15 A. That was her job responsibility.
16 Q. And did you ever see her doing that?
17 A. Yes.
18 Q. Okay. You yourself, when you were
19 dealing with outside contractors, did you actually
20 have to deal with the paperwork?
21 A. No.
22 Q. Who did that?
23 MS. MARTINEZ: Objection to form.
24 Lack of foundation.
25 Q. (By Mr. Olsen) Go ahead. I'm sorry.

Page 13

1  Can you repeat that response, sir?
2  A. Becky Capps.
3  Q. And how do you know she did that?
4  A. It was her job responsibility.
5  Q. Okay. Did you know a guy named Joe
6  McCain?
7  A. The name is familiar. I do not know
8  him personally.
9  Q. Now, when Ms. Capps departed -- maybe
10 I've already asked you this -- who told you that
11 Mr. Forry would be doing her job?
12 MS. MARTINEZ: Objection to form.
13 Asked and answered.
14 THE DEPONENT: It would have been Bob
15 Cooper or Steve Mauzy.
16 Q. (By Mr. Olsen) Did, indeed, Mr. Forry
17 come in and do her job?
18 MS. MARTINEZ: Objection to form.
19 Calls for speculation, lack of foundation.
20 THE DEPONENT: To my knowledge, yes.
21 Q. (By Mr. Olsen) When you say to your
22 knowledge, did you see him?
23 A. No, I did not.
24 Q. Then how did you know that he was
25 doing her job?

**Page 22**

1  Q. - Were you aware of any females, women,
2  who Mr. Bissani laid off beside Ms. Capps?
3  A. No.
4  Q. Did you know any other females who
5  worked in your long-haul unit?
6  A. No.
7  Q. After -- maybe you can help me in this
8  way: When you went to Salt Lake, do you remember
9  who remained behind in the unit? I assume Ms. Capps
10 was one. Do you remember the names of others?
11 A. Ms. Capps, Bob Cooper, Steve Mauzy,
12 Tom Pierce, and there were other technicians east
13 of --
14 Q. I'm sorry, go ahead.
15 A. There were other technicians east of
16 Denver and, I believe, south of Denver.
17 Q. Were any of them females?
18 A. No.
19 Q. Do you know how many miles of
20 communication lines you were working with before you
21 went to Salt Lake?
22    MS. MARTINEZ: Objection to form.
23    THE DEPONENT: As far as my specific
24 area?
25 Q. (By Mr. Olsen) No. I want to ask it

**Page 23**

1  more in Ms. Capps' area of responsibility, perhaps.
2     MS. MARTINEZ: Objection to form.
3     THE DEPONENT: I would guess over a
4  thousand.
5  Q. (By Mr. Olsen) And what metropolitan
6  areas did that link with?
7     MS. MARTINEZ: Objection to form.
8     THE DEPONENT: The Denver division and
9  then the ties out of that Denver division down into
10 Texas and east towards Omaha, Nebraska, and west
11 towards Ogden, Utah.
12 Q. (By Mr. Olsen) Did you reach Salt
13 Lake?
14 A. No.
15 Q. Did you reach Pueblo?
16 A. I believe so, yes.
17 Q. Did you ever work in Pueblo?
18 A. Yes.
19 Q. Did you consider that metro work?
20 A. No.
21 Q. And did you ever work in Salt Lake
22 before you were transferred there?
23 A. Yes, I did.
24 Q. Did you consider that metro work?
25 A. No.

**Page 24**

1  Q. So what cities is metro work
2  associated with -- was it then, I mean?
3  A. In my mind, metro work is
4  communications work within a metro ring surrounding
5  a city.
6  Q. Does that pertain to any particular
7  cities?
8  A. There's a metro ring around Denver.
9  There's a metro ring around Salt Lake City that I'm
10 also familiar with.
11 Q. Before you transferred to Salt Lake
12 City, did you work within the metro ring at Salt
13 Lake City?
14 A. I did.
15 Q. And Denver?
16 A. Yes.
17 Q. When you did work within the metro
18 rings of both those cities, was Ms. Capps your
19 supervisor?
20 A Yes.
21 Q. Did she participate in your
22 supervision when you were in those rings?
23 A. Yes.
24 Q Did she interface with any other
25 people within those rings, to your knowledge?

