IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00922-RPM-CBS

REBECCA A. CAPPS,

      Plaintiff,

v.

LEVEL 3 COMMUNICATIONS, LLC,

      Defendant.

---

### REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

      Defendant, Level 3 Communications, LLC ("Defendant" or the "Company"), through its undersigned attorneys, submits the following reply in support of its Motion for Summary Judgment ("Opening Brief").

## INTRODUCTION

      In its Opening Brief, Defendant set out how Plaintiff's separation from employment was due to legitimate, nondiscriminatory reasons.  Namely, Plaintiff was included in one of the Company's numerous reductions in force ("RIFs") that have occurred since the downturn in the telecommunications industry that began earlier in this decade.

      Although Plaintiff and her two ***male*** comparators were all slated for and informed of their impending job eliminations, Plaintiff did not apply for remaining, open positions with the Company.  Plaintiff even failed to apply for the posted position of "Field Manager," which combined some of her prior job duties (as Outside Plant Manager - Long Haul), with Outside

Plant Manager – Metro (the job held by male employee Diron Benschop), and Outside Plant Manager – WilTel (the job held by male employee Everett "Joe" McCain).  Plaintiff now contends that – based on her own subjective opinion - she was better qualified than anyone else for the Field Manager position and she should have been handed the position despite her failure to apply.  Thus, Plaintiff argues, the only plausible reason she was not given the Field Manager position is because of her gender.

        In support of these claims, and to respond to Defendant's Opening Brief, Plaintiff submitted a fifty-five page brief ("Opposition") which is nothing more than form over substance.  Most notably, the Opposition contains *thirty one* pages of what Plaintiff deems "undisputed material facts."  **See Opposition at pp. 2-32.**  The "undisputed material facts" are allegedly supported by an attached Declaration of Rebecca Capps.  That Declaration and the "undisputed material facts" are actually *made up* statements by Plaintiff (completely unsupported by the actual record and, at times, even contradictory to Plaintiff's deposition testimony), argument by counsel, and conclusory statements.  Accordingly, Defendant is filing, contemporaneously with this Reply, a Motion to Strike the Declaration of Rebecca Capps.  None of Plaintiff's tactics successfully create a genuine issue of material fact or otherwise overcome Defendant's Motion for Summary Judgment.  On this basis alone, Defendant's Motion should be granted.

        Finally, Plaintiff's Opposition addresses only her disparate <u>treatment</u> claim under Title VII; thus, Plaintiff's disparate impact claim should be deemed confessed.  During the Scheduling Conference in this matter on July 10, 2007, this Court made clear that Plaintiff must produce statistical evidence and expert testimony in order to sustain any claim for disparate impact.  Plaintiff nonetheless failed to provide any such evidence and Plaintiff never designated any

experts.  Accordingly, Plaintiff's claim for disparate impact under Title VII must be dismissed.

Plaintiff also <u>expressly confessed</u> Defendant's Motion with respect to her ADA claim.  **See**

**Opposition p. 1.**  Judgment, therefore, should enter against Plaintiff on that claim as a matter of

law.

<u>**DISCUSSION**</u>

I.     **PLAINTIFF'S OPPOSITION RESTS ON "UNDISPUTED FACTS" THAT ARE CONTRADICTED BY THE RECORD.**

As detailed below, Plaintiff's "undisputed facts" are made up of narrative statements from

her self-serving declaration, statements mischaracterizing testimony in the record, and

argumentative statements from counsel – none of which raise a genuine issue of material fact. [1]

In her opening paragraph of "facts,"  Plaintiff avers that she "is a female who never

hesitated to try anything a man would do, and this included competitive horsemanship, where she

competed in cutting horse events for prizes in many Western states."  **Opposition at 2, ¶ 1.**  Not

only is this statement completely irrelevant to any of the claims in dispute, there is no evidence

in the record to support this vague statement.

Plaintiff continues on with a claim that her former supervisor, Peter Smith, "thought it

was unusual that a woman would enjoy working in my position."  **Opposition at 3, ¶ 6.**  There is

no specific incident relayed to support this statement, nor is there corroborating evidence to

support Plaintiff's speculation about Mr. Smith's mindset.  Indeed, when asked in his deposition,

"Did you ever talk with Rebecca Capps about women in the industry?" Mr. Smith, replied, "Not

that I recall."  [Deposition of Peter Smith at 38:23-25, attached hereto as Exhibit J]  And as set

---

[1] At page 32 of the Opposition, Plaintiff starts her "Response to Defendant's Statement of Alleged Undisputed Material Facts."  The responses that follow reiterate the preceding 32 pages of the Opposition, and contain no new arguments.

forth in Defendant's Opening Brief, Mr. Smith was not the individual who made the decision to include Plaintiff in the RIF.  [Deposition of Rebecca Capps at 58:17-21, attached hereto as Exhibit K; Opening Brief at 10.]  Such "undisputed facts" are therefore insufficient to create a genuine issue of material fact.  See Volker v. T-Mobile USA, Inc., 2007 WL 951793 at *3 (D. Colo. 2007) (citing Salguero v. City of Clovis, 366 F.3d 1168, 1177 n. 4 (10th Cir. 2004)) ("assertions in [an] affidavit that [are] not supported in the record by corroborating evidence are insufficient to create a genuine question of material fact precluding summary judgment.").

Plaintiff goes on to state that, nonetheless she "always got the best raises in [her] salary" at the Company.  **Opposition at 4, ¶ 6.**  This "undisputed fact" actually contradicts Plaintiff's other claim – that she was treated unfairly by Defendant – as well as Plaintiff's sworn testimony in which she claimed to have been passed over "at least two times" for raises.  [Exhibit K at 33:25-34:5]

Next, Plaintiff claims that Mr. Smith, her boss before the May 2006 RIF, "was part of the network of good old boys who ran the company and watched each others backs."  **Opposition at 4, ¶ 11.**  Again, Plaintiff does not cite to the record or to any facts describing what would constitute such a "network"; she just cites to her own (argumentative and conclusory) declaration.  Moreover, these arguments from Plaintiff are not corroborated by any evidence in the record.  See Volker, 2007 WL 951793 at *3 (holding uncorroborated evidence insufficient to create genuine issue of material fact).  Plaintiff continues with her description of this " network" as one which "[n]o woman could ever break into. . . .  We were always outsiders.  The men all took care of each other, and sort of tolerated the women in their midst."  **Opposition at 5, ¶ 11.** This contention is only referenced in Plaintiff's Declaration, which acknowledges that

allegations included therein are based "upon information and belief" – not upon any first-hand knowledge.  See Declaration of Rebecca Capps at 1, attached hereto as Exhibit L, Opposition at ¶ 11.

