# EXHIBIT R



**Carmel Gill**
Corporate Counsel
TEL:   (720) 888-7736
FAX:   (720) 888-5128
carmel.gill@level3.com

October 11, 2006

COPY

**VIA FAX & OVERNIGHT MAIL**

Mr. Andrew G. Williams
Supervisory Investigator
EEOC Office
Denver Field Office-541
303 East 17th Avenue, Suite 510
Denver, CO  80203

     Re:  EEOC Charge No. 541-2006-02495
          Charging Party: Rebecca Capps

Dear Mr. Williams:

This constitutes Level 3 Communications, Inc's ("Level 3") response to the Charge of Discrimination filed by Charging Party, Rebecca Capps.  Level 3 firmly disagrees with Charging Party's interpretation of events and, for the reasons set forth below, believes that the facts will lead you to the inevitable conclusion that a Finding of No Cause is warranted.

**Position Statement**

**I.    Introduction**

Charging Party was terminated as part of a Reduction in Force because: (1) her position was eliminated when three manager roles were merged into one, and she lacked the experience needed for the merged role; (2) she was less qualified for the remaining open positions than other employees; (3) she failed to fulfill the requirements of her existing job even when reminded of them by her supervisor; and (4) she had poor interpersonal skills as reflected by her management performance history and her antagonistic communications with her manager.  Charging Party's supervisors were not aware of any of Charging Party's alleged medical issues when they made the decision to terminate Charging Party.

Charging Party was an employee of Level 3 from August 30, 1999 until she was terminated as part of a Reduction in Force ("RIF") effective May 5, 2006 (the "May RIF").  Charging Party was aware that her employment was "at-will." *See*, Level 3 Communications, Inc. Human Resources Policies, Statement of Acknowledgement and Compliance, signed by Rebecca Capps, on August 27, 2002, attached hereto as Exhibit A.

Level 3 acquired five separate companies during the past year.  As part of the process of integrating the new companies, Level 3 has been identifying redundant positions and achieving

cost savings by eliminating redundant positions. Since January 2006, Level 3 has had monthly RIFs to eliminate redundant positions and achieve the cost savings anticipated by the acquisitions. Charging Party was one of more than 85 employees within the Field Services Division of Level 3, and one of 131 employees company-wide, let go during the May RIF.

## II. The May RIF

Kaily Bissani became Charging Party's supervisor on March 31, 2006. Prior to the May RIF, the Level 3 field services organization was divided into two groups – Inside Plant (also known as "Metro") and Outside Plant. Charging Party reported to Mr. Bissani, under the title of Outside Plant Manager, and managed a group of outside plant technicians. Also reporting to Mr. Bissani was Diron Benschop, Metro Manager, the manager of inside plant at the Level 3 Denver Gateway, as well as other individual contributors who worked on inside plant. Mr. Bissani also managed Everett McClain, a WilTel outside plant manager. As a result of Level 3's acquisition of WilTel, Inc. ("WilTel"), Mr. Bissani was required to merge the local WilTel field services organization with his Level 3 field services organization, and to eliminate redundant positions. Mr. Bissani combined the Level 3 inside plant and outside plant management responsibilities together with the WilTel outside plant project coordination, into a combined position titled "Field Manager," thereby eliminating two management positions. A copy of the Job Specifications for the Field Manager position is attached hereto as Exhibit B. Mr. Bissani also eliminated two field services technician positions as part of the May RIF. It should also be noted that Mr. Bissani's position changed from "Vice President" to "Director" in conjunction with the May RIF.

The Field Manager position required "10 years of inside and outside plant responsibilities, knowledge and experience along with a solid management track record and experience level." *See*, Exhibit B. Mr. Bissani and his supervisor, Tim Elbert, interviewed both of Mr. Bissani's existing managers for the new position, but determined that neither of them had the requisite skill set for the new combined management position. Charging Party lacked knowledge of the Metro (inside plant) portion of the Field Manager job, and, as discussed in detail below, had a poor management track record and negative attitude. Neither Mr. Bissani nor Mr. Elbert was aware of any medical condition affecting Charging Party at the time of the decision not to select her for the Field Manager position. Indeed, Mr. Elbert had joined Level 3 from WilTel only a few weeks prior, on March 11, 2006, and Mr. Bissani had only recently become Charging Party's supervisor. Mr. Bissani ultimately selected for the Field Manager position another candidate, Steve Forry, who possessed both inside and outside plant experience.