**Page 25**

1     MS. MARTINEZ: Objection to form.
2  Q. (By Mr. Olsen) Let me repeat it, in
3  case you didn't hear it. Did she interface with any
4  other people within those rings?
5     MS. MARTINEZ: Objection to form.
6     THE DEPONENT: I'm sure that she did,
7  but I would not have specifics.
8  Q. (By Mr. Olsen) Your answer was,
9  again?
10    MS. MARTINEZ: Objection to form.
11    THE DEPONENT: I'm sure that she did,
12 but I would not have specifics.
13 Q. (By Mr. Olsen) The reason why I'm
14 asking you to repeat, Mr. Aimone, is because
15 counsel, when she objects, is talking over you, and
16 I can't be sure which language the reporter is
17 picking up. And Ms. Martinez has a right for her
18 words to be on the record, and you have your right
19 to have yours on, too. So that's the only reason I
20 follow up like that.
21 A. I understand.
22    MR. OLSEN: What I'd like to do, if
23 you'd allow, is take a short break here and check my
24 notes.
25    Before we go, Ms. Martinez, do you

Justin Aimone

**Page 26**

1  want to check with our next deponent to see if he
2  wants to start earlier?
3       MS. MARTINEZ: I can do that after we
4  hang up.
5       Jack, I think there's something going
6  on with the connection here. It's very, very hard
7  to hear.
8       MR. OLSEN: You're blasting us out
9  here.
10      MS. MARTINEZ: I cannot hear you.
11      MR. OLSEN: Why don't we redial it in
12 ten minutes.
13      MS. MARTINEZ: You want to take a
14 five-minute break, you said?
15      MR. OLSEN: Let's make it ten.
16      Mr. Aimone, in ten minutes, we'll
17 redial you. Ms. Martinez, if you hang up, we'll
18 redial, and maybe we'll get a better connection. I
19 hear both of you loud and clear.
20      MS. MARTINEZ: Okay.
21      MR. OLSEN: We'll redial in ten.
22      MS. MARTINEZ: I can't hear you, but
23 I'm going to hang up.
24      (A recess was taken.)
25      Q.  (By Mr. Olsen) I only have a few more

**Page 27**

1  questions for you, Mr. Aimone.
2       Do you remember -- was there ever an
3  occasion when you actually had to substitute in
4  Denver for people there?
5       A.  No.
6       Q.  Did you ever have to fill in for
7  anybody who went on vacation?
8       A.  Not in the Denver Gateway, no.
9       Q.  Okay. Did you ever have to do that in
10 any other metro area?
11      A.  Not in a metro area, no.
12      Q.  Was there a time when the company put
13 you up at a hotel in Denver?
14      A.  Yes.
15      Q.  Why was that?
16      A.  Various reasons. I've been down there
17 for trainings. I've been down there performing work
18 in the area. I've been performing splicing
19 activities, things of that nature.
20      Q.  With regard to those activities, who
21 was your supervisor?
22      A.  Becky Capps.
23      Q.  Did you ever have to go to the Denver
24 metro area to train anybody?
25      A.  Yes.

**Page 28**

1       Q.  Do you remember what training that was
2  that you were required to provide?
3       A.  I provided some unofficial training to
4  some of the Denver Gateway technicians on OTDRs.
5       Q.  Is that O-T, as in Tom, D, as in
6  David, R?
7       A.  Correct.
8       Q.  What does that stand for?
9       A.  Optical time domain reflectometer.
10 It's a piece of test gear that we use.
11      Q.  Why is it that you needed to train
12 them?
13      MS. MARTINEZ: Objection to form.
14      Q.  (By Mr. Olsen) If you know?
15      MS. MARTINEZ: Objection to form.
16      THE DEPONENT: I was proficient using
17 that piece of equipment, and was just trying to be
18 helpful.
19      Q.  (By Mr. Olsen) Who was your
20 supervisor at that time?
21      A.  Becky Capps.
22      Q.  And who did you have to train there in
23 Denver?
24      MS. MARTINEZ: Objection to form.
25      THE DEPONENT: I did not have to train

**Page 29**

1  anyone.
2       Q.  (By Mr. Olsen) I'm sorry, who did you
3  actually train?
4       A   Some of the Gateway technicians.
5  Specific names would have been Raleigh Dickie, is
6  one, Matt Butler was another one. There were others
7  there.
8       Q   How about Diron Benschop?
9       A.  He may or may not have participated; I
10 don't know.
11      Q.  You don't remember?
12      A.  No.
13      Q.  Now, at the time you spoke with
14 Ms. Capps about issues with Mr. Bissani, were you
15 already in Salt Lake?
16      A.  Yes.
17      Q.  And was she already gone from the
18 company?
19      A.  No.
20      Q.  So, I take it, she spoke with you
21 within the period of your transfer to Salt Lake and
22 the time of her termination?
23      A.  Yes.
24      Q.  Do you know how long after you went to
25 Salt Lake that she was terminated?

8 (Pages 26 to 29)

Calderwood-Mackelprang, Inc. 303.477.3500