Similarly, Plaintiff claims that "during the entire time [Mr.] Smith was the director of operations in global field services, there were only three females working there" and the Company "was a male operation. There was this background feeling that women were not tough enough to do this kind of work, or could not master the technical part of it . . . It happened repeatedly that I would meet someone and you could see the look on their face, like, 'Wow, a women was responsible for this work – and it was a hundred or two hundred miles of installations we were putting in and maintaining – and I was responsible for it.'"  **Opposition at 5-6, ¶¶ 13- 15.**  This statement is made without a single citation to the record.  And, Plaintiff's claim makes no reference to a specific time frame or the "someone" referenced by name or gender.  In addition, Plaintiff cannot show that anyone at the Company was aware of any of this "feeling" or shock at her role.  Moreover, Plaintiff's admission that she was in charge of such an allegedly "male dominated" field, and would get surprised reactions from others that she was "responsible this work" refutes her position that Level 3 was a "good old boys network" that would not put females in positions of responsibility;  Plaintiff clearly felt that she was in charge of important, large-scale operations.  See Exhibit L at ¶¶ 2, 6.  In addition, Plaintiff cannot establish a genuine issue of material fact simply because females are underrepresented in the workforce.  See Simpson v. Midland-Ross Corp., 823 F.3d 937 (6th Cir. 1987) ("[f]or statistics to be valid and helpful in a discrimination case, both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.").

Next, Plaintiff claims that Messrs. Bissani and Smith met at a restaurant in Denver, and that Mr. Bissani disclosed that "he was going to start his stint by implementing a so-called reorganization." **Opposition at 6, ¶ 16.** This false claim is contrary to any sworn testimony. Mr. Smith and Mr. Bissani both testified that they were directed by their boss, Tim Elbert, to combine the Outside Plant Manager positions. [Exhibit J at 48:8-16; Deposition of Kaily Bissani at 11:19-22, attached hereto as Exhibit M.] The decision was not Mr. Bissani's, but rather, a directive from his manager. [Exhibit M at 11:19-22.] Further, Plaintiff was not present at the restaurant; therefore, her assertion about what was or was not disclosed between Messrs. Bissani and Smith is pure conjecture and cannot create an issue of material fact. [Exhibit J at 40:9-22.]

Plaintiff also claims that "Benschop had no 'direct reports' i.e., he supervised no one." **Opposition at 7, ¶ 21.** This is a patent mischaracterization of the facts. Mr. Smith, in the same deposition testimony cited in the Opposition, explains that contractors – rather than Defendant's employees – were used to maintain the Metro Network, which was distinct from the long-haul, where Defendant's employees were in charge of maintenance. [Exhibit J at 72:5-8.] Mr. Benschop was, however, in charge of supervising and managing the <u>contractors</u>. [Exhibit M at 75:25-76:3.]

Plaintiff next claims that "Mr. Bissani never cared to look at Plaintiffs' credentials. His decision to fire plaintiff was entirely subjective, and Bissani's reasons were shown to be false and rife with mendacity as shown within this litigation." **Opposition at 7-8, ¶ 23.** This argumentative statement cannot masquerade as an "undisputed fact." Indeed, Plaintiff makes no citation to the record in support of this "fact." The record actually shows that Mr. Bissani did "care to look" at Plaintiff's credentials: Mr. Bissani testified that he reviewed all of his

subordinates' credentials upon assuming his position as Director of Operations.  [Exhibit M at 60:9-18, ("In trying to decide if she was qualified for the job, did you look at her resume?  Yes, I did. Yes, you did?  Yes, I looked at her resume.  Okay, And when was it that you did that? Actually, I looked at all of the resumes when I just took over the job, to understand what I have in my organization.")]

In addition, Plaintiff states that she and her employees had been responsible for metro work and she had "abundant" experience working with outside contractors, and completing related paperwork.  **Opposition at 8, ¶¶ 24-25.**  In support of this statement, Plaintiff cites to the deposition of  Justin Aimone, a male employee who previously reported to Plaintiff.   In fact, when asked "what install duties did you do that somehow related Metro?" Mr. Aimone testified: "most of that work, I guess, would entail installation of communication gear on the long-haul route in my area and in other areas, and I also assisted in the Denver Gateway on a <u>few</u> occasions. "  [Deposition of Justin Aimone at 9:7-20, attached hereto as Exhibit N.]  When Mr. Aimone was asked, "Did you consider that metro work? " he responded "I did not. "  [Exhibit N at 9:21-24.]  And Plaintiff's long-time boss, Mr. Smith, criticized her paperwork abilities to Mr. Bissani.  [Exhibit J at 62:22 – 63:3.]  Finally, although Plaintiff claims that "members of Plaintiff's crew had been <u>required</u> to train others in Denver," **Opposition at 8, ¶ 26**, the deposition testimony actually explains that Mr. Aimone was not required to train anyone, but provided some "unofficial training" on "a [single] piece of test gear," "just trying to be helpful. " [Exhibit N at 28:1-18.]

Plaintiff next claims that one of her employees, Bob Cooper, testified that Plaintiff was fully capable of performing the duties of Mr. Benschop's job.  **Opposition at 8-9, ¶ 29.**  Mr.

Cooper <u>actually</u> testified that he did not know what the metro job [Outside Plant Manager (Metro)] entailed.  [Deposition of Bob Cooper at 32:8-11, attached hereto as Exhibit O.]  ("Now, do you know what the metro job consisted of, what the duties were there?  No.")]

Plaintiff also alleges that Mr. Bissani "had an agenda to get all of the women out of his unit – fast.  And he did it."  **Opposition at 10, ¶ 34.**  This "fact" is only "supported" by Plaintiff's declaration, not evidence in the record.  Once again, Plaintiff's conclusory statement cannot raise a genuine issue of material fact to defeat summary judgment.  <u>See</u> Fed. R. Civ. P. 56(e); <u>see also</u>, <u>Finstuen v. Crutcher</u>, 496 F.3d 1139, 1144 (10th Cir. 2007) ("unsupported conclusory allegations . . . do not create an issue of fact.")

Further, Plaintiff argues that it is "undisputed" that Mr. Bissani decided to fire Kathy Bennett.  **Opposition at 10, ¶ 36.**  Yet, in her deposition, Plaintiff testified that Peter Smith (not Mr. Bissani) made the decision to fire Ms. Bennett.  [Exhibit K at 52:8-14.]  This fact is therefore disputed – by <u>Plaintiff</u>.

Plaintiff next claims that "Mr. Bissani also spoke to Plaintiff about Weber's pregnancy upon his arrival in Denver.  He said, with considerable concern, 'you know she's pregnant, don't you?'  This was an expression of concern that she would be unavailable for work soon rather than a concern about the momentous event of having a baby."  **Opposition at 11, ¶ 37.**  Plaintiff does not even attempt to cite to the record to support this allegation and such unsupported statements cannot defeat summary judgment.