Mr. Bissani was also required to eliminate some of the technical positions within his group. Mr. Bissani looked at the qualifications of all of the employees within his group and selected the most qualified candidates. Charging Party was not selected because she lacked the Metro experience needed for the role, had failed to demonstrate that she could report to work at the Denver gateway (from her home in Wyoming) on a regular basis, had demonstrated performance problems over the past two years, and (as documented in her 2005 performance summary) had been unprofessional and antagonistic in her communications. Mr. Bissani was not aware of any

Level 3 00286    CONFIDENTIAL

Andrew G. Williams, Supervisory Investigator
October 11, 2006
Page 3

medical conditions affecting Charging Party at the time he made the decision to terminate her, nor was he ever made aware of any serious medical condition affecting her.

Other individuals affected by the May RIF were: (a) Diron Benschop, whose job changed from a manager position to a Field Engineer position; (b) Everett McClain, a WilTel manager who was let go; (c) Kathy Bennett, a Level 3 technician who was let go; and (d) Patricia Weber, a WilTel employee who was let go. All of the employees retained had superior field services skills to the employees who were let go.

### III. Charging Party's Performance History

Charging Party was hired as a Regional Manager for Level 3 in the Wyoming office. Charging Party's evaluations reflect that Charging Party performed well initially; however, in the final two years of her employment, Charging Party's performance declined significantly. For example, Charging Party's supervisor in 2004 writes:

> ". . . 2005 I look for Becky to enforce and lead with a "Get back to Basics approach". This means I feel Becky should get more involved with day to day activities and understand each and every order in her groups work queue [sic]. She should improve upon her own understanding of the systems used within Level 3. I feel she should inspect and enforce a cleanliness philosophy in her sites. She should perform more periodic visits to sites and inspect the readiness for emergencies of her team. I also think she needs to improve upon her diligence to the paper trail. . . ."

See, Reward Statement and Performance Summary – Q4 2004, attached hereto as Exhibit C, at page 2. Later in the Performance Summary, when discussing Charging Party's people management performance, her manager continues:

> "This is an area I feel Becky can improve. There is no question that Becky empowers her team, creates a positive work environment, and rewards success but I feel she can improve in other areas. Providing feedback driving people's [sic] performance and improvement is the main area I think she can improve. Certain individuals in her group have been identified as underperformers or malcontents but no feedback and corrective [sic] has occurred to improve the situation. This I think has weakened her team."

See, Id., at p. 3.

The following year, Charging Party's performance declined further. Her 2005 Performance Summary reflects in greater detail Charging Party's continuing failures: (a) to manage her team effectively; (b) to stay on top of the paperwork and workload, and (c) to understand and remain apprised of the day-to-day work of her team. For example, in discussing Charging Party's management performance, her 2005 supervisor writes:

Level 3 00287

CONFIDENTIAL

Andrew G. Williams, Supervisory Investigator
October 11, 2006
Page 4

> "The problem with Becky is she doesn't [sic] take the time or put the effort in the other side of management, day to day diligence in work order management, day to day diligence in understanding the details of all work in her area, day to day diligence in Operations science, lack of attention and neglect of professional report writing and deliverables, lack of attention to PWB writing and feedback to her team, in fact lack of attention to year end individual report. 1 sentence or two sentence write up on all objectives, spelling errors etc., also failure to properly document identified performance issues and deliver a PIP when called for ( actually on 2 reviews, multiple e-mails and multiple verbal request).
> . . . ."

*See*, Total Reward Statement and Performance Summary Q4-2005, attached hereto as Exhibit D at p. 2. The 2005 Performance Summary is replete with examples of Charging Party's failure to meet objectives, lack of urgency in responding to problems, insufficient knowledge of her team's workload, and lack of attention to detail, some of which lead to hostile communications among Charging Party, her supervisor, her supervisees and other departments within Level 3. *See, Id.* at pp. 3-4.

As a supervisor, Charging Party failed to manage her team effectively and failed to deliver Performance Improvement Plans for two problem employees when requested to do so by her manager. Charging Party's supervisor writes:

> "This is an area where Becky can improve, attention to the hard part of management, deliver a PIP with clear objectives when called for, force individuals with no interest in Level 3 to be accountable and manage them out in a professional documented manner protecting Level 3 the company while you do this. In this case Becky despite numerous written and verbal requests and coaching failed to deliver the PIP."

*See, Id.* at p. 6.

Charging Party's management failures and unprofessional communication style resulted in a successful claim for unemployment benefits against Level 3 in 2005. Jay Psomas, one of the senior technicians on Charging Party's team, filed a claim for unemployment benefits, claiming that he was forced to quit his job because of harassment by Charging Party. The Division of Employment and Training issued a decision in favor of Jay Psomas. In the appeal of this decision, the Hearing Officer found that "the claimant quit this employment due to harassment visited upon him by his supervisor, Rebecca Capps, by her management style, demeanor, and inability to communicate with him effectively." *See*, Hearing Officer's Decision from the Colorado Department of Labor and Employment, dated January 18, 2006, in Docket No. 19483-2005, a copy of which is attached hereto as Exhibit E, at p. 1.