In addition, Plaintiff claims that Mr. Bissani was demoted.  **Opposition at 11, ¶ 39.**  This too is refuted by the record, which Plaintiff does not cite.  In fact, Mr. Bissani applied for the Director of Operations position, and received a raise.  [Exhibit M at 54:19 – 55:2.]

Next, Plaintiff alleges that an unnamed group – "all of the women" - were fired by Mr. Bissani. **Opposition at 11, ¶ 39**. As set forth above, this claim is contrary to – among other things – Plaintiff's deposition testimony that there <u>were</u> no other women, and that Mr. Smith terminated Ms. Bennett's employment. [Exhibit K at 52:8-14.]

Plaintiff also attempts to support her claim for discrimination by making her own racially biased remarks. She claims that "[i]t may have had something to do with Kaily's Moroccan background, I don't know. I know this – women were second class citizens to him. He was rude and abrupt with females. He was dismissive of them in a way that you might see in the movies. I could tell the very first time I spoke with him that he rankled that a female would tell him anything about anything." **Opposition at 11, ¶ 41.** These offensive statements are only supported by Plaintiff's declaration; no specific facts or evidence in the record support these contentions. Furthermore, Plaintiff admitted under oath that contrary to her novel and "undisputed" facts, she did not have the opportunity to see Mr. Bissani interacting with other women. [Exhibit K at 222:22-25.] Plaintiff concludes that "the bottom line is that Mr. Bissani, regardless of nationality, was 'sexist' in the way he dealt with women." **Opposition at 11, ¶ 43.** Like Plaintiff's other statements, this argument is made without any corroborating evidence and cannot defeat Defendant's Motion. <u>See, e.g.</u>, **Opposition at ¶¶ 1, 6, 11, 15, 23, 34, 36, 37, 41, 43, 45, 47, 53, 58-60, 68, 82, 83, 92, 102, 105, 108, 118, 122 and 125.**

Plaintiff next claims that Mr. Bissani's performance evaluation of Plaintiff contained false criticisms of Plaintiff, including that she "lack[ed] leadership and management skills" and "was rarely available for anyone not in Wyoming." **Opposition at 12-13, ¶¶ 45-48.** The performance evaluation at issue clearly provides that Mr. Bissani is only relaying his discussions with

Plaintiff's former supervisor.  See Q1-2006 Total Reward Statement and Performance Summary, attached hereto as Exhibit P, ("She is the current OSP Long Haul Managers, and didn't work for me in Q1, however, I did receive input from her previous manager: . . . ").  See Exhibit P.  The review provides that, "Becky lacks leadership and management skills and lives 3 hours away from Denver."  See Exhibit P.  This fact is also corroborated by Mr. Smith's deposition testimony, where he states, "Becky was a strong outside plant person who had limited managerial diligence."  [Exhibit J at 58:7-12.]

Plaintiff also contends that she "spent more time with [her] Colorado responsibilities than [her] Wyoming responsibilities."  **Opposition at 13, ¶ 47.**  Plaintiff cannot cite to the record to corroborate this assertion.  And in fact, the sworn testimony shows that just the opposite was true.  Mr. Bissani testified that he instructed Plaintiff to increase her presence in the Denver Metro area, but she failed to do so.  [Exhibit M at 57:14-58:8.]  Over the course of her final four weeks, after she was told to increase her presence in Denver, Plaintiff went to the Denver Gateway office only seven days.  See Denver Gateway Security Access Log, attached hereto as Exhibit Q.

Next, Plaintiff claims that she believes she was the best qualified to take the Field Manager job.  **Opposition at 14, ¶ 51.**  This claim is directly contrary to evidence in the record.  Plaintiff's former boss testified that he did not believe Plaintiff could do the combined job.  [Exhibit J at 41:23-43:11.]  And, therefore, he never told Plaintiff that she was the best qualified.  [Exhibit J at 76:1-18.]  In any event, Mr. Smith was not the decision-maker, and thus, his perception does not create a genuine issue of material fact.  See Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988) (holding that it's the decision-maker's perception that counts).

Throughout her "undisputed facts" section, including paragraph 15, Plaintiff attempts to insert her own inferences and argument and then characterize these as "facts." Plaintiff states, for example, "at one point, Smith was deriding [Mr.] Forry's lack of qualifications for the new job and jokingly said to Plaintiff that he wondered if there were some naked pictures involved." "Pete Smith was joking, **but that would suggest** how illogical it was that Kaily would simply put Steve Forry in that job at the same time firing me." **Opposition at 15, ¶ 53 (emphasis supplied).** Again, Plaintiff's only citation is to her own Declaration, which is subject to Defendant's Motion to Strike. See Starkey v. Miller, 2007 WL 4522702 at *8 (D. Colo. 2007) ("Likewise, affidavits which contain conclusions of law or ultimate facts, or contain arguments and inferences, should be struck.").

Plaintiff also attempts to mislead this Court by misstating testimony. For example, she states, "[a]stoundingly, in his deposition, [Mr.] Smith claimed that he could not recall a single thing that he said to plaintiff on the topic of recommending her for the new job." **Opposition at 15, ¶ 54.** In fact, Mr. Smith testified that he <u>never</u> said he was recommending Plaintiff for the Field Manager job, and that he believed Plaintiff was not qualified for that job. [Exhibit J at 76:1-9.]

Plaintiff next claims that "Mr. Bissani never gave any reason for firing plaintiff to plaintiff's subordinates," and that "[i]f it had been a true RIF, he surely would have told them so." **Opposition at 15, ¶ 57.** This argument is just another improper inference that Plaintiff attempts to pass off as an "undisputed fact."

Plaintiff also claims, very colorfully, that "the defendant corporation would later foist the reorganization story on the EEOC." **Opposition at 16, ¶ 59.** This argument cannot be given any

credence as an undisputed fact.  Defendant's reasons for including Plaintiff in the RIF were

numerous, and have remained consistent from the date she was let go.  [See Position Statement

attached hereto as Exhibit R; Defendant's Responses to Plaintiff's First Discovery attached

hereto as Exhibit S; Scheduling Order attached hereto as Exhibit T; emails dated April 21, 2006-

April 24, 2006 attached hereto as Exhibit U.]

Next, Plaintiff claims that because Mr. Bissani and Mr. Forry's father previously worked

together at the Company, there was a "good old boy network."  **Opposition at 16, ¶¶ 60, 61.**

Plaintiff omits the fact that she got her job at Level 3 because she had previously worked with an

employee of Defendant while that person was at Sprint and Qwest.  [Exhibit K at 24:3-13]; see

also, Application for Employment at 2, attached hereto as Exhibit V, (listing Mickey Plemons as

a reference).  Thus, Plaintiff received the same networking credit that she now claims was

inappropriate.