The hearing officer concluded:

Level 3 00288

CONFIDENTIAL

> "The claimant painted a very persuasive and credible picture of the harassment visited upon him by his supervisor, Ms. Capps. Although each incident described, separately and individually, might not amount to harassing work conditions, taken under the totality of the circumstances, including the claimant's complaints to superiors of his mistreatment, they amount to a harassing work environment. The hearing officer is persuaded that Ms. Capps might be an adequate manager of operations, but she entirely failed to be a manager of people. She demonstrated managerial failings by approaching the claimant with a negative tone and accusatory approach, assigned urgent projects to the claimant at the last minute after sitting on them needlessly for hours, when she didn't have an urgent basis upon which to label the project as such, and unreasonably demanding overtime work.
>
> Reasonable managers, as recognized by Ms. Capps, do not approach their employees with negative accusatory approaches, do not falsely label projects as urgent, do not needlessly delay the assignment of urgent projects and then demand overtime work to perform them, and do not fail to follow their supervisor's direction to implement written job descriptions. Nor do they belittle the work and efforts of their staff. Therefore, the hearing officer is persuaded that a reasonable person, in the claimant's circumstances, would have similarly perceived an intolerably harassing environment and one which was unsatisfactory for the employee's continued personal health."

*See, Id.* at p. 2. The same management issues surface in Charging Party's Performance Summary for Q1 2006, where her manager, Mr. Bissani, writes:

> ". . . Becky lacks leadership and management skills and lives 3 hours away from Denver. Becky never managed a Metro OSP market before. Becky managed 5 EO's [sic], but was rarely available for anyone that doesn't live in Wyoming . . ."

*See,* Total Reward Statement and Performance Summary Q1 – 2006, attached hereto as Exhibit F, at p. 2.

### IV. Charging Party's Failure to Perform Job Obligations and Antagonistic Communications

In March 2006, Mr. Bissani informed Charging Party that in order to fulfill her existing job obligations, and to demonstrate her ability to meet the requirements of the new Field Services organization, she needed to report to the Denver Gateway at least 3 to 4 times per week. Charging Party failed to meet this requirement in 3 of the 4 weeks between that conversation and her termination.

Finally, Charging Party was unprofessional and antagonistic in her communications with her supervisor, Mr. Bissani, and others. One example of such communications is an email exchange as follows:

> **From:** Capps, Rebecca
> **Sent:** Monday, April 24, 2006 9:08 AM
> **To:** Bissani, Kaily
> This means that I don't need you to tell me something that is obvious to me as I have run this area for over 6 years now and you need to realize that it was I that instigated Bob going out and getting this information in the first place.
>
> What would be nice right now is if you would let me know what is going on and what the time frame is for the legacy level 3 people to start locating the legacy wiltel routes and to disseminate down to me some information that is important.
>
> Thanks
>
> ---
>
> **From:** Bissani, Kaily
> **Sent:** Monday, April 24, 2006 8:32 AM
> **To:** Capps, Rebecca
> What is this all about?
>
> ---
>
> **From:** Capps, Rebecca
> **Sent:** Sunday, April 23, 2006 3:31 PM
> **To:** Bissani, Kaily
> Really?? Who do you think asked Cooper to get this info in the first place!!
>
> ---
>
> **From:** Bissani, Kaily
> **Sent:** Friday, April 21, 2006 2:18 PM
> **To:** Cooper, Bob; Capps, Rebecca
> Please make sure that all of the OSP Techs have access to that info for their routes.
>
> ---
>
> **From:** Cooper, Bob
> **Sent:** Friday, April 21, 2006 2:16 PM
> **To:** Capps, Rebecca; Bissani, Kaily; Garr, Nathan
> Am able to access the Wiltel One Call web page and see the locates for southern Wyoming. Will advise Aimone if there are locates from Table Rock site to the west. thanks
>
> Bob Cooper
> Level 3 Communications
> 303-478-3244

[Portions redacted]. *See*, email string attached hereto as Exhibit G.

## V. Conclusion

Level 3 strictly adheres to its Equal Employment Opportunity policy (Exhibit H). Charging Party was terminated from employment with Level 3 because Charging Party was not as qualified as other candidates for the positions remaining within the local Field Services division after the merger with WilTel. Charging Party also had a history of deteriorating performance with Level 3 and a number of instances of antagonistic, unprofessional communications and behavior that made her a less attractive candidate than others in the group.

CONFIDENTIAL

Andrew G. Williams, Supervisory Investigator
October 11, 2006
Page 7

Please do not hesitate to contact me if you need any additional information.

                                                Very truly yours,

                                                Carmel Gill
                                                Corporate Counsel

CONFIDENTIAL

Level 3 00291