In addition, the Field Manager position at issue in this case was a combination of

Plaintiff, Everett McCain, and Diron Benschop's former positions.  Plaintiff claims it is an

"undisputed fact" that the combination of these positions did not occur until December 2007.

**Opposition at 17, ¶ 65.**  In doing so, Plaintiff relies on the testimony of Bob Cooper, who

testified that the jobs were combined "just last week" in his December 20, 2007 deposition.

**Opposition at 17, ¶ 65.**  In the same deposition, however, Mr. Cooper testified that he did not

even know what Mr. Benschop's job entailed.  [Exhibit O at 11:21 – 12:9.]

> Q.    Did you work with Mr. Benschop?
> A.    No.
> Q.    Never?
> A.    Hardly ever.
> Q.    Well, do you know what his job title was when Ms. Capps worked there?

> A.    I think he was the metro – he had something to do with the metro outside plant manager or something like that, I have no idea.
>
> Q.    Okay.  And do you know what his job was after Mr. Forry came in?
>
> A.    No, I don't.

[Exhibit O at 11:21-12:9.]

> Q.    Well, let me ask you in another way.  I'm trying to find out what you may have observed.  Was Mr. Benschop's job ever combined into Ms. Capps' job?
>
> A.    I can't answer that.  *I couldn't tell you*.

[Exhibit O at 29:1-4 (emphasis added).]

Thus, Mr. Cooper's testimony regarding the combination of positions cannot be given any weight.  In addition, Mr. Cooper was not involved in the decision to combine the long-haul and metro positions.  That decision was made by the senior management at Level 3.  [Exhibit S at 5.]

Plaintiff also claims that Mr. Bissani "tipped off" Mr. Benschop that there was going to be a combination of long-haul and metro manager positions, and that if Mr. Benschop was interested in the combined position, he should apply for the job when it opened.  **Opposition at 18, ¶ 69.**  In fact,  Mr. Bissani encouraged everyone to apply for the position, including the Plaintiff.  [Exhibit M at 59:10-17.]  Plaintiff simply chose not to apply.  [Exhibit K at 96:8-9; 133:22-134:3.]

Further, Plaintiff claims that the Field Manager position was never posted while Plaintiff was a Level 3 employee.  **Opposition at 18-19, ¶ 70.**  Later in her Opposition, however, Plaintiff claims, "even as [Mr.] Bissani was planning to terminate plaintiff, her job was being advertised to be filled."  **Opposition at 24, ¶ 98.**  Plaintiff cannot keep her "undisputed facts" straight.

Plaintiff next asserts that during the May 2006 RIF, "to reduce headcount, Mr. Bissani's group actually increased head count." **Opposition at 20, ¶ 76.** This statement is unsupported by the record. Mr. Bissani testified that Mr. Benschop received a demotion, and thus, was no longer working under Mr. Bissani. [See Deposition of Steve Forry at 31:12-19, attached hereto as Exhibit W; see also, Deposition of Diron Benschop at 14:21-15:1; 18:9-14, attached hereto as Exhibit X.] Mr. Benschop was demoted to a technician and his new boss was Mr. Forry. [Exhibit M at 27:17- 28:1.] Mr. Bissani was a manager of managers, who successfully reduced his three managers (Mr. McCain, Plaintiff, and Mr. Benschop), to one manager (Mr. Forry). As Mr. Benschop testified, Mr. Benschop was demoted to field engineer and his boss after the demotion was Mr. Forry. [Exhibit M at 27:17- 28:1.]

Plaintiff subsequently claims that Mr. Benschop was offered his demotion to field engineer "the very next day" after Plaintiff was sent home and fired on April 25, 2006. **Opposition at 20, ¶ 79.** Plaintiff cites to Exhibit 25 of her Opposition. However, Exhibit 25 is an offer letter to Mr. Benschop for the position of Field Engineer, which is dated May 6, 2006. Thus, Plaintiff's argument in her Opposition directly contradicts the evidence. It is apparent that when Plaintiff's attempts to turn to the record to support her story fail, she turns to her self-serving Declaration. **See Opposition at 21, ¶¶ 82, 83 and 87.**

In addition, Plaintiff claims that Mr. Bissani never considered Mr. Benschop for the May 2006 RIF. **Opposition at 22, ¶ 89.** However, Mr. Bissani testified that he did not consider terminating Mr. Benschop in the same RIF as Plaintiff because every month the head count allocation changed. [Exhibit M at 64:24-65:6.] Mr. Forry testified that Mr. Bissani indeed discussed the possibility of laying off Mr. Benschop and might have done so. [Exhibit W at

18:19-19:11.]  Mr. Forry wanted to keep Mr. Benschop in a technical capacity, however, because of Mr. Benschop's extensive metro knowledge.  [Exhibit W at 19:5-11.]

Plaintiff also claims that Mr. Forry did not in fact take over the combined position (Field Manager), but simply assumed Plaintiff's duties in the long-haul.  **Opposition at 22-23, ¶ 91.** According to Mr. Benschop, however, Mr. Forry "was managing both the metro and the long haul at that point."  [Exhibit X at 20:25-21:6 (emphasis added).]

Moreover, Plaintiff claims that Mr. Forry telephoned Plaintiff weeks before he was hired as Field Manager and apologized to her, supposedly because he had been told by Mr. Bissani that he would be taking Plaintiff's job.  **Opposition at 23, ¶ 94.**  In fact, Mr. Forry testified that he saw the Field Manager position posted, and called both Plaintiff and Mr. Benschop because he knew they each held an Outside Plant Manager position (the positions that were combined to form this Field Manager position).  [Exhibit W at 63:3-64:21.]  Mr. Forry made these calls before he ever applied for the new position of Field Manager  [Exhibit W at 64:22-65:2.] Plaintiff attempts to color Mr. Forry's call to her as an apology for taking "her" job.  In fact, as Mr. Forry testified, he was only apologizing to Plaintiff that her job was posted, and not for "taking" it as Plaintiff claims.  [Exhibit W at 63:3-64:21.]  Thus, the evidence is contrary to Plaintiff's claim that Mr. Forry already had the Field Manager job when he called Plaintiff.

Plaintiff next argues that she was more qualified than Mr. Forry for the Field Manager position, and,

> [T]here was no comparing Steve's [Forry's] prior experience to mine.  By, any objective measure, I was more qualified than Steve.  Not only that, Steve told me he was on a performance plan when he was previously laid off from Level 3. That was one of the reasons he was laid off.  If you are on a performance plan, you are the first to be laid off.  So they hired back a guy who was on a

performance plan to replace me.  This only makes sense in the context of the good old boy network.

**Opposition at 25, ¶ 102.**  In support of these claims, Plaintiff again cites to just her Declaration, which must be stricken.  See Volker, 2007 WL 9572793 at *3.  Moreover, it's the decision-maker's opinion, here Mr. Bissani, that counts.  See Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988) (holding that it's the decision-maker's perception that counts).

Plaintiff also claims that "in his deposition [Mr.] Bissani added a new reason for firing plaintiff.  He claimed she had been 'disrespectful' to him." **Opposition at 25, ¶ 103.**  In fact, this reason was fully disclosed to Plaintiff years ago.  See Exhibit R ("she had poor interpersonal skills as reflected by her management performance history and her antagonistic communications with her manager.").  Moreover, the emails sent before Plaintiff's separation, on April 23, 2006 (at 3:31 PM), and April 24, 2006 (at 9:08 AM), from Plaintiff to Mr. Bissani were pointed out as disrespectful when they occurred.  See Exhibit U (response email from Mr. Bissani to Plaintiff at 1:14 PM).

Plaintiff argues that Mr. Bissani had already made the decision to fire Plaintiff and hire Mr. Forry prior to her disrespectful emails, and thus, the emails could not have been a reason for her termination.  **Opposition at 26, ¶ 105.**  Plaintiff also claims that she had already spoken to Mr. Forry before she sent the emails, so she was somehow justified in being disrespectful.

**Opposition at 26, ¶ 105.**  Plaintiff's story is inconsistent, however, with her email of 2:13 p.m. In that email, Plaintiff claims that her direct reports are being told that they will be working for Mr. Benschop, not Mr. Forry; Plaintiff never even mentions Mr. Forry.  See Exhibit U. Moreover, as supported by Mr. Bissani's email to Human Resources representative Greg Daub, (dated April 24, 2006, at 9:27 a.m.), Plaintiff's antagonistic and disrespectful communications to

16

Mr. Bissani indeed played a part in Plaintiff's treatment.  [See email dated April 24, 2006, at 9:27 a.m. from Mr. Bissani to Mr. Daub, attached hereto as Exhibit U.]

Plaintiff also claims that Mr. Bissani told Mr. Daub that he needed to terminate Plaintiff immediately because of Plaintiff's email to Bissani to "let [plaintiff] know what is going on." **Opposition at 27, ¶ 110.**  In the email at issue, however, Plaintiff is requesting information on the time frame for locating routes.  The sequence of emails is actually as follows:

> April 21, 2006 at 2:16 p.m.:  Mr. Bissani to Plaintiff: Make sure that all of the OSP Techs have access to that info for their routes.

> April 23, 2006 at 3:31 p.m.:  Plaintiff to Mr. Bissani:  Really?? Who do you think asked Cooper to get this info in the first place!!

> April 24, 2006 at 8:32 a.m.:  Mr. Bissani to Plaintiff:  What is this all about?

> April 24, 2006 at 9:08 a.m.:  Plaintiff to Mr. Bissani:  This means that I don't need you to tell me something that is obvious to me as I have run this area for over 6 years now and you need to realize that it was I that instigated Bob going out and getting this information in the first place.  What would be nice right now is if you would let me know what is going on and what the time frame is for the legacy level 3 people to start locating the legacy wiltel routes and to disseminate down to me some information that is important.  Thanks.

> April 24, 2006 at 9:27 a.m.: Mr. Bissani to Daub:  This is the reason why I need to RIF her ASAP.

> April 24, 2006 at 1:14 p.m.:  Mr. Bissani to Plaintiff:  **Rebecca, this email is very disrespectful; I don't tolerate this kind of behavior in my organization.  In the future, if you have an issue that needs to be discussed, please contact me directly.**  I have no problem sharing information that is important to you as long as it's appropriate to share.  Thanks.

See Exhibit U (emphasis added).

Further, Plaintiff claims that Mr. Bissani targeted Plaintiff soon after being "demoted to Denver, just like he targeted the other females.  Thereafter, it became a scramble for Bissani to fabricate barely plausible, but provably false, *ex post facto*

excuses to deal with plaintiff's claim of discrimination and the instant litigation."
**Opposition at 27, ¶ 111.**  None of these statements has any support in the record, and
Plaintiff makes no attempt to cite to the record.  **See also Opposition at 28, ¶ 112.**
Notably, Plaintiff fails to identify the "other females" Mr. Bissani allegedly "targeted."
**Opposition at 27, ¶ 111.**

Plaintiff next claims that Mr. Bissani came up with another "patently pretextual
reason" for passing over Plaintiff and hiring Mr. Forry from the outside instead – that
Plaintiff was unwilling to move to Denver.  **Opposition at 28, ¶ 114.**  What actually
occurred was that Mr. Bissani asked Plaintiff to be more available in Denver and increase
her presence at the Denver Gateway office.  [Exhibit M at 57:14-58:14.]  During the
month leading up to Plaintiff's termination, access logs show that Plaintiff – even after
being specifically reminded to be available in the Denver Gateway – was only present
seven days out of the next four weeks.  [Exhibit Q.]  Thus, although Mr. Bissani never
stated that Plaintiff was unwilling to move to Denver, he observed that she would rarely
show up there.  [Exhibit M at 57:14-58:14; see also, Exhibit P.][2]

Plaintiff failed to apply for the Field Manager position.  [Exhibit K at 96:8-9;
133:22-134:3.]  Plaintiff claims that she never applied because "she had been told that
[Mr.] Forry had already been hired for the job."  **Opposition at 30, ¶ 120.**  Earlier in her

---

[2] In addition, although not pertinent to Defendant's Motion for Summary Judgment, Plaintiff claims that undersigned counsel "contacted [Becky Shepard] and tried to get [her] to sign a false statement that said [Plaintiff] and [her] did not have a rental agreement when Becky would stay with [her] in Denver."  **Opposition at 28, ¶115.**  This statement is a bold mischaracterization.  Undersigned counsel spoke to Ms. Shepard in order to verify Plaintiff's discovery responses that Plaintiff did not have a lease with Ms. Shepard.  Ms. Shepard confirmed this fact and stated that she would sign a declaration to that effect.  When undersigned counsel drafted the declaration setting forth the conversation with Ms. Shepard, Ms. Shepard was told not to sign anything she did not agree with and to make any changes she wished.

Opposition, however, Plaintiff claims that "prior to her termination, [which was April 25, 2006], her job was being advertised to be filled." **Opposition at 24, ¶ 98.** Accordingly, Plaintiff could have, and indeed, should have, applied. Plaintiff cannot use Mr. Forry as an excuse for failing to apply, as Mr. Forry did not receive an offer for the Field Manager position until May 9, 2006. <u>See</u> Forry Offer Letter dated May 9, 2006, attached as Exhibit Y.

Plaintiff asserts, "this was all a bad joke" and that, "Kaily [Bissani] had no intention of keeping me employed." **Opposition at 30, ¶ 122.** There is simply no support for this conclusion, and as with Plaintiff's other conclusions, Plaintiff cites only to her own self-serving Declaration. **<u>See also</u>, Opposition at 31, ¶ 125.**

Plaintiff also claims that because Mr. Bissani "interviewed" Plaintiff for the Field Manager position, this somehow contradicts Defendant's statement – and the law of the Tenth Circuit – that Plaintiff still needed apply for the Field Manager job. **Opposition at 32, ¶ 129.** The two matters were separate. As stated by Plaintiff in her deposition, "in the discussion of the combined areas, Pete [Smith] informed me that there would be – they're looking to do one position, and it would be myself, Diron Binshop [sic.], and a WilTel employee [Everett McCain] . . . and the three of us were basically in line for this position." [Exhibit K at 93:19-94:2.] Indeed, there were three existing managers (including Plaintiff) whose positions were going to be combined. Mr. Bissani reviewed each of these individual's credentials and discussed the position with them. [Exhibit M at 60:3-62:1.] <u>Mr. Bissani still told the candidates that they had to apply for the position.</u> [Exhibit M at 59:12-17.]

II.     **PLAINTIFF CANNOT PROVE A *PRIMA FACIE* CASE OF DISCRIMINATION.**

A.      **Plaintiff Failed to Establish a *Prima Facie* Case of Disparate Impact .**

As set forth in Defendant's Opening Brief,  a "plaintiff may establish a *prima facie* case of disparate impact discrimination by showing that a specific identifiable employment practice or policy cause a significant disparate impact on a protected group. "  See Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1312 (10th Cir. 1999), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117, n.11 (2002).

In her Opposition, Plaintiff makes no argument in support of her claim of disparate impact.  She fails to point to any specific employment practice or policy she claims had a disparate impact.  She also fails to provide any statistical evidence regarding an alleged disparate impact on women.  Accordingly, this Court should grant Defendant's Motion  and dismiss Plaintiff's disparate impact claim.  See Defendant's Motion at pp. 13-16.

B.      **Plaintiff Failed to Establish a *Prima Facie* Case of Disparate Treatment.**

As set forth in Defendant's Motion, this case is a failure to hire case, and should be addressed under the framework for such a claim: (1) Plaintiff belongs to protected class; (2) Plaintiff applied; (3) despite being qualified, the Plaintiff was rejected; and (4) position remained open.  Kendrick v. Penske Transp. Services, Inc., 220 F.3d 1220, 1227 (10th Cir. 2000).  Plaintiff does not even address the failure to hire framework in her Opposition because she understands she cannot meet the *prima facie* elements of such a claim.  See Defendant's Motion at pp. 16-17.

Plaintiff also loses under the discriminatory termination theory advanced in her Opposition.  Plaintiff counters that her cause of action under Title VII consists of three elements: (1) she was in a protected class; (2) suffered an adverse employment action; and (3) was treated

less favorably than similarly situated employees not in the protected class.  **See Opposition at 44.**  For purposes of its Motion, Defendant does not dispute the first two elements.

As to the third element, however, Plaintiff attempts to pick and choose her comparators – and does so to avoid scrutiny based on her actual comparators.  The record supports the existence of two comparators, Diron Benschop and Everett McCain.  [Exhibit K at 56:1- 57: 7; 224:10-225:2; Exhibit M at 40:24-42:2.]  And Plaintiff admitted in her deposition that Messrs. Benschop and McCain were her peers.  [Exhibit K at 56:17-24; 224:10-16.]  The evidence shows nonetheless, that Mr. McCain (a male) was underlined(terminated in the same RIF as Plaintiff).  [Exhibit K at 224:23-225:2.]  Thus, McCain was a similarly situated employee, underlined(not in the protected class,) that was treated the same as Plaintiff.  Plaintiff testified that it was Messrs. McCain and Benschop, and herself, that were supposedly "in-line" for the new Field Manager position.  [Exhibit K at 93:19-94:7.]  In addition, Mr. Bissani, supervisor to Plaintiff and Mr. McCain, testified that Plaintiff and McCain performed the same job (and thus, were comparators).  [Exhibit K at 40:24-42:2.]

Mr. Benschop was selected for termination by Mr. Bissani as well.  [Exhibit W at 18:19 – 19:8.]  Subsequently, Mr. Forry wanted the benefit of Mr. Benschop's metro experience, and thus decided to retain Mr. Benschop, albeit in a lower position.  [Exhibit W at 18:8-19:11; Exhibit X at 14:21-15:1.]

In light of Defendant's similar treatment of Mr. McCain and Plaintiff, and demotion of Mr. Benschop, Plaintiff's *prima facie* case of disparate treatment fails.  Plaintiff cannot show that her two underline(male) comparators were treated more favorably.  Accordingly, this Court should also

grant Defendant's Motion for Summary Judgment with respect to Plaintiff's disparate treatment claim.

## III.    PLAINTIFF MISCHARACTERIZES THE SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate when the record shows "that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

Despite this long-established precedent, Plaintiff attempts to defeat Defendant's Motion by mischaracterizing the applicable standard.  Plaintiff alleges that "a mere 'suspicion of mendacity'" suffices to defeat a motion for summary judgment.  **Opposition at 47.**  This argument is contrary to the holding in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  In Reeves, the Supreme Court held a trier of fact may conclude that an employer discriminated based on "a plaintiff's *prima facie* case, ***combined with sufficient evidence*** to find that the employer's asserted justification is false [pretext.]" Id. at 135 (emphasis added).

Nor do cases cited by Plaintiff demonstrate that mendacity alone will defeat summary judgment.  See, e.g., Reynolds v. School Dist. No. 1, 69 F.3d 1523 (10th Cir. 1995) (affirming district court's grant of summary judgment in favor of defendant due to plaintiff's failure to raise a genuine issue of material fact as to pretext);  Ingles v. Thiokol Corp., 42 F.3d 616, 622023 (10th Cir. 1994), *abrogated on other grounds by* Martinez v. Potter, 347 F.3d 1208 (10th Cir. 2003) (rejecting plaintiff's argument that alleged inconsistencies in the testimony of the key decision-makers who selected plaintiff to be RIFed was sufficient evidence of pretext to defeat

summary judgment).  Plaintiff is still required to "bring forward specific facts showing a genuine

issue for trial as to those dispositive matters for which [it] carries the burden of proof."  <u>Simms v.

Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.</u>, 165 F.3d 1321, 1326 (10th

Cir. 1999).  Because Plaintiff has not done so, summary judgment should be granted for

Defendant.

## IV.    PLAINTIFF ALSO CANNOT PROVE PRETEXT.

In her Opposition, Plaintiff summarily claims that she has shown pretext by

"overwhelming" evidence and that Defendant's reasons for her termination are "unworthy of

credence."  <u>**See**</u> **Opposition at 45.**  This argument is simply not supported by the record.

For example, Plaintiff claims that Defendant's reasons for terminating Plaintiff's

employment have changed over the course of the litigation, thus proving pretext.  <u>**See**

**Opposition at 48.**  This allegation is directly contrary to the evidence.  On October 11, 2006,

Defendant responded to Plaintiff's Charge of Discrimination filed with the EEOC.  In its position

statement, Defendant reported that Plaintiff was included in the May 2006 RIF for several

reasons, not just one.  <u>See</u> Exhibit R.  The position statement clearly states that, "Charging Party

was terminated as part of a Reduction in Force because:  (1) her position was eliminated when

three manager roles were merged into one, and she lacked the experience needed for the merged

role; (2) she was less qualified for the remaining open positions than other employees; (3) she

failed to fulfill the requirements of her existing job even when reminded of them by her

supervisor; and (4) she had poor interpersonal skills as reflected by her management

performance history and her antagonistic communications with her manager."  <u>See</u> Exhibit R.

Each of Defendant's reasons, therefore, was consistently explained since the beginning of this

dispute.  Plaintiff's argument that Defendant is "fabricating" new reasons for her termination is contrary to the evidence.  See Exhibit R; Exhibit S; Exhibit P; Exhibit Q; Exhibit U.  A variety of reasons for a termination decision does not create pretext.  See Villiarimo v. Aloha Island Air, Inc., 281 F.2d 1054, 1063 (9th Cir. 2002) (upholding grant of summary judgment when employee was fired for two different, but consistent, reasons); Johnson v. Nordstrom, Inc., 260 F.3d 727, 733-34 (7th Cir. 2001) (explaining no pretext existed when employer's reasons for termination were neither inconsistent nor conflicting).  Here, there is nothing inconsistent between the reasons articulated at the time Plaintiff's employment was terminated and those proffered during litigation.  All stem from a belief that Plaintiff was an "adequate" Outside Plant Manager (long-haul), [see Exhibit J at 37:25-38:8], but not qualified for the combined Field Manager position.  [See Exhibit J at 64:4-10.]

Plaintiff claims, nonetheless, that "the Company's initial reason for terminating plaintiff—that it was merging her job with the job of another employee (Mr. Benschop) and thus only one of them would wind up with the combined job – was false.  Neither got the combined job – but only plaintiff was terminated."  **Opposition at 49, ¶ 2.**  Plaintiff does not even attempt to cite to the record.  And Defendant never indicated that only Plaintiff or Mr. Benschop would wind up with the Field Manager position.  Plaintiff even acknowledged that she was informed by her supervisor that at least three people were to be considered for the position.  [Exhibit K at 93:19-94:2.]

Plaintiff next claims that she was better qualified than Mr. Benschop for the Field Engineer position, and thus, should have been offered Mr. Benschop's demotion.  **See Opposition at 49, ¶¶ 3-4.**  There is no evidence that Plaintiff was better qualified.  Indeed,

Messrs. Forry and Bissani both testified that Plaintiff did not have the metro knowledge that Mr. Benschop possessed. [Exhibit W at 34:2-18; Exhibit M at 30:7-16.]

Plaintiff also attempts to mislead the Court by citing incomplete testimony and testimony taken out of context. **See Opposition at 49, ¶ 5** ("Even Benschop himself admitted, We did the same job . . . ."). Plaintiff and Mr. Benschop were both called Outside Plant Managers; however, Plaintiff and Mr. Benschop were responsible for distinctly different areas of the Defendant's network. [Exhibit J at 62:7-14.] Plaintiff's job was to manage the long-haul routes, and Mr. Benschop's job was to manage the Metro network. [Id.] The nature of the routes and networks is distinct. [Id.] As Plaintiff testified, "he [Mr. Benschop] was considered a peer of mine, but he worked in the Metro area." [Exhibit K at 56:8-24.] She further testified as follows:

> Q. Did you work with Diron on a day-to-day basis?
> A. No. He maintained the Metro area. We had defined lines drawn in the dirt where he started and I left off.

[Exhibit K at 57:8-11.]

In addition, Plaintiff's claim that she was never told that she was being RIF'd is also contradicted by her own testimony. **See Opposition at 49, ¶ 6.** Plaintiff knew that the Outside Plant Manager positions (from the Company and its newly acquired affiliate, WilTel) were being merged into one position and that her job was being eliminated. [Exhibit K at 93:10-94:7.] Plaintiff admitted that she was told that her position was being combined with at least one other job, and she understood that if she did not get the new position that she would be demoted or laid off. [Exhibit K at 93:10-94:7.]

Further, Plaintiff claims that Mr. Bissani told her that she "simply was not qualified for her job." **See Opposition at 49, ¶ 7.** This is also a mischaracterization. Mr. Bissani reported to

25

Plaintiff that she was not qualified for the combined position of Outside Plant Manager for the long-haul and the metro. [Exhibit K at 97:4-9.] This opinion was in fact shared by Plaintiff's previous supervisor, Pete Smith. [Exhibit J at 61:18-22.]

Plaintiff repeatedly characterizes Mr. Bissani's position as Director of Operations as a demotion. **See** **Opposition at pp. 1, 5, 13 at ¶ 49, 27 at ¶ 111; 49 at ¶ 7.** The record refutes this characterization. When Mr. Bissani's former position was eliminated, he applied for the Director of Operations position. [Exhibit M at 54:12-15.] Notably, his salary was increased. [Exhibit M at 54:13-55:9.] There is simply no evidence to support Plaintiff's claim that Mr. Bissani was demoted.

Next, Plaintiff argues that there was no reduction in head count because Mr. Benschop was demoted and remained employed. **See** **Opposition at 49, ¶ 8.** Plaintiff fails to account for Everett McCain, however; Mr. McCain was also an Outside Plant Manager. Mr. McCain was also laid off, with Plaintiff. [Exhibit K at 224:10-16.] Furthermore, there was a mandated head count from senior management for managers, not simply employees. [Exhibit S at 5.] Thus, with Benschop's demotion to Field Engineer, the number of managers in Field Operations was indeed reduced from three (Plaintiff, Messrs. McCain and Benschop) to one (Mr. Forry). And, Plaintiff's contention that the head count remained the same is without support.

Plaintiff also claims that Mr. Bissani "belatedly" disclosed that he fired plaintiff because "she was insubordinate." **See** **Opposition at 50, ¶ 10.** This allegation is refuted by Defendant's position statement submitted to the EEOC in October 2006, which specifically states that Plaintiff was terminated in part because of her antagonistic communications with her supervisor [Mr. Bissani.] See Exhibit R. Moreover, Plaintiff claims that she was only insubordinate, if at

all, because she had been told by Mr. Forry that he was taking her job.  **Opposition at 50, ¶ 10.**

The sequence of events does not support Plaintiff's poor excuse for her conduct.  Plaintiff claims

in her Opposition, that she received the call from Mr. Forry on April 24, 2006, where he

allegedly apologized for taking her job.  **Opposition at 26, ¶ 104.**  Plaintiff's antagonistic

communications with Mr. Bissani began on April 23, 2004.  See Exhibit U.

   Plaintiff also attempts to show pretext by lodging a number of unsupported allegations of

sexism against Mr. Bissani.  Plaintiff claims, for example, that "[Mr.] Bissani's interaction with

women was so grossly sexist as to be like something 'seen in the movies.'"  **See Opposition at

50, ¶¶ 11-14.**  Notably, Plaintiff does not point to any interactions with women that she

observed.  In her deposition, Plaintiff even testified that she could not have observed such

interactions.  [Exhibit K at 222:22-25.]

   Plaintiff also attempts to show pretext by claiming that Mr. Forry did not take over any of

Mr. Benschop's duties, and only took over Plaintiff's long-haul duties.  **See Opposition at 50,

¶¶ 15-17.**  Mr. Benschop testified, however, that Mr. Forry managed both the metro and the

long-haul in his new position, and that Mr. Forry performed additional new duties as well.

[Exhibit X at 19:14-17.]  Accordingly, Plaintiff's attempt to show pretext fails.

   Plaintiff then claims that she was more qualified than Mr. Forry for the Field Manager

position because she had more subordinates, more years of experience, and had maintained more

miles of network.  **Opposition at 51, ¶ 19.**  First, Plaintiff fails to account for the fact that her

long-time supervisor, Mr. Smith, testified that she lacked managerial diligence.  [Exhibit J at

58:7-12.]  Second, the "facts" she cites do not necessarily support the conclusion that Plaintiff

had better management skills.  And Plaintiff's subjective belief is irrelevant.  See Sanchez v.

Denver Public Schools, 164 F.3d 527, 534 (10th Cir. 1998) (employee's subjective beliefs are irrelevant).  In fact, Plaintiff had shown herself to be antagonistic and insubordinate.  See Exhibit U.

Plaintiff also alleges that the "good old boy network" was in operation because Mr. Benschop was saved from termination even though he "had previously done a poor job for Pete Smith."  **Opposition at 51, ¶¶ 20-22.**  Mr. Benschop was actually demoted from his manager position to a technical position, Field Engineer.  [Exhibit M at 14:21-15:1; 18:9-14.]  And Mr. Smith's criticisms of Mr. Benschop only related to his managerial skills, not his technical skills. [Exhibit J at 64:18-20.]

Plaintiff asserts that Mr. Bissani never checked out Plaintiff's prior experience or "managerial accomplishments."  **Opposition at 51, ¶ 23.**  Contrary to Plaintiff's unsupported contention, Mr. Bissani testified that he reviewed Plaintiff's resume, performance and work experience when he took over as her manager.  [Exhibit M at 60:19-61:3.]  Plaintiff cannot refute this evidence.

The remaining statements at pages 51-53 in the Opposition are just a reiteration of Plaintiff's "undisputed facts," which are addressed above.

Finally, Plaintiff contends that "Mr. Bissani decided inside of his own head to get rid of Plaintiff along with the other females."  **Opposition at 53.**  Plaintiff then contends that Mr. Bissani's decision-making was subjective, and as such, demonstrates pretext.  The mere use of subjective criteria does not suffice to prove intentional discrimination.  Doan v. Seagate Tech., Inc., 82 F.3d 974, 978 (10th Cir. 1996) (internal citation omitted).  See also, Bauer v. Bailar, 647 F.2d 1037, 1046 (10th Cir. 1981) ("Subjective considerations are not unlawful *per se*. . . . An

employer has discretion to choose among equally qualified candidates, provided that the decision is not based upon unlawful criteria." (internal quotation marks and citation omitted)). "[W]e typically infer pretext. . . only when the criteria on which the employers ultimately rely are entirely subjective in nature." Jones v. Barnhart, 349 F.3d 1260, 1267-68 (10th Cir. 2003).

And the issue before the Court is not whether Mr. Bissani's decision to terminate Plaintiff's employment was correct from a technical standpoint; the law does not require that the Court stand in the shoes of the Company and determine which candidate would have made the most qualified Field Manager. See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir. 1999). The issue is whether Mr. Bissani honestly believed that Plaintiff was not the most qualified applicant for the Field Manager position, considering factors other than Plaintiff's gender. See Doan, 82 F.3d at 978; see also, McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) (explaining no pretext exists where employer had good faith belief in reasons for adverse employment action, even if that belief was later found to be erroneous).

Plaintiff has failed to show pretext because she cannot show that Mr. Bissani did not honestly believe he was making the correct decision in hiring Mr. Forry or that Mr. Bissani ever considered Plaintiff's gender in choosing her for termination. See Kendrick v. Penske Transp. Services, Inc., 220 F.3d 1220, 1229 (10th Cir. 2000) (explaining that the court must examine the "facts as they appear to the person making the decision to terminated the plaintiff"). Thus, Plaintiff's claims fail.

## **CONCLUSION**

For the reasons set forth above, Defendant respectfully requests that this Court grant

Defendant's Motion for Summary Judgment.

Dated this 21st day of March, 2008.

BROWNSTEIN HYATT FARBER SCHRECK, LLP


s/Leah P. VanLandschoot
Meghan W. Martinez
Leah P. VanLandschoot
410 17th St., 22nd Floor
Denver, CO 80202
(303) 223-1100

ATTORNEYS FOR DEFENDANT
LEVEL 3 COMMUNICATIONS, LLC

## CERTIFICATE OF MAILING

The undersigned hereby certifies that on this 21st day of March, 2008, a true and correct copy of the foregoing **REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

olsenbrown@comcast.net

BROWNSTEIN HYATT FARBER SCHRECK, LLP


s/ Leah P. VanLandschoot
Meghan W. Martinez
Leah P. VanLandschoot
410 17th Street, Suite 2200
Denver, Colorado 80202
(303) 223-1100

ATTORNEYS FOR DEFENDANT
LEVEL 3 COMMUNICATIONS, LLC